**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| VS. | § | CRIMINAL  NO. H-07-434 |
| | § | |
| | § | |
| BP PRODUCTS NORTH AMERICA INC. | § | |

**MEMORANDUM AND ORDER**

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        A.    The Clean Air Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        B.    The Explosion at the Texas City Refinery . . . . . . . . . . . . . . . . . . . . . . . 9
        C.    The Regulatory and Internal Investigations . . . . . . . . . . . . . . . . . . . . . . 14
              1.    The CSB Report and the Baker Report  . . . . . . . . . . . . . . . . . 14
              2.    The OSHA Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . 16
              3.    The TCEQ Agreed Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        D.    The Criminal Investigation and Plea Agreement  . . . . . . . . . . . . . . . . . 18

III.    The Legal Standard for Accepting or Rejecting a Rule 11(c)(1)(C) Plea  . . . . . . 28

IV.     The Objections to the Proposed Plea  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        A.    Objections that the Victims No Longer Assert or Press  . . . . . . . . . . . . . 37
        B.    The Present Objections  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

V.      The Fine  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
        A.    The Applicable Statutory Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . 43
        B.    Disputed Issues Relating to § 3571(d) . . . . . . . . . . . . . . . . . . . . . . . . 45
              1.    The Loss or Gain To Be Measured . . . . . . . . . . . . . . . . . . . . . . 45
              2.    The *Apprendi* Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
              3.    Causation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
              4.    Whether Calculating Gain or Loss Under § 3571(d) Would "Unduly
                    Complicate or Prolong the Sentencing Process"  . . . . . . . . . . . . . 61
                    a.    Multiple Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
                    b.    Disputed Causation and Other Issues  . . . . . . . . . . . . . . . 64

          c.     Future Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

C.    Analysis of the Victims' Objections to the $50 Million Fine . . . . . . . . . . 71

    1.    Calculation Based on Gain  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

          a.    The Information and Charged Offense  . . . . . . . . . . . . . . . 73

              i.     The Scope of the Information . . . . . . . . . . . . . . . . . 73

              ii.    The Charged Offense and Other Offense Conduct  . 75

          b.    The Victims' Proposed Bases for Determining Gain  . . . . . 78

              i.     Fine Based on Profits . . . . . . . . . . . . . . . . . . . . . . . 78

              ii.    Fine Based on Cost Savings . . . . . . . . . . . . . . . . . . . 80

              iii.   Fine Based on the Cost-Saving Estimate that Forms the
                    Basis for the Proposed Plea . . . . . . . . . . . . . . . . . . . 82

    2.    Calculation Based on Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

          a.    The Victims' Submissions . . . . . . . . . . . . . . . . . . . . . . . . . 88

          b.    Worker's Compensation Records  . . . . . . . . . . . . . . . . . . . 94

D.    Conclusion as to the Victims' Objections to the Fine . . . . . . . . . . . . . . . 95


VI.    The Victims' Objections to the Terms of Probation . . . . . . . . . . . . . . . . . . . . . . . 96

A.     The OSHA Settlement Agreement and the Sawyer Report . . . . . . . . . . . . 99

    1.    Whether BP Products Improperly Controlled the Audit  . . . . . . . 102

    2.    Whether the Audit's Sampling Practices Were Improper  . . . . . . 103

    3.    Whether the Time Frame Is Acceptable . . . . . . . . . . . . . . . . . . . . 112

    4.    Whether BP Products's Remediation Response Has Been Adequate
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

    5.    Whether BP Products's Provision of Data for Follow-Up Reports Is
          Proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

B.    The TCEQ Agreed Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

C.    Whether an Independent Monitor Is Necessary . . . . . . . . . . . . . . . . . . . 120

D.    Conclusion as to the Objections to the Proposed Probation Terms . . . . . 124


VII.   Whether This Court Should Order a Presentence Investigation and Report  . . . 125


VIII.  Whether the CVRA Violation Provides a Basis for Rejecting the Plea . . . . . . . 129


IX.    Whether To Accept or Reject the Proposed Plea . . . . . . . . . . . . . . . . . . . . . . . . 133


X.     Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

2

## I.      Introduction

BP Products North America, Inc. entered a plea of guilty to an information charging a felony violation of the federal Clean Air Act.  The charge arises from the March 23, 2005 explosion at the Texas City, Texas plant that killed 15 and injured scores.  The plea agreement stipulates the sentence: a $50 million fine and three years of probation with the conditions that BP Products comply with a Settlement Agreement reached with the Occupational Safety and Health Administration ("OSHA") and an Agreed Order imposed by the Texas Commission on Environmental Quality ("TCEQ").

The United States asks this court to accept BP Products's guilty plea under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  Under Rule 11(c)(1)(C), if this court accepts the plea, it must impose the stipulated sentence.  This court has the responsibility of deciding whether to accept or reject the proposed plea.

Victims of the explosion have objected.  The victims have been given the opportunity to participate in court hearings.  The victims and their lawyers have spoken at these hearings and many victims have submitted written impact statements.  Through their lawyers, the victims have also filed numerous briefs and voluminous information, including a report on environmental and safety compliance prepared for the civil cases filed after the explosion. The victims have been heard and their views fully considered.

The victims' arguments include that the fine is too low and the probation conditions are too lenient.  The government responds that it aggressively prosecuted BP Products. When BP Products signed the plea agreement, it would have been the first company

3

criminally convicted of knowing violations of the Risk Management Plan regulations of the Clean Air Act.[1]  The $50 million fine will be the largest criminal fine imposed against a single corporation under the Clean Air Act and the largest criminal fine imposed for a fatal industrial accident.   The proposed probation conditions include compliance with requirements imposed after the explosion for extensive process safety and environmental improvements at the Texas City refinery.  The government states that it required BP Products to plead to the highest offense that could have been charged based on the evidence, despite the fact that lesser charges were available.  (Docket Entry No. 18 at 4, 10–11).  The victims are not asking this court to reject the plea because of the offenses charged.  (Docket Entry No. 66 at 100–01).

BP Products points out, and the victims have not disputed, that the fine is not the only financial consequence that BP Products will bear as a result of the explosion.  In addition to paying over $1.6 billion to the victims to settle approximately 4,000 civil cases, BP Products has also paid almost $21.7 million in fines to OSHA and to the TCEQ and will pay over $265

---

[1]        Since BP Products and the government signed the plea agreement, at least one other corporation has been criminally convicted of a knowing violation of the RMP regulations.  On September 24, 2008, Hershey Creamery Company pleaded guilty to one felony count under 42 U.S.C. § 7413(c)(1) for violating the RMP regulations promulgated under 42 U.S.C. § 7412(r)(7).  The case involved the improper storage and use of anhydrous ammonia as part of the refrigeration operations at two of Hershey's facilities.  There were no fatalities.  Under the plea agreement, Hershey agreed to pay a $100,000 fine and serve one year of probation.  *See* Plea Agreement, *United States v. Hershey Creamery Co.*, No. 08-0353 (M.D. Pa. Sept. 24, 2008).  The district court entered judgment on the plea on November 5, 2008.  *See* Judgment, *United States v. Hershey Creamery Co.*, No. 08-0353 (M.D. Pa. Nov. 5, 2008).

million to do the work required under the OSHA Settlement Agreement and the TCEQ Agreed Order.  (Docket Entry No. 8 at 10–11).[2]

A fine is just that.  It is not intended to be compensation to the victims or payment for safety improvements.  The victims have not objected to the proposed plea on the basis that restitution is not part of the stipulated sentence.

In deciding whether to accept or reject the proposed plea, this court's task is to make an individualized assessment of the stipulated sentence based on the facts and circumstances specific to this case.  A court may not reject a plea proposed under Rule 11(c)(1)(C) based on broad policy grounds or on a categorical basis.  A court's discretion to reject a plea is also limited by the constraints of the judicial, as opposed to the prosecutorial, role.  A court may not reject a proposed plea because it believes that additional crimes or additional defendants should have been charged; such decisions are up to the prosecutor.  Nor may a court insert itself into the plea-bargaining process by modifying or rewriting the proposed plea and sentence.  A court may only evaluate the plea that the parties have proposed, not a hypothetical plea that the court might prefer but the parties have not presented.  A court must accept or reject the proposed plea and explain why, but may not modify or change its terms.

---

[2]        As a result of inspections of the Texas City facility conducted by the Environmental Protection Agency in the wake of the 2005 explosion, BP Products also recently entered into a civil settlement under which it must implement over $161 million in new pollution controls, pay a $12 million civil penalty, and complete a $6 million supplemental project.  This civil settlement addresses pollution control, maintenance and monitoring, and internal management violations at the Texas City facility unrelated to the cause of the 2005 explosion. *See* Sixth Amendment to Consent Decree, *United States v. BP Exploration & Oil Co.*, No. 2:96-cv-0095 (N.D. Ind. Feb. 19, 2009); Press Release, Environmental Protection Agency, *BP Products to Pay Nearly $180 Million to Settle Clean Air Violations at Texas City Refinery* (Feb. 19, 2009).

A disciplined and careful analysis of the facts and circumstances, under the applicable law and statutes, is required.

Based on the pleadings, the briefs, the statements, the submissions, the arguments, and the applicable law, this court finds that the proposed plea satisfies the purposes that the law recognizes as controlling.  The victims' arguments that the plea agreement is too lenient fail to recognize the statutory constraints that apply and the risks to the government if the plea were rejected.  The court must take into account "the exigencies of plea bargaining from the government's point of view," including "limited resources and uncertainty of result."  *United States v. Bundy*, 359 F. Supp. 2d 535, 538 (W.D. Va. 2005).  The issues in this case, one of the few in which the government has successfully applied a felony criminal statute to an industrial accident, present significant risks that absent the plea, the government would not be able to prevail or would only obtain a $500,000 fine.  These risks have been considered in weighing the adequacy and reasonableness of the proposed plea terms.

Considering the specific facts and circumstances presented in this voluminous record, including the victims' objections, this court finds that the proposed plea is a reasonable disposition given the available alternatives, the risks they present, and the limits inherent in the statutes that the government can use to obtain a felony conviction to punish conduct leading to an industrial accident.  Accordingly, this court accepts the proposed plea.

The reasons are stated in detail below.

## II.     Background

### A.     The Clean Air Act

BP Products pleaded guilty to a criminal information charging it with a felony violation of the Clean Air Act, 42 U.S.C. § 7413(c)(1), which imposes criminal penalties for knowing violations of certain provisions of the Clean Air Act,[3] including violations of regulations enacted under 42 U.S.C. § 7412(r)(7).  Section 7412(r)(7) was enacted in 1990, in the wake of the disaster at the Union Carbide plant in Bhopal, India, to "prevent accidental

---

[3]     Many of the convictions obtained under § 7413(c)(1) have been against individuals.  These cases are of limited value to the analysis in this case because the sentences typically involve a term of imprisonment, an option not available for organizational defendants like BP Products.  *See, e.g., United States v. Alghazouli*, 517 F.3d 1179, 1194 (9th Cir. 2008) (affirming a 41-month sentence against an individual convicted under § 7413(c)(1) of the unlawful importation of R-12 freon, an ozone-depleting substance); *United States v. DiMaio*, 255 F. App'x 537, 538–39 (2d Cir. 2007) (affirming a 42-month sentence against an individual convicted of violating § 7413(c)(1)); *United States v. Dykes*, 244 F. App'x 296, 300 (11th Cir. 2007) (affirming a 24-month sentence against an individual convicted of failing to comply with work-practice standards, in violation of § 7413(c)(1)); *United States v. Peters*, 349 F.3d 842, 849–50 (5th Cir. 2003) (rejecting the individual defendants' arguments that their convictions for violating § 7413(c)(1) failed as a matter of law, but remanding for new trial on other grounds).  A limited number of § 7413(c)(1) convictions have also been obtained against organizational defendants.  In 2007, for example, a jury convicted Citgo Petroleum Corp. under § 7413(c)(1) of two knowing violations of regulations promulgated under Title 40 of the C.F.R.  *See* Minute Entry, *United States v. Citgo Petroleum Corp.*, 2:06-cr-0563 (S.D. Tex. June 27, 2007).  Sentencing is pending.  In 2006, Longley-Jones Management Corporation pled guilty under Rule 11(c)(1)(C) to a violation of  § 7413(c)(1).  The defendant paid a $4 million sentence, $3 million of which was suspended on the condition that it be applied to asbestos cleanup and the implementation of the Environmental Compliance Plan that was a special condition of its two-year term of probation.  *See* Judgment, *United States v. Longley-Jones Mgt. Corp.*, No. 06-0190 (N.D.N.Y. July 12, 2006).  In 2005, Tyler Pipe Company pleaded guilty under Rule 11(c)(1)(C) to a violation of § 7413(c)(1) and was sentenced to pay a $4.5 million fine, fulfill a Compliance Agreement, and submit to a five year period of probation.  *See* Judgment, *United States v. Tyler Pipe Co.*, No. 6:05-0029 (E.D. Tex. Apr. 12, 2005).  The fine was based on the defendant's cost savings from failing to comply with the Clean Air Act.  The parties did not specify how the fine was calculated, except to say that the cost savings figure was an estimate "based on multiple assumptions."  *See* Motion to Waive Presentence Report, *United States v. Tyler Pipe Co.*, No. 6:05-0029 (E.D. Tex. Mar. 22, 2005).  In 2002, in *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1037, 1053 (9th Cir. 2002), the Ninth Circuit affirmed the organizational defendant's conviction under § 7413(c)(1) and other statutes and a $600,000 fine and five years' probation.  Of that fine, $520,000 was for Clean Water Act violations, based on a $5,000 per-day charge over 104 days.  *Id.* at 1053.  The Clean Air Act portion of the fine was not disputed.  *Id.*

releases of regulated substances."  42 U.S.C. § 7412(r)(7).  The Environmental Protection Agency acted under § 7412(r)(7) to promulgate the Risk Management Plan (RMP) regulations set forth in 40 C.F.R. § 68.1 *et seq*.  The RMP regulations codify requirements for Process Safety Information systems, which companies are required to implement to prevent chemical and petrochemical plant releases.  Substantially similar regulations known as Process Safety Management (PSM) regulations are promulgated and enforced by OSHA. *See* 29 C.F.R. § 1910.119.[4]  The government decided to prosecute BP Products under the RMP regulations because the PSM regulations do not allow a felony penalty and contain a lower default maximum fine.  (Docket Entry No. 96 at 4 n. 7).[5]

BP Products pleaded guilty to violating two of the regulations promulgated under § 7412(r)(7):  40 C.F.R. § 68.73(b), which requires the owner or operator of a plant such as the Texas City refinery to establish and implement written procedures to maintain the ongoing

---

[4]      OSHA's Appendix to the PSM regulations states that "[t]he major objective of process safety management of highly hazardous chemicals is to prevent unwanted releases of hazardous chemicals into locations that could expose employees and others to serious hazards."  29 C.F.R. § 1910.119, App'x C. "Process safety management is the proactive identification, evaluation and mitigation or prevention of chemical releases that could occur as a result of failure in processes, procedures, or equipment."  *Id.*  The regulations are aimed as much at ensuring that employers have systems in place to detect safety hazards as at determining whether such hazards in fact exist.  *Id.*

[5]      Under the Occupational Safety and Health Act, an employer whose willful violation of a PSM regulation results in the death of an employee may be punished by imprisonment up to six months for the first offense and a fine consisting of the greater of $10,000 or twice the pecuniary gain or loss that results from that offense.  29 U.S.C. § 666(e); 18 U.S.C. § 3571(d).

Tyson Foods Inc. recently entered a plea under Federal Rule of Criminal Procedure 11(c)(1)(B) to one count under § 666(e).  The plea agreement proposes a sentence of a $500,000 fine and one year of probation for the death of a maintenance employee after exposure to hydrogen sulfide gas.  *See* Plea Agreement, *United States v. Tyson Foods, Inc.*, No. 4:09-4001 (W.D. Ark. Jan. 6, 2009).  The court has not yet entered judgment or imposed a sentence.  Under Rule 11(c)(1)(B), the court will not be bound by the proposed sentence and may impose different terms.

integrity of process equipment; and 40 C.F.R. § 68.87(b)(2), which requires the owner or operator of such a plant to warn contractors working on or adjacent to a "covered process" of the known potential fire, explosion, or toxic-release hazards related to the contractor's work and the process.[6]  BP Products and the government jointly moved the court to waive the presentence investigation and accept the proposed plea.  (Docket Entry No. 8).

### B.   The Explosion at the Texas City Refinery

The facts set out in this section include those that BP Products admitted in the Statement of Facts that accompanied the joint motion for waiver of the presentence report. (*Id.*, Ex. A; Docket Entry No. 96, Ex. 6).  Other sources of information about the explosion include a report by the United States Chemical Safety and Hazard Investigation Board ("CSB")[7] after an extensive two-year investigation, *see* U.S. Chem. Safety & Hazard Investigation Bd., BP TEXAS CITY: FINAL INVESTIGATION REPORT (Mar. 20, 2007) (Docket Entry No. 8 at 3, Ex. 2), and a report published after an internal investigation led by former Secretary of State James Baker, *see* JAMES A. BAKER *ET AL.*, REPORT OF THE BP U.S. REFINERIES INDEPENDENT SAFETY REVIEW PANEL (January 2007) (the "Baker Report").[8]

---

[6]      Under 40 C.F.R. § 68.73, the term "process equipment" includes: "(1) Pressure vessels and storage tanks; (2) Piping systems (including piping components such as valves); (3) Relief and vent systems and devices; (4) Emergency shutdown systems; (5) Controls (including monitoring devices and sensors, alarms, and interlocks); and (6) Pumps."

[7]      The CSB is an independent federal agency charged with investigating the root causes of industrial chemical accidents.  The CSB was authorized by the Clean Air Act Amendments of 1990 and became operational in January 1998.  The CSB on occasion collaborates with the EPA, OSHA, and other agencies.  *See* U.S. Chemical Safety and Hazard Investigation Board, CSB Mission & History, http://www.chemsafety.gov/index.cfm?folder=Mission_History&page=index (last visited March 6, 2009).

[8]      A copy of the Baker Report is available at the Chemical Safety Board's website, at (continued...)

The Texas City refinery is the largest BP Products refinery in the United States. When BP Products acquired the refinery in 1999, it was an aging facility.  Parts of the process unit involved in the March 2005 explosion were nearly fifty years old.  The refinery covers more than 1,200 acres and in March 2005 employed approximately 1,800 permanent staff and 2,000 contract workers.  The plant included twenty-nine different refining units and four chemical units and had the capacity to process approximately 460,000 barrels of crude oil a day.  (Docket Entry No. 8, Ex. A at 3; Ex. 2 at 194, 218–19; Docket Entry No. 96, Ex. 6 at 3).

The explosion occurred in the plant's isomerization unit ("ISOM unit").  The ISOM unit's main function was to increase the octane in a chemical component of gasoline.  The ISOM unit had several process components, including a pressure vessel known as a "raffinate splitter."  The raffinate splitter was a 164-foot tall tower that could hold approximately 3,700 barrels.  The explosion occurred as the raffinate splitter was restarted following a shutdown for maintenance and repairs.

"Raffinate" describes gasoline components that are being or have been refined.  The raffinate splitter separated the components into "heavy" and "light" raffinate.  Heavy raffinate emerged from the splitter as a hydrocarbon liquid that could be blended into jet fuel or unleaded gasoline.  Light raffinate emerged as hydrocarbon vapor.  The process involved

---

[8](...continued)
http://www.csb.gov/completed_investigations/docs/Baker_panel_report.pdf.

high pressures and temperatures.  The resulting vapor was highly volatile and could easily ignite.  (Docket Entry No. 8, Ex. A at 4; Docket Entry No. 96, Ex. 6 at 4).

The raffinate splitter had a set of pressure-relief valves and headers intended to prevent excess pressure build-up from hydrocarbon vapors.  There were different options in the ISOM unit for using the relief valves to direct the release of the hydrocarbon vapors.  Written procedures required that during a normal startup of the raffinate splitter, a flare system was to be used to burn off the hydrocarbon vapors before they were released into the open air.  Although no written procedures authorized the practice, another option was to direct the hydrocarbons to a "blowdown stack."  The blowdown stack used water to cool some of the hydrocarbon vapors into liquid and released the remaining vapors through the stack into the open air.  Under its written procedures, BP Products was permitted to release hydrocarbons from the blowdown stack to the open air in the case of an emergency or process upset, after providing advance notice to the TCEQ.  (Docket Entry No. 8, Ex. A at 2–5; Docket Entry No. 96, Ex. 6 at 2–5).  BP Products had not performed a study since at least 1999 to determine whether the blowdown stack had the capacity to release hydrocarbons safely.  The blowdown stack in the ISOM unit had been in poor operating condition since at least April 2003.  (Docket Entry No. 8, Ex. A at 8, 10–11; Docket Entry No. 96, Ex. 6 at 8, 10–11).

During the month before the explosion, the ISOM unit was shut down for maintenance and repairs.  Around March 21, 2005, BP Products maintenance personnel informed ISOM unit personnel that critical alarms for that unit had not been properly inspected.

Nevertheless, on March 23, the raffinate splitter was restarted.  (Docket Entry No. 8, Ex. A at 11–12; Docket Entry No. 96, Ex. 6 at 11–12).   Restarting the splitter was the most dangerous phase of operating the ISOM unit because of the reintroduction of hydrocarbons in the presence of elevated temperatures and pressure.  Although federal regulations required BP Products to establish and implement specific written instructions for operators and supervisors and to ensure that alarm systems and process safety components in the ISOM unit were operating correctly, *see* 40 C.F.R. §§ 68.69(a), 68.73(b), on the morning of March 23, 2005, safeguards important to the safe startup of the raffinate splitter either had not been established through written procedures or the written procedures that did exist were not being followed.

The acts that BP Products has admitted as knowing violations of the RMP regulations include the following:

- BP Products failed to notify nonessential employees and nonessential contractors located in temporary office trailers close to the raffinate splitter that the startup was going to occur.

- The bottom of the raffinate splitter was filled above the level permitted under the written procedures for startups. This had become a common practice for raffinate splitter startups.

- The ISOM unit's control board operator had filled the tower with raffinate feed but heavy and light raffinate were not being emptied.  A control instrument showed that the level of feed in the tower was decreasing when in fact it was increasing, and the operator did not see the increase.  The required instrument checks were not performed before the startup, despite knowledge that there was a question about whether the sight glass on the

12

tower used for visually checking the product level in the tower was functioning properly.

- Alarms failed to function or were ignored.  BP Products knew that the alarms had not been inspected but allowed the startup to proceed.

- The blowdown stack rather than a flare was being used to release excess hydrocarbon vapors, an unauthorized but common practice.  There was no emergency that required sending the hydrocarbons to the blowdown stack rather than the flare.  The TCEQ had not been notified in advance.

- BP Products had not treated the overfill of the raffinate splitter as a credible threat and had chosen not to perform a "what-if" scenario to study what would occur if the splitter overfilled.

- BP Products had failed since 1999 to perform a relief-valve study on the ISOM unit blowdown stack to determine whether it had adequate capacity to release excess hydrocarbons safely.

- An April 2003 inspection showed deficiencies in the blowdown drum and stack, including that the quench system did not operate and baffles used to reduce the amount of released vapors were corroded and did not operate as designed.  BP Products nonetheless continued to use the blowdown drum and stack.

(Docket Entry No 8, Ex. A at 8–12; Docket Entry No. 96, Ex. 6 at 8–12).

At 1:15 p.m., on March 23, 2005, excess liquid pressure and temperature had been building up inside the raffinate splitter for several hours.  Hydrocarbon vapors and liquids were released from the raffinate splitter into the blowdown stack.  The volume of the hydrocarbon liquid exceeded the blowdown stack's capacity.  Hydrocarbon liquid was released out of the top of the stack and flowed down, reaching the ground.  A vapor cloud

13

formed and migrated away from the blowdown stack.  An ignition source, believed to be the running engine of a truck parked nearby, caused the hydrocarbon vapor cloud to explode. Fifteen people working in two temporary trailers approximately 150 feet away from the stack died.  At least 170 other workers in the plant were injured.  (Docket Entry No. 8, Ex. A at 7–8; Docket Entry No. 96, Ex. 6 at 7–8).

BP Products has admitted that it knowingly violated the RMP regulation requiring it to "establish and implement written procedures to maintain the on-going integrity of process equipment." 40 C.F.R. § 68.73(b).  BP Products has also admitted that it knowingly violated the RMP regulation requiring it to inform contractors in the vicinity of the raffinate splitter of the risks posed by the restart.  40 C.F.R. § 68.87(b)(2).

### C.    The Regulatory and Internal Investigations

After the explosion, investigations were conducted by federal agencies, including the CSB, OSHA, and the Department of Justice; by Texas agencies, including the TCEQ; and internally by BP Products through the Baker panel.

### 1.    The CSB Report and the Baker Report

The CSB Report on the explosion issued on March 20, 2007.  The Baker Report issued in January 2007.  The CSB Report examined "immediate causes," "possible root causes," "cultural issues," and "corrective actions."  The Baker Report focused on the role of BP Products's corporate hierarchy and culture, studying "the effectiveness of BP's corporate oversight of safety management systems at its five U.S. refineries and its corporate safety culture."  (Baker Report at ix).  Both reports emphasized that BP Products's parent

14

company, headquartered in London, had implemented budget cuts that adversely affected the Texas City refinery, including its process safety management systems.  (Docket Entry No. 8, Ex. 2 at 157–59; Baker Report at 59).  The plant was aging when BP Products acquired it in 1999, with equipment and infrastructure in decline.  But rather than committing resources to repair equipment and address safety problems that had been identified in audits and investigations – problems that included a lack of proper process safety management – BP Products's parent company implemented budget cuts.  The CSB concluded that a "lack of investment compromised safety" and that budget cuts by BP Products's parent company "did not consider the specific maintenance needs of the Texas City refinery."  (Docket Entry No. 8, Ex. 2 at 157–58).  The Baker Report concluded that "BP has not always ensured that it identified and provided the resources required for strong process safety performance at its U.S. refineries."  (Baker Report at xii).

The CSB Report summarized by stating that "[c]ost-cutting, failure to invest and production pressures from BP Group executive managers impaired process safety performance at Texas City."  (Docket Entry No. 8, Ex. 2 at 25).  The CSB Report identified various decisions affected by budget cuts and pressures: reduction in maintenance spending for a decade; "impaired training, operations staffing levels, and mechanical integrity"; and the decision on several occasions "not to replace the ISOM blowdown system" with a flare system.  (*Id.*, Ex. 2 at 188).  The reports acknowledged that although BP Products had focused on "personal safety," it had not focused on "process safety."  (*Id.*, Ex. 2 at 210; Baker Report at x).  The victims argue that the "root causes" of the explosion were the parent

15

company's budget cuts and refusal to provide the resources necessary to achieve process safety compliance at the Texas City refinery.  (Docket Entry No. 16 at 7–10; Docket Entry No. 28 at 5).

## 2.    The OSHA Settlement Agreement

On September 22, 2005, BP Products and OSHA signed a Settlement Agreement under which BP Products paid a $21,361,500 penalty and "agreed to perform extensive upgrades and improvements to equipment and process safety management ('PSM') systems at the Refinery."  (Docket Entry No. 94 at 3; Docket Entry No. 96, Ex. 2).  BP Products was required to retain an external expert, subject to OSHA's approval, "to conduct a comprehensive audit and analysis of the PSM systems at BP Products' Refinery and assess the robustness of the PSM systems."  (Docket Entry No. 96, Ex. 2 at 2).  The audit, which was to be "conducted in accordance with best practices in the industry," was to include, but was not to be limited to, the following:

> (1) the safe location of personnel in relation to hazardous processes; (2) the safe movement of vehicles into process areas; (3) the construction of fired and unfired pressure vessels, particularly the relief of overpressures to a safe location, in accordance with 29 C.F.R. 1910.106(i)(3) and the referenced ASME codes; (4) the classification of hazardous locations as defined in 29 C.F.R. 1910.399; (5) the notification of contractors and employees regarding potential hazards; (6) the inspection and maintenance of alarms providing personnel with notification of hazardous conditions that may be developing; (7) the standard operating procedures (particularly start-up and emergency shut-down procedures); (8) the adequacy of pressure relief for individual pieces of equipment; (9) the adequacy of safety instrumented systems; (10) human factor analysis; and (11) lock out/tag out programs, procedures, and applications.

(*Id.*, Ex. 2 ¶ 1(b)(1)–(11)).  The auditor was to complete, and  BP Products was to forward to OSHA for review, an initial report, two biannual progress reports, and one final report detailing deficiencies found and recommendations for correction.  (*Id.*, Ex. 2 at 3–4).  BP Products was required to implement "all feasible recommendations" in these reports.  Within thirty days of each audit report, BP Products was required to file a statement of action, informing OSHA which recommendations it would implement and the steps taken toward implementation.  If BP Products chose not to implement certain recommendations, it was required to provide detailed reasons for that decision.  (*Id.*, Ex. 2 at 4).

Other requirements of the OSHA Settlement Agreement included that BP Products would: retain an organizational expert, subject to OSHA's approval, to conduct an organizational systems audit, (*id.*, Ex. 2 at 5–7); conduct safety and health training to ensure that all employees and contractors understood the hazards to which they might be exposed, and how to prevent harm from those hazards, (*id.*, Ex. 2 at 7–8); submit logs of occupational injuries and illnesses to OSHA every six months for three years, (*id.*, Ex. 2 at 8–9); abate the specific conditions identified during OSHA's investigation,[9] (*id.*, Ex. 2 at 9–13); and permit OSHA to verify and monitor the abatement, (*id.*, Ex. 2 at 13–14).  In addition to the $21.3 million fine that it has already paid, BP Products estimates that compliance with the OSHA Settlement Agreement will cost $15 million.  (Docket Entry No. 8 at 10–11).

---

[9]    One such abatement requirement was that BP Products would shut down the ISOM unit and submit an abatement action plan to OSHA at least 90 days before restarting the unit.  BP Products states that it has no plans to restart the ISOM unit.  (Docket Entry No. 94 at 14).

The Settlement Agreement explicitly gives "OSHA (including its experts) access to the Texas City Refinery to determine progress and compliance with this Agreement." (Docket Entry No. 96, Ex. 2 at 14). It also permits OSHA, through an enforcement order entered by the Fifth Circuit under 29 U.S.C. § 660(b), to pursue civil contempt remedies against BP Products. (*Id.*, Ex. 4).

### 3.    The TCEQ Agreed Order

BP Products was already under investigation by the TCEQ before the March 23, 2005 explosion for exceeding emissions limits in several of its Texas City facility process units. On May 31, 2006, BP Products and the TCEQ signed an Agreed Order that assessed a penalty of $336,556 and "require[d] BP Products to undertake a substantial program of improvements to control and reduce emissions from its flares." (Docket Entry No. 94 at 18; Docket Entry No. 96, Ex. 3). A number of the compliance items in the Agreed Order are not scheduled for completion until 2011. (Docket Entry No. 96, Ex. 3-A § 7). BP Products states that compliance with this Order will cost $250 million. (Docket Entry No. 8 at 10–11).

### D.    The Criminal Investigation and Plea Agreement

The DOJ also investigated the explosion at the Texas City refinery. As part of its investigation, the government communicated with many affected by the explosion, including those pursuing civil litigation against BP Products. (Docket Entry No. 26 at 31–32; Docket Entry No. 63 at 5). Lawyers representing many of the victims in civil cases "worked very close[ly] with the Department of Justice to try to get them the information that [they] were deriving from the civil litigation." (Docket Entry No. 120 at 149–150). One of the lawyers

representing the victims in this case was also liaison counsel for the plaintiffs' steering

committee in the victims' state-court civil litigation.   At a hearing before this court, that

lawyer explained the nature and extent of his work with the DOJ before the plea was

negotiated:

> On a regular basis, [DOJ] attorneys would come in, first from
> Houston, later from Washington.   We were closer to the
> documents that were being produced in the [civil] discovery. .
> . . [A]s we evolved more into the litigation, we understood better
> the regulatory compliance issues . . . and the emissions problems
> they were having there. . . . [W]e shared that information [with
> the DOJ].

(*Id.* at 150).   At another hearing in this court, another lawyer who represented both plaintiffs

in civil cases against BP Products and victims in this criminal case confirmed that he had been

subpoenaed by the DOJ before the plea agreement was executed and that he "provided very

important documents to them."  (Docket Entry No. 26 at 31).   Before the proposed plea was

announced, counsel for some of the victims had also shared with the government the opinions

of Michael Sawyer, a regulatory expert who worked on behalf of the civil plaintiffs, about BP

Products's regulatory compliance issues.  (Docket Entry No. 120 at 150–51).   The government

"remained in contact with counsel for the victims through the investigation [and] benefitted

from their cooperation with the investigation."  (Docket Entry No. 63 at 5).   Not all victims

had this degree of contact or communication with the government before the plea agreement

was executed.  (Docket Entry No. 117 at 2 n.1).

On October 18, 2007, before any charging instrument was filed, the government filed

a sealed *ex parte* motion seeking "an order outlining the procedures to be followed under the

Crime Victims' Rights Act."[10]   (Docket Entry No. 54, Ex. 1 at 3).   In that motion, the government stated that it was engaged in plea negotiations with BP Products; a plea agreement was anticipated to be signed by October 25, 2007; and the plea was expected to be entered in late November 2007.  (*Id.*, Ex. 1 at 2).   The motion stated that due to the large number of victims in the case, "consulting the victims prior to reaching a plea agreement would not be practicable."  (*Id.*).   The government recognized in the motion that the Crime Victims' Rights Act (CVRA) provides victims a "reasonable right to confer with the attorney for the Government in the case."   The government invoked the CVRA section stating that "in a case where the court finds that the number of crime victims makes it impracticable to accord all of the crime victims the rights described in subsection (a), the court shall fashion a reasonable procedure to give effect to this chapter that does not unduly complicate or prolong the proceedings."   18 U.S.C. § 3771(d)(2).   The government asserted that "a reasonable procedure to give effect to the Crime Victims' Rights Act" was to provide prompt notice to victims and their families of their rights under the CVRA after the plea agreement was signed and to have an extended period before entry of the plea.   During that period, the government would send victims notice of their CVRA rights, including information on any hearings; a contact telephone number with updates on the case status; points of contact at the U.S. Attorney's Office and/or the Department of Justice; and "updates and case information" on a website and/or the Victim Notification System. (Docket Entry No. 54, Ex. 1 at 3).   The plea

---

[10]      The sealed *ex parte* motion was filed on October 18, 2007, as a miscellaneous matter under cause number MC-07-623.   The order was signed by the judge handling the miscellaneous docket on that date.

hearing would be delayed to ensure that victims could receive notice and fully exercise their rights to attend and be heard.   On the same day the *ex parte* motion was filed on the miscellaneous docket, October 18, 2007, a district court judge issued a sealed order approving this arrangement.  (*Id.*, Ex. 2 at 1).

On October 22, 2007, the government filed the criminal information, under seal.  The information charged a single count: the knowing violation, under 42 U.S.C. § 7413(c)(1), of two regulations under 42 U.S.C. § 7412(r)(7).  The information stated:

<u>Knowing Violations of Risk Management Practices</u>

20.   Between in or about January 1999 and on or about March 23, 2005, in Texas City, Texas, within the Southern District of Texas, the defendant, BP PRODUCTS NORTH AMERICA INC., did knowingly violate a requirement promulgated pursuant to the Clean Air Act, Title 42, United States Code, Section 7412(r)(7); specifically, defendant BP PRODUCTS NORTH AMERICA INC. knowingly failed to do the following:

a.   Establish and implement written procedures to maintain the ongoing mechanical integrity of process equipment, in violation of Title 40, Code of Federal Regulations, Section 68.73(b).

b.   Inform contract owners and operators of the known potential fire, explosion, or toxic release hazards related to the contractors['] occupation of temporary trailers in the vicinity of the ISOM Unit, in violation of Title 40, Code of Federal Regulations, Section 68.87(b)(2).

(Docket Entry No. 1 at 7–8).

Two days later, on October 24, 2007, the government and BP Products signed a plea agreement  under which BP Products agreed to plead guilty to the information.  As part of the plea agreement, BP Products conceded that it knowingly failed to establish and implement

written procedures to maintain the ongoing integrity of the raffinate splitter in the ISOM unit and related process equipment, in violation of 40 C.F.R. § 68.73(b), and that it failed to inform its contractors of the risks associated with the restart of the raffinate splitter and the risks of siting contractor trailers in the near vicinity of the ISOM unit blowdown stacks, in violation of 40 C.F.R. § 68.87(b)(2).  (Docket Entry No. 8 at 6–7).   Under the proposed plea, BP Products agreed to pay a $50 million fine within three days of sentencing and a $400 special assessment immediately upon sentencing, and to serve a three-year probation term.  During probation, BP Products would be required to comply fully with the OSHA Settlement Agreement and the TCEQ Agreed Order.  The plea agreement provided that if BP Products is unable to comply with its obligations under the TCEQ Agreed Order within the three-year probation term, the probation term will be extended to the statutory maximum of five years, with "compliance with and completion of the TCEQ order as the only term[s] of the extended probation period."  (Docket Entry No. 96, Ex. 1 at 2).  The plea agreement required BP Products to cooperate with the government in its ongoing investigation of other possible criminal violations related to the explosion, including making its employees available to participate in judicial proceedings; making documents, records, and other technical information relating to the explosion available to the government; and providing the government access to the Texas City refinery.  (*Id.*, Ex. 1 at 2–3).

On October 25, 2007, the day after the United States and BP Products signed the plea agreement, a magistrate judge signed an order unsealing the criminal information.  The

proposed plea was announced at a press conference that received extensive coverage. But the *ex parte* order was not unsealed at that time.

After the criminal information was unsealed and the plea agreement filed and announced, the government mailed written notices to victims in compliance with § 3771(a) of the CVRA.[11] The notices advised the victims of the proposed plea and the plea agreement,

---

[11]     A "crime victim" is defined under the CVRA as a person:

>     directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia. In the case of a crime victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardians of the crime victim or the representatives of the crime victim's estate, family members, or any other persons appointed as suitable by the court, may assume the crime victim's rights under this chapter, but in no event shall the defendant be named as such guardian or representative.

18 U.S.C. § 3771(e). Victims have the following rights under the CVRA:

(1)     The right to be reasonably protected from the accused.

(2)     The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3)     The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4)     The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5)     The reasonable right to confer with the attorney for the Government in the case.

(6)     The right to full and timely restitution as provided in law.

(7)     The right to proceedings free from unreasonable delay.

(8)     The right to be treated with fairness and with respect for the victim's dignity and privacy.

(continued...)

the dates and times of court proceedings, and that the victims had a right to attend and be heard at those proceedings.[12]  On the day the plea agreement was announced, the government set up a telephone number and website that provided current information about the criminal case, established a procedure for submitting victim-impact statements, and made the victim-witness coordinator for the U.S. Attorney's Office for the Southern District of Texas available to answer victims' questions.  These notices by the government were reinforced by extensive media coverage and by the fact that most of the victims had counsel representing them in civil lawsuits.

On November 16, 2007, BP Products and the United States jointly moved under Rule 32(c)(1)(A)(ii) of the Federal Rules of Criminal Procedure for a waiver of the presentence investigation and report and acceptance of the plea agreement.  (Docket Entry No. 8).  On November 20, 2007, a week before a hearing set for November 27, 2007, twelve victims – Alisa Dean, Ralph Dean, Tracy Donaie, Tyrone Smith, Ronald Duhan, Mary Ann Duhan, Michael Jordan, Sandra Thomas, Kelly Porter, Calvin Thomas, Henry Rivera, and Maria

---

[11](...continued)
18 U.S.C. § 3771(a).  The CVRA also provides that the government must make its best efforts to "see that crime victims are notified of, and accorded, the rights described in subsection (a)," including the "reasonable right to confer with the attorney for the Government in the case" and the right to be "treated with fairness." § 3771(c)(1).

[12]        On November 2, 2007, the U.S. Attorney's Office mailed written notices to approximately 180 victims, advising them of the proposed plea agreement and informing them that they had an opportunity to be present and to be heard at the plea and sentencing hearing.  On November 16, 2007, the U.S. Attorney's Office sent out another notice, stating the date and time and place of the hearing and requesting confirmation as to whether the victims wished to attend.  The U.S. Attorney's office sent a third notice on January 11, 2008 to inform the victims that a hearing on the proposed plea agreement was set for February 4, 2008.  (Docket Entry No. 66 at 13–14).  The government also provided notice of subsequent hearings on July 16, 2008, and October 7, 2008.

Rivera – moved through counsel for leave to appear and be heard under the CVRA and asked the court to reject the proposed plea agreement or at least defer decision and require a presentence investigation. (Docket Entry No. 9). Nine other victims – Kenneth Grant, George Hardin, Lee Dusek, Jason Wimberly, Liberato Solis, Jorge Patino, Rodolfo Mendoza, Luis Villazana, and Jerett Pahkala – filed a similar motion through counsel on November 23, 2007. (Docket Entry No. 14). On November 27, 2007, the case was reassigned to this court.

At a status conference held on November 28, 2007, lawyers for numerous victims appeared and urged that they and their clients be heard in opposition to the proposed plea agreement. This court granted the requests. The victims submitted extensive information supporting their opposition to the proposed plea agreement. At the hearing, liaison counsel for the plaintiffs' steering committee in the state-court civil litigation also agreed to communicate with the other plaintiffs' counsel to be sure that the plaintiffs in those cases were informed of their rights under the CVRA, including the right to attend hearings and to be heard on the proposed plea and sentence. (Docket Entry No. 26 at 44). The government worked with counsel handling the many civil cases relating to the explosion to ensure that the victims received notice of their CVRA rights.

At a February 4, 2008 hearing, BP Products entered its guilty plea under Rule 11(c)(1)(C). Lawyers for the victims filed motions and extensive briefs with supporting materials in opposition to the proposed plea. One hundred and thirty-four individuals filed victim-impact statements. At the hearing, the court allowed all those present who wanted to

speak to do so.  Ten individuals spoke in open court.[13]  The lawyers representing the victims presented arguments on their request that this court reject the proposed plea.

One of the asserted grounds for rejecting the plea was the government's failure to respond to two letters  – one sent on December 21, 2007 and one sent on January 11, 2008 – asking for an explanation of how the $50 million fine was calculated.  The day after the victims filed a motion asserting that the government had violated the victims' "reasonable right to confer" by failing to respond to the letters, the government moved to unseal the October 2007 *ex parte* motion and order.  On February 5, 2008, the victims moved to reject the proposed plea on the ground that the October 18, 2007 *ex parte* motion and order granting it, as well as the government's failure to answer the two letters later sent by one of the lawyers representing the victims, violated the victims' "reasonable right to confer" with the prosecutors and to be treated with fairness.  On February 21, 2008, this court issued an opinion holding that these asserted CVRA violations were not in themselves a basis for rejecting the proposed plea.  (Docket Entry No. 72).  The victims petitioned the Fifth Circuit for a writ of mandamus.  On May 7, 2008, the Fifth Circuit denied the petition.

---

[13]     The speakers included Robbie Gracia, whose statement was read by her daughter, Nicole; David Senko; Eva Rowe; attorney Sherry Chandler, who spoke on behalf of Patricia Myles; David Leining; Ronald James Peavy; attorney Edward Mallett, who read a statement from Ralph Dean; Becky Linsenbardt; Robin Soileau; and Jose Montemayor.  The following lawyers for victims and victims' groups were present: Edward Mallett and Paul Cassell for the Dean Group; Michael Holley for the Lanier Firm; Sherry Chandler on behalf of the Chandler Law Firm; Tommy Gillaspie on behalf of the Gillaspie Law Firm; Brent Coon and Art Gonzalez on behalf of Brent Coon & Associates, the Liaison Plaintiffs' Steering Committee of the BP Explosion, the general counsel of the United Steelworkers, and Eva Rowe and David Senko; and Tony Buzbee on behalf of Nicole Pina, Robbie Gracia and Jeremy Gracia.

The Fifth Circuit held that the *ex parte* procedure had violated the CVRA, concluding that because "there were fewer than two hundred victims . . . it [wa]s not reasonable to say that notification itself" would have been too difficult or that the government could not confer "in some reasonable way with the victims before ultimately exercising its broad discretion" to execute a plea.  (Docket Entry No. 79 at 6-7).  The court concluded that:

> [t]he Act gives the right to confer.  The number of victims here did not render notice to, or conferring with, the victims to be impracticable, so the victims should have been notified of the ongoing plea discussions and should have been allowed to communicate meaningfully with the government, personally or through counsel, before a deal was struck.

(*Id.* at 7).[14] But the Fifth Circuit agreed with this court that the alleged CVRA violations were not grounds for the relief sought.  Observing that 134 victims had filed impact statements, and that ten had spoken in open court at the February 4, 2008 hearing, the court concluded that the victims had been "allowed substantial and meaningful participation."  (*Id.*).  The Fifth Circuit concluded that "the better course" was to "deny relief, confident that the district court will take heed that the victims have not been accorded their full rights under the CVRA and will carefully consider their objections and briefs" "in deciding whether the plea agreement should be accepted."  (*Id.* at 8).

---

[14]    The precise number of victims has not expressly been addressed.  The government stated that it gave direct notification under the CVRA to over 180 individuals and family members.  The Fifth Circuit assumed that that there were fewer than 200 victims.  The government based the victims that it notified on BP Products's records of those who received medical attention on the day of the explosion.  (Docket Entry No. 66 at 13–14).  The government recognizes that the definition of "victim" in the CVRA is expansive.  4,000 civil lawsuits were filed as a result of the explosion, indicating far more than 180 victims.  The government has worked with counsel for the victims in the civil cases to ensure that notice under the CVRA was widely disseminated to all the victims.  The victims have not asserted that the plea should be rejected because of inadequate notice by the government.

After the Fifth Circuit's opinion, the victims – most through counsel – and the parties appeared at a July 16, 2008 hearing before this court.  At the hearing, this court invited the victims to submit additional briefing and exhibits on the adequacy of the proposed fine and of the proposed terms of probation.  The court specifically invited the victims to submit information about their losses and, over the parties' objections, allowed the victims to provide their expert's report on BP Products's compliance with the OSHA Settlement Agreement.  (Docket Entry No. 84 at 9, 43–44).  The parties were given the opportunity to respond.  The victims and the parties appeared at another hearing before this court on October 7, 2008, to present argument on the victims' submissions and the parties' responses.  (Docket Entry No. 120).

Four fatalities associated with the Texas City refinery have occurred since the March 2005 explosion.  Three of these deaths – all to employees of contractors – were unrelated to the type of conduct that led up to the March 2005 explosion.  BP Products apparently has not been implicated in these deaths.  The fourth death, of BP Products employee William J. Gracia, occurred when a 500-pound lid blew off of a water-filtration unit with defective bolts in the plant's Ultracracker unit during startup on January 14, 2008.  BP Products entered a settlement with OSHA, agreeing to correct six regulatory violations and to pay a $28,000 fine. (Docket Entry No. 110, Ex. 1; Docket Entry No. 111).  A member of Gracia's family spoke in court to object to the proposed plea in this case.  (Docket Entry No. 66 at 50–54).

## III.    The Legal Standard for Accepting or Rejecting a Rule 11(c)(1)(C) Plea

Federal Rule of Criminal Procedure 11(c)(1)(C) states that the government may enter into a plea agreement in which it "agree[s] that a specific sentence or sentencing range is the

28

appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply."  Such an agreement under Rule 11(c)(1)(C) "binds the court once the court accepts the plea agreement."  FED. R. CRIM. P. 11(c)(1)(C); *see also United States v. Shepard*, 88 F. App'x. 44, 45 (5th Cir. 2004) (unpublished); *McClure v. Ashcroft*, 335 F.3d 404, 413 (5th Cir. 2003); *United States v. Rhodes*, 253 F.3d 800, 804 (5th Cir. 2001).  "If the court accepts a plea agreement containing a Rule 11(c)(1)(C) stipulation, it must notify the defendant that 'the agreed disposition will be included in the judgment.'" *In re Morgan*, 506 F.3d 705, 709 (9th Cir. 2007) (quoting FED. R. CRIM. P. 11(c)(4)). "Conversely, if the court rejects such a plea agreement, it must (1) inform the parties, (2) advise the defendant that the court is not bound by the plea agreement and give the defendant an opportunity to withdraw the guilty plea, and (3) advise the defendant that if the plea is not withdrawn, 'the court may dispose of the case less favorably toward the defendant than the plea agreement contemplated.'" *Id.* (quoting FED. R. CRIM. P. 11(c)(5)).

Federal Rule of Criminal Procedure 11(c)(5) "allows the judge to reject [a Rule 11(c)(1)(C)] bargain if the agreed sentence would be one the judge deems inappropriate." *In re United States*, 503 F.3d 638, 641 (7th Cir. 2007).  "A district court may properly reject a plea agreement based on the court's belief that the defendant would receive too light of a sentence." *United States v. Smith*, 417 F.3d 483, 487 (5th Cir. 2005), *cert. denied*, 546 U.S. 1025 (2005) (citing *United States v. Crowell*, 60 F.3d 199, 205–06 (5th Cir. 1995); *United States v. Foy*, 28 F.3d 464, 472 (5th Cir. 1994); *United States v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977)).

A district court has broad discretion to accept or reject a plea agreement under Rule 11(c)(1)(C).  *See United States v. Vega-Nieto*, 239 F. App'x. 74, 74 (5th Cir. 2007) (unpublished); *Smith*, 417 F.3d at 487 ("Rule 11 does not limit a district court's discretion in rejecting a plea agreement.").  The text of Rule 11(c)(1)(C) does not "define the criteria by which a district court should exercise the discretion the rule confers, or explain *how* a district court should determine whether to accept a plea agreement." *Morgan*, 506 F.3d at 710.  "This conspicuous omission . . . appears to be intentional, as the drafters stated that the decision to accept or reject a plea agreement should be 'left to the discretion of the individual trial judge,' rather than governed by any bright-line test."  *Id.* at 710 n.2 (quoting FED. R. CRIM. P. 11, advisory committee note).  In exercising its discretion, a court should take into account "the exigencies of plea bargaining from the government's point of view," including "limited resources and uncertainty of result."  *United States v. Bundy*, 359 F. Supp. 2d at 538.

A court may not apply categorical rules in deciding whether to accept or reject a plea agreement under Rule 11(c)(1)(C) because "the existence of discretion requires its exercise." *United States v. Miller*, 722 F.2d 562, 565 (9th Cir. 1983).  "When a court establishes a broad policy based on events unrelated to the individual case before it, no discretion has been exercised." *Id.*  The court must make an "individualized assessment" of the plea agreement. *Morgan,* 506 F.3d at 712 ("[D]istrict courts must consider individually every sentence bargain presented to them and must set forth, on the record, the court's reasons in light of the specific circumstances of the case for rejecting the bargain.").

There are limits on a court's discretion. A court may not reject a plea proposed under Rule 11(c)(1)(C) on the grounds that it fails to charge a sufficiently severe crime, provided that the government has not made its decision not to charge a higher offense contingent on the defendant's acceptance of the plea bargain. The government has wide prosecutorial discretion to bring appropriate charges, and the court must "defer to the government's position except under extraordinary circumstances." THOMAS W. HUTCHINSON *ET AL.*, FEDERAL SENTENCING LAW AND PRACTICE § 6B1.2 (2009). A court may not "intrude upon the charging discretion of the prosecutor." U.S.S.G. § 6B1.2 cmt.

A court may not use its discretion to accept or reject a Rule 11(c)(1)(C) plea to intrude into the plea-bargaining process. "[T]he district court has a limited role regarding [Rule 11(c)(1)(C)] plea agreements. . . . [It] may accept or reject a plea agreement after one is reached; but, generally once the court has accepted the agreement, it may not subsequently reject or modify it." *McClure*, 335 F.3d at 413. A court may not accept or reject such a plea agreement on a piecemeal basis. *Morgan*, 506 F.3d at 709; *see also* 1A CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE AND PROCEDURE – CRIMINAL § 180 (4th ed. 2008) ("Once a court accepts a Type C agreement, it may not unilaterally modify the agreement and impose either a higher or lower sentence than the one negotiated by the parties."). A court may not condition acceptance of a Rule 11(c)(1)(C) plea on the modification of its terms. *See Smith*, 417 F.3d at 488 ("A district court is absolutely prohibited from participating in plea negotiations."); *Crowell,* 60 F.3d at 203 ("When a court goes beyond providing reasons for rejecting the agreement presented and comments on the hypothetical agreements it would or

31

would not accept, it crosses over the line established by Rule 11 and becomes involved in the negotiations."); *United States v. Miles*, 10 F.3d 1135, 1140 (5th Cir. 1993) ("Rule 11 requires that a district court explore a plea agreement once disclosed in open court; however, it does not license discussion of a hypothetical agreement that it may prefer.").

A court generally does not have the discretion to accept a Rule 11(c)(1)(C) plea agreement that provides for a sentence above a statutory maximum or below a statutory minimum. *See United States v. Cieslowski*, 410 F.3d 353, 363 (7th Cir. 2005), *cert. denied*, 546 U.S. 1097 (2006) (holding that the sentence imposed under a Rule 11(c)(1)(C) plea agreement "must comply with the maximum (and minimum, if there is one) provided by the statute of conviction"); *see also United States v. Greatwalker*, 285 F.3d 727, 730 (8th Cir. 2002) ("Even when a defendant, prosecutor, and court agree on a sentence, the court cannot give the sentence effect if it is not authorized by law."); *United States v. Gibson*, 356 F.3d 761, 766 (7th Cir. 2004) (quoting *Greatwalker*). A court also does not have discretion to accept a plea bargain that lacks a factual basis. FED. R. CRIM. P. 11(b)(3) ("Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea."). "The quantum of evidence needed to supply a factual basis is not specified in the rule, but it is clear that it takes less evidence than would be needed to sustain a conviction at trial." 1A CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE AND PROCEDURE – CRIMINAL § 179 (4th ed. 2008). "[A] district judge satisfies th[is] requirement . . . when he 'determine[s] that the conduct which the defendant admits constitutes the offense charged in the indictment or information or an offense included therein to which the defendant has pleaded guilty.'"

32

*Libretti v. United States*, 516 U.S. 29, 38 (1995); *see also United States v. Marek*, 238 F.3d 310, 315 (5th Cir. 2001), *cert. denied*, 534 U.S. 813 (2001) (the factual basis requirement is satisfied by the district court's determination that the defendant's admitted conduct satisfies every legal element of the offense).

One ground for rejecting a plea under Rule 11(c)(1)(C) does not apply here. "[A] court is well-advised to reject a plea agreement that dismisses a charge if it finds that the remaining charges do not adequately reflect the seriousness of a defendant's actual offense behavior." *Smith*, 417 F.3d at 487 (citing U.S.S.G. § 6B1.2(a); *United States v. Mizell*, 88 F.3d 288, 291 (5th Cir.1996), *cert. denied*, 519 U.S. 1046 (1996); *Crowell*, 60 F.3d at 206; *Foy*, 28 F.3d at 473). BP Products is pleading to the only charge in the information. The victims do not ask this court to reject the plea because of the offense charged. (Docket Entry No. 66 at 100–01).

Most of the cases that reject a Rule 11(c)(1)(C) plea do so for reasons that do not bear on this case, such as a proposed term of imprisonment that falls below the Sentencing Guidelines range.[15] Few cases discuss the adequacy of a fine or of probation terms, the components of the sentence at issue in this case.

---

[15]

    *See, e.g.*, *United States v. Carmenores*, No. 07-1531, 2008 WL 5207097, at **1–2 (10th Cir. Dec. 15, 2008) (unpublished) (affirming the sentence imposed after the district court rejected a Rule 11(c)(1)(C) plea; the trial court had rejected the plea after reading the presentence report and concluding that the stipulated term of imprisonment was too short); *United States v. Macias-Gonzalez*, 219 F. App'x 814, 817–18 (10th Cir. 2007) (unpublished) (affirming the district court's rejection of a plea agreement in an immigration case because the sentence did not comply with the government's fast-track program); *United States v. Rivera*, 209 F. App'x 618, 620 (8th Cir. 2006) (unpublished) (affirming the district court's decision to reject the plea agreement after considering the presentence report and concluding that the proposed sentence would create disparities with sentences of similar offenders and would "undermine the Guidelines"); *United States v. Ginyard*, 215 F.3d 83, 86 (D.C. Cir. 2000) (affirming the district court's rejection of a plea agreement providing for eighteen months of imprisonment on the ground that the sentence did "not protect the public for the maximum period of time that it could be protected for").

In *United States v. Samueli*, 575 F. Supp. 2d 1154, 1163–64 (C.D. Cal. 2008), the court rejected as "not reflect[ing] the seriousness of" the crime a plea bargain that would have sentenced the defendant, who had been involved in a $2.2 billion options backdating scandal, to a five-year probation term. The indictment charged the defendant with "falsify[ing] dozens of corporate records to further and disguise the fraud," "select[ing] the date to which options should be backdated," and "advocat[ing] the creation and use of fraudulent employment records to compensate recruits with backdated grants through acquired companies." *Id.* at 1163. The court concluded that the sentence did not adequately punish this conduct. The sentence was "vastly disproportionate" to the sentences faced by the defendant's coworkers, two of whom were eligible for life in prison. *Id.* at 1164. In *United States v. Munroe*, 493 F. Supp. 134, 136 (D. Tenn. 1980), the court rejected as "too light a sentence under the circumstances of the case" a plea bargain that would have sentenced a defendant, who defrauded the factor for his company out of more than $1 million over a four-month period, to a $3,000 fine and three years' probation. *Id.* at 135. The court noted that "54% of the persons convicted of the offense of which [the defendant] says he is guilty were sentenced to terms of incarceration which averaged 51 months in the year ended in mid-1978." *Id.* at 136 n. 1. As in *Samueli*, the concern over disparity is evident.

The victims and the parties have brought to this court's attention the plea agreement entered in the 1989 Exxon *Valdez* oil spill disaster. The plea was to violations of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1319(c)(1)(A); the Refuse Act, 33 U.S.C. § 407; and the

Migratory Bird Treaty Act, 16 U.S.C. §§ 703, 707(a).[16]  In April 1991, the Alaska federal

district court rejected a plea bargain that provided for a $100 million criminal fine in addition

to criminal restitution as too low, commenting that the fine did not "adequately achieve

deterrence" and "sen[t] the wrong message, suggesting that spills are a cost of business that

can be absorbed."  *See* Keith Schneider, *Judge Rejects $100 Million Fine for Exxon in Oil*

*Spill as Too Low*, N.Y. TIMES, Apr. 25, 1991.  In October 1991, the same court accepted a

plea to the same charged offense with a stipulated sentence of a $25 million fine and $100

million in criminal restitution.  The restitution was to be applied to environmental cleanup.

The fine portion of the sentence was technically $150 million, but $125 million was forgiven

in recognition of Exxon's cleanup efforts.  (Docket Entry No. 33, Ex. A); *see also Exxon*

*Shipping Co. v. Baker*, --- U.S. ---, 128 S. Ct. 2605, 2613 (2008); Keith Schneider, *Exxon to*

*Pay Higher Criminal Fines in New Pact to Settle Valdez Claims*, N.Y. TIMES, Oct. 1, 1991.[17]

The Alaska district court judge later stated, in an opinion that examined the legitimacy of a

---

[16]

The section of the Clean Water Act to which Exxon pleaded guilty provided for a fine of "not less than $2,500 nor more than $25,000 per day of violation," or, in the case of repeat offenders, "a fine of not more than $50,000 per day of violation."  33 U.S.C. § 1319(c)(1)(A), (B).  The Refuse Act provided for a "fine of up to $25,000 per day."  33 U.S.C. § 411.  The Migratory Bird Treaty Act provided for a fine of "not more than $15,000" per violation.  16 U.S.C. §707(a).  The DOJ argued that the Alternative Fines Act was also applicable.  *See* Philip Shabecoff, *5 Laws Cited in Indictment for Oil Spill*, N.Y. TIMES, Mar. 1, 1990.  The DOJ's position in the *Exxon Valdez* case was consistent with the Alternative Fines Act, which provides that "[i]f a law setting forth an offense specifies . . . a fine that is lower than the fine otherwise applicable under this section and such law, by specific reference, exempts the offense from the applicability of the fine otherwise applicable under this section, the defendant may not be fined more than the amount specified in the law setting forth the offense."  18 U.S.C. § 3571(e).  None of the statutes to which Exxon pleaded guilty specifically exempted those offenses from the Alternative Fines Act.

[17]     The district court's order described the fine as $125 million, with $105 million forgiven, for a net fine of $20 million.  (Docket Entry No. 33, Ex. A).  The Supreme Court, however, described the fine as $150 million, reduced to a net fine of $25 million.  *Exxon Shipping Co. v. Baker*, 128 S. Ct. at 2613.

35

civil jury's punitive damages verdict against Exxon in connection with that accident, that he had accepted the criminal plea bargain to "avoid[] a difficult and expensive trial"; because, at the time of the plea, the "court did not have the benefit of the more robust development of actual damages which took place later in the civil proceedings"; and because it was "far preferable for Exxon to be sanctioned by means of a restitution obligation which would be employed for restoration of the environment than by a larger fine which would not be so employed." *In re the Exxon Valdez*, 296 F. Supp. 2d 1071, 1079 n. 111 (D. Alaska 2004), *vacated and remanded on other grounds, In re Exxon Valdez*, 472 F.3d 600 (9th Cir. 2006). Besides the $100 million fine, the court also noted that Exxon had agreed to pay almost $1 billion to settle related civil and regulatory cases.

In the present case, BP Products has paid over $1.6 billion to settle related civil cases. BP Products estimates that it will pay an additional amount of over $265 million to comply with the regulatory requirements imposed by OSHA and the TCEQ. BP Products has recently entered a civil settlement agreement with the Environmental Protection Agency to pay almost $180 million more to update pollution control, maintenance and monitoring, and internal management systems at the plant.

If a court rejects a plea agreement under Rule 11(c)(1)(C), the defendant must be given the option of withdrawing the plea. FED. R. CRIM. P. 11(c)(5). If the plea is withdrawn, any admissions that the defendant may have made for purposes of the plea agreement have no preclusive effect. Instead, the parties are "returned to their pre-plea posture." *United States v. Cervantes-Valencia*, 322 F.3d 1060, 1062 (9th Cir. 2003) (citing *United States v. Mukai*,

26 F.3d 953, 955–56 (9th Cir. 1994)); *see also United States v. Agosto-Vega*, No. 05-0157, 2007 WL 4116847, at *2 (D.P.R. Nov. 16, 2007).  The fact of, and the contents of, the guilty plea, and "any statement made in the course of any proceedings" concerning the negotiation or acceptance of that plea, are inadmissible in any future civil or criminal proceedings.  FED. R. EVID. 410; *see also* FED. R. CRIM. P. 11(f) ("The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410.").  "Rule 410 excludes any evidence of a withdrawn plea of guilty; it does not distinguish between direct and circumstantial evidence.  Hence, any evidence that would permit the jury to infer that the defendant had once pleaded guilty would be within the scope of the rule."  23 CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE & PROCEDURE § 5343 (1980).

## IV.    The Objections to the Proposed Plea

The victims have submitted extensive filings, posing numerous – and evolving – objections to the proposed plea agreement.  Each objection is examined and analyzed under the applicable legal standard.

### A.    Objections that the Victims No Longer Assert or Press

In initial briefs objecting to the proposed plea, the victims raised several arguments that they have since abandoned or no longer press.  These arguments show the evolving nature of the objections the victims have raised.

The victims initially urged this court to reject the proposed plea because only BP Products, and not the parent company, BP p.l.c. (referred to as "BP Global"), was criminally

37

charged.  The victims later withdrew this objection, recognizing that it had no support in the

law:

> The Victims realize that the prosecutor has the exclusive
> discretion to select whom to charge.  We concede that failure or
> refusal to charge the party which supervised, controlled, and
> directed the crime, however lenient or unwise, is within the
> prosecutor's prerogative.  We do not, because we cannot, ask the
> Court to reject the Plea Agreement for failing to charge BP
> Global.

(Docket Entry No. 28 at 21–22; *see also* Docket Entry No. 66 at 88–89 (affirming that the

victims are not asking for rejection of the plea because the parent company and affiliates were

not charged)).[18]  The victims are not asking this court to reject the proposed plea because a

higher or more severe criminal offense could have been charged.  (*Id.* at 100–01).[19]

---

[18]      The following exchange occurred at the February 4, 2008 hearing:

> THE COURT:  I want to invite argument on . . . the argument that the plea
> agreement improperly or overly generously immunizes BP Products or its
> parent from criminal prosecution for events arising from the causes of the
> March 2005 explosion. This argument initially was couched as concern that
> the parent had not been charged.  But the later briefing refined that
> argument and did not, for reasons that are well-founded in the applicable
> law, did not ask this court to reject the plea because of who or what entity
> was or wasn't charged.  And the lawyers for the victims can correct me if
> I am incorrect, but I do not understand that to be your argument any longer.
> That is, I do not understand the victims to be asking that the plea be rejected
> because the charging decision was made not to attempt to charge any
> affiliated or parent company of BP Products; is that correct?

> PROFESSOR CASSELL:  That's correct, Your Honor.

(Docket Entry No. 66 at 88–89).

[19]      At the February 4, 2008 hearing, the victims confirmed to this court that they were not
arguing that the government had failed to charge the highest possible offense:

> THE COURT:  The government made a specific argument that the offenses
> pleaded to were the most significant offenses that were applicable. . . .  But

<span style="text-align: right; display: block;">(continued...)</span>

The victims initially urged this court to reject the proposed plea because it improperly "immunized" BP Global and its subsidiaries from prosecution for future misconduct.  This argument lacks a basis in the facts and the law.  The plea agreement immunizes BP Products and its affiliates, including its parent, BP Global, from federal prosecution for any additional offenses "known to the Government at the time of this [plea] Agreement that are based upon evidence in the Government's possession at this time and that *arose out of the conduct giving rise to the criminal investigation of the March 23, 2005 explosion*."  (Docket Entry No. 96, Ex. 1 at 4) (emphasis added).  BP Products and the government have both clarified that this language does not prevent the prosecution of individuals for their role in the March 23, 2005 explosion.  Nor does the language prevent the prosecution of BP Products, its parent, or its affiliates for their role in the explosion based on evidence that was not in the government's possession in October 2007.  Nor does the language immunize any individual, BP Products, its parent, or its affiliates, from criminal liability for any offenses occurring after the March 23, 2005 explosion, even if those offenses stemmed from the same problems that caused the March 23, 2005 explosion.  The government explained that the clause at issue is a standard

---

[19](...continued)
the briefing that came back in response did not challenge that argument. That is, the argument is not being made to me to reject this plea because of the offenses that are the subject of the plea.  Do you agree with that, Professor Cassell?

PROFESSOR CASSELL:  Yes, Your Honor.

(Docket Entry No. 66 at 100–01).

clause and is never used to immunize postoffense conduct.[20]  (Docket Entry No. 66 at 90–91).

Counsel for BP Products explained in open court that "BP Products does not take the position

and will not take the position that this agreement gives immunity for any conduct after the

March 23, 2005 explosion."  (*Id.* at 91–92).  The victims are no longer urging this objection

as a basis for rejecting the plea.  (*Id.* at 93).

The victims also initially argued that the proposed plea should be rejected, or at least

a presentence investigation performed, because the government and BP Products had

underreported the prior criminal history of BP Products and its parent and affiliates

worldwide.  The victims argued that the "total record" for BP Products, BP Global, and its

affiliates "reveals at least nine cases of fines for safety violations, five of which involve death

or injury, and at least 14 cases of environmental crimes and five cases of fraud crimes."

(Docket Entry No. 28 at 10–13).  The victims later acknowledged that the criminal history

disclosure was "not [their] main source of concern."  (Docket Entry No. 66 at 93–94).[21]

---

[20]     Examples of other federal criminal plea agreements to include such a clause include *United States v. Clark*, 218 F.3d 1092, 1096 (9th Cir. 2000), *cert. denied*, 531 U.S. 1057 (2000) (concluding that a plea agreement that granted immunity from further prosecution on facts known to the government in connection with an investigation for postal fraud did not bar prosecution for a pawn shop burglary known to the government at the time the plea agreement was signed); *United States v. Manning*, No. 4:07-cr-81, 2008 WL 5100119, at *7 (E.D. Va. Dec. 2, 2008) (concluding that a plea agreement stating that the United States Attorney in the Eastern District of Virginia would "not further criminally prosecute the defendant . . . for the specific conduct described in the indictment or statement of facts and any related conduct known to the United States at the time of the defendant's plea" for a drug distribution conspiracy did not bar prosecution for an unrelated but similar drug distribution conspiracy in which the defendant participated before and after signing the plea agreement); *see also United States v. Al-Arian*, 514 F.3d 1184, 1193 (11th Cir. 2008) (concluding that a plea agreement that barred prosecution for federal crimes "known to" the United States Attorney's Office for the Eastern District of Virginia at the time of the agreement did not immunize the defendant from future grand jury subpoenas.

[21]     The following exchange occurred at the February 4, 2008 hearing:

(continued...)

40

### B.     The Present Objections

The victims continue to object to the fine, the probation terms, the absence of a presentence report, and the violation of the right to confer with the prosecution before the plea agreement was executed.   The victims dispute virtually every aspect of how the fine should be calculated, including whether nonpecuniary losses and gains may be considered; what causation standard applies; and whether the fine calculation is so complex and burdensome that the statutory default maximum of $500,000 would apply if the plea were rejected.

The victims have specifically briefed the pecuniary and causation issues, (Docket Entry No. 69), and BP Products and the government have responded, (Docket Entry Nos. 74, 75). To obtain information about the nature and extent of the victims' losses and to test the difficulty of making those determinations, this court asked the victims to submit loss information for between thirty to fifty victims, including all those who died in the explosion.

---

[21](...continued)

    THE COURT:  [An]other issue raised is . . . that the court should consider rejecting the plea and plea agreement because the disclosure of the criminal history was inadequate.  Again, here the briefing has refined some of the arguments that were initially made in response to the Department and BP pointing out some of the limits to the obligation to make the disclosures that they were faulted for not having specifically included, limits that I understand the victims to be urging in other contexts should apply because they derive from the guidelines, which the victims want the court to consider in other aspects of the proposed agreement.  Perhaps just out of efficiency, let me ask if on behalf of the victims if this continues to be a source of concern?

    PROFESSOR CASSELL:  Your Honor, it's not our main source of concern. . . .  We think the argument is better phrased . . . as a concern that the full history and characteristics be provided to the defense.  We used some colorful language in our opening briefs about criminal history, and I think we've refined our argument and expressed it in a more precise fashion now.

(Docket Entry No. 66 at 93–94).

41

(Docket Entry No. 84 at 43–44).  The victims filed briefs and numerous exhibits on the alleged losses, (Docket Entry No. 101), and BP Products and the government have responded, (Docket Entry Nos. 104, 107).

The victims also object to the proposed probation terms.  The victims do not appear to argue that requiring compliance with the OSHA Settlement Agreement or the TCEQ Agreed Order is inappropriate.  Rather, the victims' primary argument is that BP Products is not complying with the OSHA Settlement Agreement, making the proposed plea inadequate because it does not also require a court-appointed monitor to serve as an additional check.  The victims have submitted the report of Michael Sawyer, who served as an expert witness for many of the plaintiffs in the civil litigation.  The victims provided this report to the government before it executed the plea agreement.  (Docket Entry No. 89; Docket Entry No. 120 at 150–51).  BP Products and the government have replied to the victims' briefs, attaching voluminous exhibits, including submissions from OSHA and the TCEQ.  (Docket Entry Nos. 94, 96).  BP Products and the government argue that the evidence shows that BP Products has in fact complied with the regulatory requirements imposed after the explosion and that the terms of probation are adequate and effective.

The victims also continue to argue that this court should deny the motion for waiver of the presentence investigation and report.  (Docket Entry No. 117).  BP Products and the government responded.  (Docket Entry Nos. 118, 119).  These arguments and response raise the issue whether the information that the parties and the victims have provided gives this court a sufficient basis to determine whether to accept the proposed plea.

Finally, the victims assert that the CVRA violation that the Fifth Circuit found is in itself a basis to reject the proposed plea.  (Docket Entry No. 117 at 1–5).  BP Products and the government have responded.  (Docket Entry Nos. 118, 119).

Each of these issues is examined in depth.

## V.     The Fine

### A.     The Applicable Statutory Provisions

The Sentencing Guidelines provisions on fines for organizational defendants do not apply to environmental offenses.  U.S.S.G. § 8C2.1.  Instead, under U.S.S.G. § 8C2.10, a court is to "determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572."  Section 3553 sets forth the factors a court is to consider in determining a sentence.[22]  Section 3572 sets forth the factors a court is to consider in setting a fine.[23]

---

[22]     Section 3553 provides, in relevant part:

(a) Factors to be considered in imposing a sentence. – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider –
>    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>    (2) the need for the sentence imposed –
>>        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>        (B) to afford adequate deterrence to criminal conduct;
>>        (C) to protect the public from further crimes of the defendant; and
>>        . . .

(3) the kinds of sentences available.

18 U.S.C. § 3553.

[23]     Section 3572 provides, in relevant part:

(continued...)

43

No fine, even if the parties agree, can exceed the statutory maximum.  Under 18 U.S.C. § 3571(c), an organizational defendant that has been found guilty of a criminal offense for which no fine amount is specified by separate statute may be sentenced to a maximum statutory fine of not more than $500,000.  Under the Alternative Fines Act, 18 U.S.C. § 3571(d), however, a higher fine may result.  Section 3571(d) states:

> If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant  may not be fined more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process.

---

[23](...continued)

(a) Factors to be considered. – In determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a) –

(1) the defendant's income, earning capacity, and financial resources;

(2) the burden that the fine will impose upon the defendant . . . relative to the burden that alternative punishments would impose;

(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution;

(5) the need to deprive the defendant of illegally obtained gains from the offense;

(6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;

(7) whether the defendant can pass on to consumers or other persons the expense of the fine; and

(8) if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

18 U.S.C. § 3572.

Under § 3571, $500,000 is the statutory maximum fine against an organization that has been found guilty of a felony, but an alternative statutory fine applies if the defendant has derived pecuniary gain from the offense or the offense has resulted in pecuniary loss to a person other than the defendant. That alternative fine can be no more than the greater of twice the gross gain or twice the gross loss. Under § 3571(d), if imposing the alternative maximum fine would "unduly complicate or prolong the sentencing process," the $500,000 maximum applies.

### B.    Disputed Issues Relating to § 3571(d)

The victims and parties disagree about how § 3571(d), which is rarely discussed in the case law, should be interpreted and applied. These disputes bear on whether the $50 million fine is adequate and just.

### 1.    The Loss or Gain To Be Measured

The victims assert that under § 3571(d), the fine must be based on the greater of twice the gross loss or gain, including all nonpecuniary losses such as pain and suffering, emotional distress, and loss of consortium. The parties vigorously dispute this interpretation. Instead, the parties argue that the statutory and Guidelines language and the case law make clear that the court is limited to considering gross *pecuniary* losses or gains under § 3571(d).

The victims assert that the use of the terms "pecuniary gain" and "pecuniary loss" in the first part of § 3571(d) and "gross gain" and "gross loss" in the second part indicates that Congress intended nonpecuniary as well as pecuniary gains and losses to be included in the fine calculation.  The victims argue that § 3571(d) has two parts.  The first is a "trigger

45

mechanism," which invokes the Alternative Fines Act only if pecuniary gain or loss is present ("[I]f any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant . . . ."). The second is a "penalty calculator," which allows all forms of gain or loss to be considered in calculating the fine ("[T]he defendant may not be fined more than the greater of twice the gross gain or twice the gross loss . . . ."). (Docket Entry No. 69 at 1–3). The victims cite no authority to support this interpretation. The case law, the language of § 3571(d), and the related Guidelines provisions are all to the contrary, supporting the conclusion that the "gross loss" and "gross gain" referred to are the gross *pecuniary* loss and gain identified in the statute.

The decisions addressing § 3571(d) have stated that calculations of loss or gain are to be based on pecuniary loss or gain amounts. *See, e.g.*, *United States v. Chusid*, 372 F.3d 113, 117 (2d Cir. 2004) ("Section 3571 provides for a fine which is . . . twice the resulting gross pecuniary gain to the defendant or loss to the defendant's victims."); *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 994 (9th Cir. 2001) (upholding loss calculation based on pecuniary loss); *United States v. Pippin*, 903 F.2d 1478, 1483 (11th Cir. 1990) ("This fine cannot exceed . . . twice the gross pecuniary gain from the offense, or twice the gross pecuniary loss to the victim.").

This reading is faithful to the language of the statute. Section 3571(d) applies only "if any person derives *pecuniary* gain from the offense, or if the offense results in *pecuniary* loss to a person other than the defendant." 18 U.S.C. § 3571(d) (emphasis added). In such cases, the fine is to be "no more than the greater of twice the gross gain or twice the gross loss." As

a matter of grammar and logic, the words "the gross gain" and "the gross loss" in the second part of the sentence could only refer to the pecuniary gain derived from the offense or the pecuniary loss resulting from the offense identified in the first part of the sentence. "Gross" pecuniary gain or loss simply means that the court is not to reduce the amounts to a net sum, by deducting such items as costs.

The victims' approach makes the "pecuniary gain" derived from the offense or "pecuniary loss" resulting from the offense in the first part of the sentence mean something different or refer to something different than the "gross gain" and "gross loss" in the second part of the sentence. This reading ignores the words of the statute. This reading would lead not only to considering nonpecuniary losses or gains but also to considering *any* losses or gains, even if they are not derived or resulting from the offense.[24] Section 3571(d) is clear that the losses or gains must be those derived or resulting from the offense.

The Sentencing Guidelines also support interpreting § 3571(d) as including only pecuniary losses resulting and gains derived from the offense. The Guidelines consistently

---

[24] As the government points out, the victims' interpretation would also "lead[ ] to inconsistent results":

> Under such a theory, a defendant who caused $1 dollar in pecuniary losses and $50 million in non-pecuniary losses would trigger an alternative fine of over $100 million, whereas a defendant who caused $50 million in non-pecuniary losses would be subject to no alternative fine. With no case law or legislative history, victims' counsel have created a fine scheme that leads to markedly disparate fines for similar conduct – when other, more plausible constructions exist. Their suggested scheme runs afoul of the time-honored principle that statutes ought not to be construed to create anomalous results.

(Docket Entry No. 75 at 1 n.1).

47

define "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense. U.S.S.G. § 2B1.1, cmt. n.3(A)(i). Similarly, "pecuniary harm" is defined as "harm that is monetary or that otherwise is measurable in money . . . not includ[ing] emotional distress, harm to reputation, or other non-economic harm." *Id.*, cmt. n.3(A)(iii). The Guidelines explain that they derive the terms "pecuniary gain" and "pecuniary loss" from § 3571(d). U.S.S.G. § 8A1.2 cmt. n.3(h), (i). The Guidelines explain that the "pecuniary gain" derived by the organization from the offense or the "pecuniary loss" resulting from the offense should be used to determine the base fine. U.S.S.G. § 8C2.4 cmt. n.1. The cases recognize that "[l]oss in the Sentencing Guidelines generally refers to pecuniary loss," and that the Guidelines definition of "loss" was derived from § 3571(d). *United States v. Painter*, 375 F.3d 336, 339 (5th Cir. 2004) (internal quotations omitted) (citing U.S.S.G. § 5E1.2 cmt. n.2).

The legislative history of the predecessor statute to § 3571(d), 18 U.S.C. § 3623(c)(1) (repealed Nov. 1, 1987), also supports limiting the loss or gain to pecuniary loss or gain.[25] "Section 3623(c) authorizes a judge to impose a fine of up to twice the *pecuniary* gain derived by the defendant from the offense or twice the *pecuniary* loss inflicted upon any victim of the offense." H.R. Rep. No. 98–906, at 17 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5433, 5449 (emphasis added). The same House Report also states that § 3623(c)(1) was modeled on §

---

[25]     18 U.S.C. § 3623(c)(1) (repealed Nov. 1, 1987) is virtually identical to § 3571(d). It states:

If the defendant derives pecuniary gain from the offense, or if the offense results in pecuniary loss to another person, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process.

48

6.03(5) of the Model Penal Code, which permits courts to impose a fine "not exceeding . . . any higher amount equal to double the *pecuniary* gain derived from the offense by the offender."  MODEL PENAL CODE § 6.03(5) (emphasis added).

The weight of authority strongly supports limiting the fine calculation and the review of the reasonableness of the fine under § 3571(d) to pecuniary losses or gains.  That precludes including such nonpecuniary factors as pain and suffering, mental anguish, or loss of consortium in examining the gross losses resulting from the offense and the gross gains BP Products derived from the offense.

### 2. The *Apprendi* Issue

BP Products and the government dispute whether under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), absent a plea, the government would have to prove the amount of gain or loss caused by the offense, to a jury, beyond a reasonable doubt, to obtain a fine above $500,000 under § 3571(d).   Under the Supreme Court's decision in *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.  "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (emphasis in original).   A sentence below the statutory maximum may be set by the court under a preponderance of the evidence standard.  BP Products argues that § 3571(c) sets a $500,000 maximum fine per felony count against a defendant organization, and that were the case to

49

go to trial, the United States would have to prove the gain or loss to support a higher fine to the jury beyond a reasonable doubt.  In support of its argument that any fine above $500,000 under § 3571(d) must be proved beyond a reasonable doubt, BP Products cites *United States v. LaGrou Distribution Systems, Inc.*, 466 F.3d 585, 594 (7th Cir. 2006), in which the Seventh Circuit vacated a $1 million fine imposed on the defendant organization for one felony count because gains or losses beyond what the court characterized as "the default statutory maximum [of] $500,000" had not been established by a "jury finding beyond a reasonable doubt."  *Id.*  Instead, the district court computed the fine amount "using a preponderance of the evidence standard."  *Id.*

LaGrou does not make clear whether the district court determined that the $1 million fine was twice the maximum amount of either loss or gain under § 3571(d) or whether the court simply assessed what it believed to be the appropriate fine.  *Id.*  *LaGrou* appears to be the only case to have examined whether *Apprendi* applies to determining the amount of a fine under § 3571(d).[26]  Although the court in *LaGrou* applied *Apprendi* to fine determinations,

---

[26]     The Ninth Circuit stated in *dicta*  in *United States v. W. Coast Aluminum Heat Trading Co.*, 265 F.3d at 994, that *Apprendi* would apply if a court decided to impose a Guidelines fine that exceeded the default statutory maximum in § 3571(c), but concluded that because the fine at issue did not exceed § 3571(c), *Apprendi* did not apply.

BP Products also points to secondary sources agreeing that this result is mandated by *Apprendi* and the Supreme Court's subsequent decisions in *Blakely v. Washington*, 542 U.S. at 303, and *United States v. Booker*, 543 U.S. 220 (2005).  One such article speculates that as a result of these cases:

> Unless Congress redrafts Section 3571(d), prosecutors will find it difficult, if not impossible, to prove the gain or loss necessary to support large fines in cases involving the most egregious financial crimes.  Defendants will be unlikely to accept plea agreements that impose fines that would rely on proving gain or loss.  Juries will be burdened with longer trials and longer

(continued...)

it concluded that *Apprendi* did not apply to restitution: "[T]his court has consistently held that restitution is a civil penalty, not criminal, and therefore the Sixth Amendment and *Booker* do not apply."  466 F.3d at 593.

Other courts have similarly held that *Apprendi* does not apply to restitution determinations in criminal cases.  *See United States v. Danford*, 435 F.3d 682, 689 (7th Cir. 2006) ("[R]estitution 'is not a criminal punishment but a civil remedy administered for convenience by courts that have entered criminal convictions.'  Restitution is determined by the judge using the lower preponderance of the evidence standard.") (quoting *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005)); *United States v. Ziskind*, 471 F.3d 266, 269 (1st Cir. 2006), *cert. denied*, 549 U.S. 1316 (2007); *United States v. May*, 413 F.3d 841, 849 (8th Cir. 2005) (concluding that *Apprendi* does not apply because "restitution does not have a 'statutory maximum'"), *cert. denied*, 546 U.S. 1024 (2005).  Courts have also held that *Apprendi* does not apply to forfeiture orders.  *See United States v. Swanson*, 483 F.3d 509, 516 (7th Cir. 2007), *cert. denied*, 128 S.Ct. 455 (2007) ("[T]he Sixth Amendment and *Booker*

---

[26](...continued)

> deliberations as they struggle to determine whether an argument based on econometrics proves gain or loss beyond a reasonable doubt.  The alternative maximum fine of Section 3571(d) might have worked well in an era when crucial facts relating to sentences were determined by a judge by a mere preponderance of the evidence.  But when facts relating to the determination of a statutory maximum must be found by a jury beyond a reasonable doubt, the usefulness of Section 3571(d) becomes quite limited.

Phillip C. Zane, *Booker Unbound: How the New Sixth Amendment Jurisprudence Affects Deterring and Punishing Major Financial Crimes and What to Do About It*, 17 FED. SENT'G REP. 263, 267 (2005); *see also* John M. Connor & Robert H. Lande, *How High Do Cartels Raise Prices?  Implications for Optimal Cartel Fines*, 80 TUL. L. REV. 513, 563 (2005) ("*Booker* could have a significant impact because 'twice-the-gain or twice-the-loss' will now have to be proven to a jury beyond a reasonable doubt.").

do not apply to forfeiture orders because there is no statutorily prescribed maximum amount of forfeiture."); *United States v. Huber*, 462 F.3d 945, 949 (8th Cir. 2006) ("Criminal forfeiture is an indeterminate sentencing scheme and accordingly, Huber was not entitled to a reasonable doubt forfeiture instruction under the *Apprendi* line of reasoning."); *United States v. Alamoudi*, 452 F.3d 310, 315 (4th Cir. 2006) ("We note that in holding that the Sixth Amendment right recognized in *Booker* does not apply to forfeiture orders, we join every circuit to consider the issue.") (citing cases from the Second, Third, Sixth, Seventh and Eighth Circuits); *United States v. Gasanova*, 332 F.3d 297, 300–01 (5th Cir. 2003), *cert. denied*, 540 U.S. 1011 (2003) ("[S]tatutorily-prescribed forfeiture is warranted upon a showing of a preponderance of the evidence.").

If the conditions for applying § 3571(d) are met – pecuniary gain is derived from the offense or pecuniary loss resulted from the offense – the "statutory maximum" is the greater of twice that gross gain or gross loss and a fine within that limit arguably is not subject to *Apprendi*. This is consistent with the rationale some circuit courts have used in explaining why *Apprendi* does not apply to determining restitution or forfeiture amounts. As the Third Circuit explained in *United States v. Leahy*, 438 F.3d 328, 337–38 (3d Cir. 2006), *cert. denied*, 549 U.S. 1071 (2006):

> Under the defendants' view, the conviction itself yields a restitution amount of zero dollars, and the factual finding of the amount of loss therefore increases the sentence beyond the maximum sum authorized by the facts, in violation of *Booker*. On the contrary, we see the conviction as authorizing restitution of a specific sum, namely the "full amount of each victim's loss"; when the court determines the amount of loss, it is merely giving shape to the restitution penalty born out of the conviction.

*Id.* (quoting 18 U.S.C. § 3664(f)(1)(A)); *see also United States v. Reifler*, 446 F.3d 65, 119 (2d Cir. 2006) ("[A]lthough judicial fact-finding determines what th[e] full amount [of loss] is, the sentencing court is 'by no means imposing a punishment beyond that authorized by jury-found or admitted facts,' or 'beyond the statutory maximum as that term has evolved in the Supreme Court's Sixth Amendment jurisprudence.'") (quoting *Leahy*, 438 F.3d at 377).

The Sentencing Guidelines characterize § 3571(d) as creating an "alternative" for calculating fines under that statute, rather than as creating an amount that exceeds a $250,000 maximum applicable to individuals under § 3571(b) or a $500,000 statutory maximum applicable to organizations under § 3571(c). *See* U.S.S.G. § 5E1.2 cmt. n.2.[27] The legislative history of the predecessor statute to § 3571(d), 18 U.S.C. § 3623(c)(1), also supports viewing § 3571(d) as setting an alternative fine measure, not as setting an amount that exceeds the $500,000 maximum of § 3571(c). The statute's drafters drew on a similar provision from the Criminal Code Reform Act of 1977. *See* H.R. Rep. No. 98–906, at 17 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5433, 5449. Section 2201(c) of the Act, passed by the Senate, implemented a statutory method for "relating the maximum fine to the gain or loss occasioned by the offense." *See* RPT. OF S. COMM. ON THE JUDICIARY TO ACCOMPANY S. 1437, 95TH CONG., CRIMINAL CODE REFORM ACT OF 1977 912–14 (Comm. Print 1977). The Senate

---

[27]    The Eleventh Circuit took this position in *United States v. Looney*, 152 F. App'x 849, 859–60 (11th Cir. 2005), stating that the statutory maximums for the defendant's fine were either twice the pecuniary loss (which came to $141,333) under § 3571(d) or the default maximum for a individual's commission of a Class A misdemeanor ($100,000) under § 3571(b), and concluding that *Apprendi* did not apply to the $75,000 fine the district court had imposed because the fine fell below both of these maximums.

Judiciary Committee's report characterizes § 2201(c) as setting "overall limit[s]" and "maximum fine[s]" based on double the gain or loss.  *Id.*

In sum, there appear to be cogent arguments that *Apprendi* would not apply to the fine calculation were this case to go to trial.  But there is some litigation risk that *Apprendi* would apply.  The government states that although it has "extensively looked" at the issue before entering into the plea agreement, it had not been able to determine whether *Apprendi* would apply to fines in general and to fine determinations under § 3571(d) in particular.

### 3.    Causation

Section 3571(d) applies when pecuniary gain is "derive[d] . . . from the offense" or when the "offense results in" pecuniary loss.  18 U.S.C. § 3571(d).  The victims and parties disagree on the causation standard that applies in determining the reasonableness and adequacy of the fine amount, and in determining the standard that the government would have to satisfy if it had to litigate the issue.  The government argues that this court may consider only losses or gains that the offense of conviction proximately caused.  The victims argue that the "derived from" or "results in" standard requires only the more-relaxed "but-for" causation standard.  The victims argue that BP Products's "failure to implement proper and written Process Safety Management Procedures is the overarching 'but for' cause" of the explosion, and that this causation satisfies the requirements of § 3571(d).  (Docket Entry No. 69 at 7). As a result, according to the victims, a fine amount should be based on all losses from the explosion, which were much greater than $25 million.  (*Id.* at 4–5).

54

BP Products and the government respond that the victims' argument ignores the substantial authorities requiring proximate causation under criminal statutes.  The parties also argue that the victims ignore the fact that under § 3571(d), the losses or gains must be causally linked to the *offense*, which is not the same thing as the *explosion*.  BP Products and the government emphasize that although BP Products agrees that its knowing violations of the Clean Air Act were "but-for" causes of the explosion, there is no such agreement as to proximate cause.  According to the parties, there were many other causes of the explosion, including conduct that was not criminal and therefore cannot be the basis of criminal punishment.  (Docket Entry No. 74 at 2–5; Docket Entry No. 75 at 4–5).  BP Products and the government argue that proving that the offense proximately caused $25 million or more in gross pecuniary losses or that BP Products derived $25 million or more in gross pecuniary gains from the offense is a significant litigation risk that supports approving the $50 million fine as reasonable, adequate, and just.

The victims argue that had Congress intended to require proximate cause as the standard in § 3571(d), it would have so stated, as it did in the statutes governing criminal restitution and the CVRA.  (Docket Entry No. 69 at 5–6); *see* 18 U.S.C. § 3663(a)(2) (permitting restitution for victims "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"); 18 U.S.C. § 3663A(a)(2) (requiring restitution for victims "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"); 18 U.S.C. § 3771(e) (extending protections to victims "directly and proximately harmed as a result of the

55

commission of a Federal offense").  The victims argue that § 3571 should be interpreted as applying a broad tort-like standard, "without a 'proximate' requirement and as broadly setting maximum fines based upon a crime's result."  (Docket Entry No. 69 at 5–8).

The parties counter that "[c]ommon law principles of causation – principles that specifically apply to criminal law – mandate that gain or loss be both factually and proximately caused by the defendant's acts."  The parties argue that "the fact that [§ 3571(d) and other criminal statutes] do not use the word 'proximate' does not mean that Congress intended to abrogate the general common law of causation."  (Docket Entry No. 74 at 3 & n.6).

Construing § 3571(d) to require a proximate cause standard is consistent with the case law.  *See, e.g.*, *United States v. Izydore*, 167 F.3d 213, 224 (5th Cir. 1999) ("[M]ere 'but-for' causation is not the litmus test for loss determinations under U.S.S.G. 2F1.1.").  In *United States v. Spinney*, 795 F.2d 1410, 1415 (9th Cir. 1986), which interprets the causation requirements of § 3623, the predecessor to § 3571(d), the court analyzed the fine based on the "basic tenet of criminal law . . . that the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury."  *Id.*  The court stated that "[c]ausation in criminal law has two requirements:  cause in fact and proximate cause."  *Id.* (citations omitted); *see also United States v. Marlatt*, 24 F.3d 1005, 1007 (7th Cir. 1994) (noting "the difference between 'but-for' causation and the causation – for which the presence of but-for causation is ordinarily a necessary condition but rarely a sufficient one – that imposes legal liability").

56

The *Spinney* court also pointed out that proximate causation in a criminal case presents a higher threshold for proof than proximate causation in a civil tort case.  "We reject the government's argument that the RESTATEMENT OF TORTS provides a useful guideline for resolving the proximate cause issue in this case.  Proximate cause analysis in crimes differs from tort analysis of causation."  795 F.2d at 1416 n.2.

Construing § 3571(d) as imposing a proximate causation requirement is also consistent with the Supreme Court's decision in *Hughey v. United States*, 495 U.S. 411 (1990), in which the Court concluded that a defendant could be ordered to pay restitution only for damages caused by the "offense of conviction," to the exclusion of other "losses stemming from all conduct attributable to the defendant, including conduct unrelated to the offense of conviction."  *Id.* at 418.

BP Products and the government argue that if a proximate causation standard applies under § 3571(d), absent the plea, the government would have a difficult time at trial establishing the necessary causal links among BP Products's charged criminal conduct, liability for the explosion, and the victims' losses or BP Products's gain.[28]  BP Products points

---

[28]     BP Products argues that "the offense conduct . . . is but one of many factors related to the explosion":

> Absent the unforeseeable confluence of many non-criminal causal factors occurring at multiple levels of the organization, such as the failure to follow procedures, a lack of adequate supervision, insufficient communication, multiple human errors and an ignition source, the explosion would not have occurred.  The offense conduct was not the proximate cause of the damages, as there were multiple other intervening and proximate causes of the explosion, and the explosion and injury simply were not a reasonably foreseeable result of the offense conduct.

(continued...)

out that the CSB identified numerous causes of the explosion for which BP Products has not been charged, including many actions and omissions that are not criminal.  These actions and omissions include miscommunications among operations personnel, employees' failures to follow written start-up procedures that were in place, inadequate training, ineffective supervision, insufficient staff, and excessive overtime for workers.  (Docket Entry No. 107 at 9–13).  BP Products and the government argue that these uncharged and noncriminal acts would greatly complicate and could defeat the government's ability to prove not only that the charged offense proximately caused the explosion, but also the amount of the pecuniary losses or pecuniary gains proximately caused by the offense.[29]  The government recognizes that if it had to try this case, showing the necessary causal link between the specific Clean Air Act violations charged and the explosion at the ISOM unit would require "methodically and

---

[28](...continued)
(Docket Entry No. 74 at 4–5) (internal citations omitted).

[29]        The presence of additional, noncriminal causes of the explosion does not preclude proof that the "offense" was a proximate cause.  The Ninth Circuit recently upheld a restitution award in a case in which the defendant's criminal conduct was merely the first of "multiple links in the causal chain."  *See United States v. Peterson*, 538 F.3d 1064, 1075 (9th Cir. 2008).  The defendants were home builders convicted of making false statements to the Department of Housing and Urban Development ("HUD") about the sources of their buyers' down payments.  The court rejected the defendants' argument that their fraud did not proximately cause the losses to HUD:

> Defendants argue that the district court erred because the losses to HUD were caused not by the fraudulent gift letters, but by intervening events. Specifically, they argue that the defaults were caused by the home-buyers' inability to repay the loans due to increased interest rates, inability to maintain employment, and decreased paychecks.  We disagree with Defendants that these events preclude a conclusion that Defendants were the direct and proximate cause of the losses to HUD.  Our analysis of our own case law as well as that of our sister circuits leads us to conclude that despite the multiple links in the causal chain, the Petersons directly and proximately caused the losses to HUD.

*Id.* at 1077.

carefully structure[d]" and highly technical proof.  (Docket Entry No. 75 at 5).  The government concedes a significant risk that were the case to go to trial, the court would not adopt "the victims' expansive reading of" § 3571(d) and the government would be unable to draw a connection sufficient to satisfy the statute's causation requirement as to liability or as to the losses or gains to be used in determining the fine.  (*Id.* at 4).

There are two aspects to the causation issues raised by the briefing.  Both bear on the litigation risks that must be analyzed in assessing the proposed plea.  The first is the causal relationship between the charged offense and liability for the explosion.  The government notes that before it executed the plea agreement, there was no admission from BP Products that its criminal conduct resulted in the explosion.  The victims respond that since then, a BP Products business unit leader admitted at a state civil trial that BP Products's criminal conduct caused the explosion:

> MR. CANNON:  See, what I'm trying to make sure is that the lawyers don't come back later and say, well, that was just a violation of the Clean Air Act.  It doesn't have anything to do with this accident.  You're testifying under oath and assuring this jury and this judge that BP is guilty of a felony that caused this accident and these injuries?
>
> MR. CASEY:  Yes.

(Docket Entry No. 69, Ex. 2 at 137–38).  The victims argue that because of this statement, the "litigation risk on the causation issue is, exactly, zero."  (*Id.* at 8).  Although the unit leader's statement establishes but-for cause, it is unclear that it establishes proximate cause.  This is clarified by other portions of his testimony:

> MR. CANNON: [D]o you admit that your company committed a crime that caused this explosion, a criminal act?
>
> MR. CASEY: I admit and I, on behalf of the company, have signed that agreement that we are taking responsibility for those facts on the violation of the Clean Air Act.

(*Id.*, Ex. 2 at 137).

The second aspect to the causation issue is the relationship between BP Products's offense and the elements of the fine under §§ 3571(c) and (d). In assessing the adequacy and reasonableness of the proposed fine, this court need not determine with precision what amount of pecuniary loss resulted from, or what amount of pecuniary gain was derived from, the offense conduct under a proximate-cause standard. This court must consider whether $25 million is a reasonable estimate of those losses or gains. As part of that analysis, this court must also consider whether, absent the plea, the difficulties in proving the pecuniary losses or gains proximately caused by the offense would trigger the complexity provision of § 3571(d) and limit the government to the default $500,000 fine amount.

### 4.    Whether Calculating Gain or Loss Under § 3571(d) Would "Unduly Complicate or Prolong the Sentencing Process"

A court need not – and should not – calculate a fine under § 3571(d) if calculating the gain or loss "would unduly complicate or prolong the sentencing process." 18 U.S.C. § 3571(d). If a court concludes that the calculation is unduly complicated, then the statutory maximum fine for an organization is $500,000 per felony count under § 3571(c). BP Products and the government strenuously argue that were this case to go to trial, the court would conclude that calculating the pecuniary gain derived from the offense or pecuniary loss

60

resulting from the offense would unduly complicate and prolong the sentencing process.  The result would be a $500,000 fine.

The victims have not directly addressed the argument that calculating the fine based on gain derived from or loss resulting from the offense would be unduly complicated and time-consuming.  Instead, the victims argue that it is enough to show that calculating even a portion of the total gain or loss results in a figure far above $25 million.  (Docket Entry No. 69 at 1).  BP Products and the government counter that calculating even a portion of the gain or loss would be unduly complicated and would prolong sentencing beyond what the statute contemplates or permits.

Few authorities shed light on how complicated or prolonged a fine determination must be to trigger the complexity provision of § 3571(d).  The legislative history of 18 U.S.C. § 3623(c), the predecessor statute to § 3571(d), includes a House Report that explains that the complexity provision "does not require that a fine be determined on the basis of the defendant's gain or the victim's loss in every case":

> [F]or example, if determining the amount of the defendant's gain were to require a protracted hearing that would last longer than the trial, the judge could decline to base the fine on the defendant's gain.  The court's determination as to whether imposing a fine based on defendant's gain or victim's loss is discretionary, and the committee is confident that federal judges will not abuse this discretion.

H.R. Rep. No. 98–906, at 17 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5433, 5450.

Similar statutory sections provide useful guidance.  The Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663(a)(1)(B)(ii), provides that "[t]o the extent that the court

determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order."  This provision was added to "prevent sentencing hearings from becoming prolonged and complicated trials on the question of damages owed the victim."  S. Rep. No. 97–532, at 31 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2515, 2537.  The Mandatory Victims' Restitution Act (MVRA), 18 U.S.C. § 3663A(c)(3)(B), provides that the restitution requirement "shall not apply [in cases involving offenses against property or offenses violating the Controlled Substances Act, including offenses committed by fraud or deceit] if the court finds, from the facts on the record, that determining complex issues of fact related to the cause or the amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." This provision was added to "guarantee[ ] that the sentencing phase[s] of criminal trials do not become fora for the determination of facts and issues better suited to civil proceedings":

> In *all cases*, it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution.  The committee believes that losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution.

S. Rep. No. 104–179, at 19 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 931–32 (emphasis added).

62

The cases decided under § 3571(d) as well as under §§ 3663(a)(1)(B)(ii) and 3663A(c)(3)(B) show that courts are most likely to conclude that determining the amount of a fine or restitution would unduly complicate or prolong the sentencing proceeding when there are: multiple victims; the causation issues are disputed; or disputed future losses are involved. In the present case, all three factors are present.

a.      *Multiple Victims*

In a case decided under the MVRA, *In re W.R. Huff Asset Mgt. Co., LLC*, 409 F.3d 555, 563 (2d Cir. 2005), the Second Circuit approved a settlement creating a $715 million fund to be divided among thousands of victims. The court acknowledged that the fund did not provide full restitution to all victims. The court approved the settlement because if the case had been tried, there was a strong likelihood that the complexity exception to the MVRA would apply and the victims would receive no restitution. The court emphasized the large number of victims and the presence of disputed issues, including causation:

> The district court determined that the victims in this case were numerous and that the complexity of resolving a multitude of factual and causal issues would extend the sentencing process inordinately. As a basic predicate to this complexity, it is undisputed that there are potentially tens of thousands of victims of the [defendants'] crimes. Second, the amount of losses of those victims has not been established, and doing so would indisputably take a great deal of time.

*Id.* The court concluded that "[c]learly[ ] this case fits within the dual exceptions contained in the MVRA, and the district court did not abuse its discretion by deciding to accept the provisions of the Settlement Agreement as reasonable substitute restitution . . . ." *Id.* at 563–64.

63

In another MVRA case, *United States v. Reifler*, 446 F.3d at 113–139, the Second Circuit stated that the complexity exception might apply in a securities fraud action involving millions of shares and an unspecified number of shareholders.  In that case, determining the restitution amount would require analyzing which shares were purchased in reliance on the defendants' alleged fraudulent statements and determining whether these shares were later sold, and, if so, at what price.  The district court had failed to conduct this analysis before ordering the defendants to pay over $8.6 million in restitution.  The appellate court vacated the sentence and remanded, stating that the district court might appropriately invoke the complexity exception to the MVRA.  *Id.* at 139.

### b.  *Disputed Causation and Other Issues*

The Supreme Court has held in the restitution context that a defendant may only be ordered to pay restitution for damages caused by the "offense of conviction," to the exclusion of other "losses stemming from all conduct attributable to the defendant, including conduct unrelated to the offense of conviction."  *Hughey v. United States*, 495 U.S. at 418.  Courts are more likely to apply the complexity exception if the amount of gain or loss caused by the defendant's offense conduct is difficult to separate from gain or loss attributable to other factors.  In *United States v. Kones*, 77 F.3d 66, 69 (3d Cir. 1996), the Third Circuit explained that the complexity exception in the VWPA was designed to avoid "bring[ing] fault and causation issues before the sentencing court that cannot be resolved with the information otherwise generated in the course of the criminal proceedings on the indictment."  The court explained:

64

> Nothing in the legislative history evidences an expectation that a sentencing judge would adjudicate, in the course of the court's sentencing proceeding, all civil claims against a criminal defendant arising from conduct related to the offense.  Rather, it was expected that entitlement to restitution could be readily determined by the sentencing judge based upon the evidence he had heard during the trial of the criminal case *or learned in the course of determining whether to accept a plea and what an appropriate sentence would be.*

*Id.* (emphasis added).  The court affirmed the district court's refusal to award restitution to a patient of the defendant doctor.  The patient had become addicted to pain killers that the defendant illegally prescribed.  The defendant was convicted of mail fraud based on his submission of fraudulent insurance claims, some related to the patient.  The court concluded that although the patient's addiction may have arisen from drugs provided "in furtherance of" the defendant's mail fraud scheme, establishing a restitution amount based on the contribution to the patient's addiction would require prolonged and complicated proceedings to resolve the disputed issues.  *Id.* at 71.

In *United States v. Reifler*, 446 F.3d at 135, the Second Circuit vacated over $8.6 million in restitution that two of the defendants were ordered to pay to victims of their securities fraud.  The district court had ordered restitution based on the total diminution in value for all shares after the fraud was revealed.  The Second Circuit reversed and remanded.  The court noted that many of the shareholders were the defendants and their coconspirators and concluded that the restitution amount could not include those shareholders' losses.  As to the losses of the nondefendant shareholders, there were "difficult questions as to both the causation requirement and the requirements for determining the timing and the amounts of

losses caused." *Id.* at 135.  The court noted that many of the nondefendant shareholders would not be entitled to recover under § 10(b) and Rule 10b-5 because they could not show that they made their purchases in reliance on a fraudulent misrepresentation by the defendants or because they did not sell after the fraud was revealed.  *Id.* at 136.  The court remanded to the district court for resentencing and suggested – but did not mandate – that the district court invoke the complexity exception and decline to award restitution:

> Congress plainly intended that sentencing courts not become embroiled in intricate issues of proof, as it provided that the MVRA is to be inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process.  This provision reflects Congress's intention that the process of determining an appropriate order of restitution be streamlined . . . and be made quickly.

*Id.* at 136, 139 (internal citations and quotations omitted).

In *United States v. Gibson*, 409 F.3d 325, 342 (6th Cir. 2005), the Sixth Circuit upheld the district court's invocation of the complexity exception under § 3571(d).  The defendant corporation was convicted of conspiracy, making false statements to and concealing material facts from a federal agency, and violating the Mine Safety and Health Act.  The government pursued a sentence under § 3571(d) based on the defendants' pecuniary gain derived from the offense.  The district court acknowledged that the corporation "probably realized some gain," but refused to hear evidence the government sought to present on the pecuniary gain issue. *Id.*  The court concluded that "there's no defensible methodology to use in calculating the gain with any reasonable certainty."  *Id.*  The district judge added:  "I might be here for a long time and still have lots of questions about the amount, and I'd be[ ] engaging in speculation and

guesswork, . . . and certainly I think it's going to complicate matters, and it's going to prolong this sentencing." *Id.* The Sixth Circuit concluded that the district court did not err in invoking the complexity provision of § 3571(d).

Similarly, in *United States v. Schwartz*, No. 3:06-cr-2, 2006 WL 1662899, at *1 (D. Conn. May 25, 2006), the defendant, a tax accountant, pleaded guilty to two counts of making false statements to the IRS in his own federal income tax returns and in income tax returns he prepared on behalf of the CEO of his company. The CEO and the CEO's wife sought restitution, arguing that the defendant's actions had cost them between $2.1 million and $5.4 million in tax penalties. *Id.* The court concluded that the complexity exception to the restitution statutes applied because "a determination of fault, causation, and amount of restitution in this case would clearly overwhelm an otherwise straightforward sentencing proceeding." *Id.* at *5. The court described the complexities in calculating the loss amount to determine restitution:

> [T]he court would be required to resolve many issues outside of the Information and Stipulated Offense Conduct, including . . . whether the IRS penalties and interest claimed by the [putative victims] were proximately caused by defendant's misrepresentations to the IRS or whether there were other intervening factors, and the amount of restitution – which is demonstrably complex, as the [victims] themselves have claimed different amounts in their various letters, and uncertain, because the [victims] are currently protesting various penalties. Assessment of IRS policy would have to be made to determine the likely outcome had defendant not made the misrepresentations for which he was convicted, and defendant would likely have to obtain his own forensic accountant to examine the claimed amount of losses flowing directly from these lies, as opposed to the other alleged fraudulent conduct.

67

*Id.* at *6.  The court noted that determining restitution would be complicated because the amount of the victims' loss was "intertwined with the losses caused by defendant's allegedly fraudulent and other wrongful conduct" that were not part of the criminal charge but had been the subject of prolonged civil litigation.  *Id.*

In *United States v. Foote,* No. 00-cr-20091, 2003 WL 22466158, at *7 (D. Kan. July 31, 2003), the defendant was convicted of conspiracy to traffic in counterfeit goods.  The defendant argued, and the court agreed, that restitution under § 3663 based on loss would be inappropriate, in part because the causation issues would unduly complicate the sentencing.  There was no reliable way to quantify the pecuniary losses to the victims – which included purchasers, manufacturers, and retailers –  resulting from the sales of the counterfeit goods, and the "government ha[d] not proposed any reliable estimate of victim losses." *Id.*  The court concluded, however, that a fine under § 3571(d) based on the gross gain realized by the defendant from sales of the infringing products was calculable and appropriate.  The court based the fine upon the defendant's revenues from the sale of the infringing merchandise.  *Id.*

c.  *Future Losses*

BP Products argues that future losses should never be compensable under § 3571(d).  The parties and victims agree that no case has addressed the issue in the context of § 3571(d).  BP Products cites the Seventh Circuit's opinion in *United States v. Fountain*, 768 F.2d 790, 802 (7th Cir. 1985), *cert. denied*, 475 U.S. 1124 (1986), in which the court held that in calculating restitution under the statutory predecessor to § 3663, "a calculation of lost future earnings unduly complicates the sentencing process and hence is not authorized by [§ 3663]

68

– unless, to repeat a vital qualification, the amount is uncontested, so that no calculation is required." *Id.* The court concluded that "projecting lost future earnings has no place in criminal sentencing if the amount or present value of those earnings is in dispute." *Id.* BP Products argues that the logic underlying the court's determination that calculating future losses unduly complicates a restitution order is equally applicable to fine calculations under § 3571(d). (Docket Entry No. 107 at 4–7).

This court disagrees that applying *Fountain* results in a categorical bar to basing restitution or a fine on future losses resulting from an offense. Courts in this circuit have, without discussion, approved using future losses to determine restitution. *See United States v. Razo-Leora*, 961 F.2d 1140, 1146 (5th Cir. 1992) (affirming order that defendant pay $100,000 in lost future income as restitution to the victim's widow); *United States v. Jackson*, 978 F.2d 903, 915 (5th Cir. 1992), *cert. denied*, 549 U.S. 1088 (2006) (holding that the district court has the authority to award future lost income under the VWPA, but remanding for further factual findings on the victim's losses).

Courts in other circuits have questioned or rejected a categorical approach, while recognizing that the difficulties in calculating future loss are likely to trigger the complexity exception. In *United States v. Oslund*, 453 F.3d 1048, 1063 (8th Cir. 2006), the Eighth Circuit concluded that the restitution statutes "do[ ] not prevent the district court from using its abundant discretion in crafting restitution orders to include the lost future income of a victim." The court stated, however, that "a burdensome, complicated, or speculative calculation provides a good reason for the district court to decline to exercise its discretion in favor of

including future lost income in a restitution order." *Id.* The Eighth Circuit also agreed with the proposition in *Fountain* that the calculation of restitution based on future losses will in many cases be unduly complicated unless there is no dispute as to the amount. *Id.*

In *United States v. Cienfuegos*, 462 F.3d 1160 (9th Cir. 2006), the Ninth Circuit concluded that interpreting § 3663A to bar restitution for lost future income "would conflict with Congress's stated intent to force offenders to 'pay full restitution to the identifiable victims of their crimes.'" *Id.* at 1165 (quoting S. Rep. No. 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925). The court stressed, however, that proof of future losses "must not be predicated on speculation or conduct unrelated to the offense of conviction, as such an award would be inconsistent with congressional intent." *Id.* at 1168 (citing S. Rep. No. 104–179, at 19 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 932 ("The committee believes that losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution.")). The court remanded for calculation of restitution to the estate of a manslaughter victim's family consistent with its order. *Id.* at 1169.

In *United States v. Serawop*, 505 F.3d 1112, 1123–25 (10th Cir. 2007), the Tenth Circuit concluded that future losses may be included in a restitution order under § 3663A, citing *Cienfuegos*. The court noted, however, that the statute does not cover "incidental, consequential, or pain and suffering awards . . . [or] speculative reimbursements." *Id.* at 1124. The court upheld the award of lifetime future earnings to the estate of a three-month-old homicide victim but commented that "[t]he district court would also certainly have been on

70

firm ground, noting the time and complexity of its subsequent proceedings, to have left such complex matters to a civil determination.  Indeed, it might often be the case that complexity or delay caused by these determinations should be deferred to a civil forum." *Id.*

This court must consider the risk that absent the parties' agreement as to the fine, the complexity provision of § 3571(d) would likely apply.  The criteria the cases use for applying the provision are all met:  there are multiple victims (in numbers that could range from 180 to 4,000); there are disputed issues as to causation; and many of the victims have claimed future losses in amounts that are vigorously disputed.  These considerations impact the reasonableness of the fine amount in the proposed plea.

## C.   Analysis of the Victims' Objections to the $50 Million Fine

### 1.   Calculation Based on Gain

The government and BP Products have clarified that the $50 million fine represents a reasonable estimate of twice BP Products's gross pecuniary gain derived from the Clean Air Act violations to which it pleaded guilty.  The government arrived at the $50 million figure by calculating BP Products's cost savings in not replacing the blowdown stack in the ISOM unit and in not using an off-site contractor facility.  (Docket Entry No. 66 at 120–22).  The government calculated the costs that BP Products incurred in replacing eleven other blowdown stacks at the Texas City refinery ($50 million).  The government also calculated the costs that BP Products incurred in manufacturing an off-site contractor facility after the explosion ($33 million).  The government prorated both of these costs to determine the portion attributable to the ISOM unit.  Using these figures, the government concluded that BP

Products saved approximately $25 million from not implementing these improvements in the ISOM unit before the explosion, and that this was the gross pecuniary gain derived from the offense.  The government doubled this figure under § 3571(d) to reach the $50 million fine agreed to in the proposed plea.  (*Id.* at 121).  The government and BP Products assert that this fine is based on a proper estimate of the cost savings derived from the offense, and that it is the "very highest end of the fine amount that [could be recovered] in this case."  (*Id.*).

The victims contend that the $50 million fine is far too low a measure of gross gain.  The victims correctly note that "[g]ain can result from either additional revenue or cost savings." U.S.S.G. § 8A1.2 cmt. n.3(h).  But the victims' arguments for a higher gain amount are factually or legally deficient under § 3571(d).  The bases the victims urge for determining a higher gain amount rely on an improper construction of the information and are too tenuously connected to the offense conduct.

### a.    The Information and Charged Offense

### i.    The Scope of the Information

The victims argue that the information charges a plant-wide offense, and that a fine based on gross gain derived from the offense should therefore be based on the profits from the entire Texas City refinery, not just the cost savings allocated to the ISOM unit.  The victims point to the introduction section of the information, which states that "[w]ithin the BP Products Texas City refinery, there were 29 different refining units and four chemical units that had the capacity to process 460,000 barrels of crude oil per day into components including gasoline, jet fuel, diesel fuel, and chemical feed stocks."  (Docket Entry No. 1 at 1).

72

The victims also point to the fact that one of the two regulatory violations charged in the information – the failure to warn the contractors of the raffinate splitter startup, in violation of 40 C.F.R. § 68.87(b)(2) – explicitly references the ISOM unit, while the other charged violation –  failing to [e]stablish and implement written procedures, in violation of 40 C.F.R. § 68.73(b) – does not.

The information states:

### Knowing Violations of Risk Management Practices

Between in or about January 1999 and on or about March 23, 2005, in Texas City, Texas, within the Southern District of Texas, the defendant, BP PRODUCTS NORTH AMERICA INC., did knowingly . . . fail[ ] to do the following:

a.      Establish and implement written procedures to maintain the ongoing mechanical integrity of process equipment, in violation of Title 40, Code of Federal Regulations, Section 68.73(b).

b.      Inform contract owners and operators of the known potential fire, explosion, or toxic release hazards related to the contractors['] occupation of temporary trailers in the vicinity of the ISOM Unit, in violation of Title 40, Code of Federal Regulations, Section 68.87(b)(2).

(Docket Entry No. 1 at 7–8).  The victims argue that because the § 68.73(b) charge does not reference the ISOM unit, this charge applies to the entire Texas City refinery.  (Docket Entry No. 51 at 22–24 & n.9).

The information describes the entire plant only in an introductory section, under the subheading "BP Texas City Refinery Operations."  (Docket Entry No. 1 at 1).  There are subsequent, separate subheadings for "The Clean Air Act," "BP Products Texas City Refinery

73

Isomerization Unit, Blowdown Drum and Stack," and "Explosion of March 23, 2005." (*Id.* at 3–4). As the sequence of these subheadings makes apparent, the information begins with a general introduction and becomes progressively more specific in setting out the charge, which appears under the final subheading, "Knowing Violations of Risk Management Practices." (*Id.* at 7). Two subsections – under subheadings reading "BP Products Texas City Refinery Isomerization Unit, Blowdown Drum and Stack," and "Explosion of March 23, 2005" – state the specific conduct alleged as criminal conduct. The conduct alleged in these sections relates only to the ISOM unit. (*Id.* at 3–7). The structure of the information and the nature of the conduct that it alleges make clear that the violations charged occurred only in the ISOM unit. The victims' argument that the information charges a plant-wide violation of § 68.73(b) because this part of the information does not specifically reference the ISOM unit is not persuasive.

"An indictment must be read in its entirety." *United States v. Miranda*, 494 F.2d 783, 785 (5th Cir. 1974), *cert. denied*, 419 U.S. 966 (1974) (citing *United States v. Wilshire Oil Co.*, 427 F.2d 969 (10th Cir. 1970)). "An indictment is reviewed entirely on a practical basis, rather than in a 'hypertechnical manner.'" *United States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2003) (quoting *United States v. Craig Smith*, 230 F.3d 300, 305 (7th Cir. 2000)). "The indictment or information must be a plain, concise and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). The information, viewed as a whole, describes and charges conduct in the ISOM unit that led up to the March 2005 explosion. The information does not allege criminal conduct outside the ISOM unit.

74

The government asserts that it only intended to charge a criminal violation of the Clean Air Act in the ISOM unit, where the explosion occurred.  (Docket Entry No. 66 at 124–25).  In the Statement of Facts, BP admits to criminal violations of the Clean Air Act only in the ISOM unit.  (Docket Entry No. 8, Ex. A at 8–16; Docket Entry No. 96, Ex. 6 at 8–16).  The information and Statement of Facts support the parties' interpretation of the information as limiting the criminal conduct alleged to the ISOM unit.

### ii.    The Charged Offense and Other Offense Conduct

A fine under § 3571(d) may only be based on the conduct specifically charged in the information, not on other uncharged criminal activity or other wrongdoing.  Under § 3571(d), the fine may be no more than the greater of the gross (pecuniary) gain derived from the "offense" or the gross (pecuniary) losses resulting from the "offense."  "Offense," in Guidelines terms, means the offense of conviction and relevant conduct.  *See* Section 8A1.2, application note 3(h) (the term "pecuniary gain" is derived from § 3571(d) and means additional before-tax profit – either additional revenues or costs savings – resulting from the offense of conviction and relevant conduct under § 1B1.3).  "Relevant conduct" is "all acts and omissions . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G. § 1B1.3(a).  Relevant conduct is limited to *criminal* conduct and cannot extend to acts or omissions that are not criminal, even if they are negligent or repugnant.  "Relevant conduct includes *offenses* that are part of the same course of conduct or common scheme or plan as the offense of conviction."  *United States v. Mann*, 493 F.3d

75

484, 497 (5th Cir. 2007) (emphasis added) (internal quotations omitted) (quoting *United States v. Brummett*, 355 F.3d 343, 344 (5th Cir. 2003)); *see also United States v. Peterson*, 101 F.3d 375, 385 (5th Cir. 1996) ("For conduct to be considered 'relevant conduct' for the purpose of establishing one's offense level that conduct must be criminal.").

As noted, few cases analyze the application of § 3571(d).  One such case is instructive in defining the term "offense."  In *United States v. Aguilar*, 928 F.2d 1137, 1991 WL 40339, at *1 (9th Cir. Mar. 25, 1991) (unpublished), the defendant pleaded guilty to one count of possession with intent unlawfully to use or transfer five or more false United States immigration documents.  The court imposed a $33,580 fine, the amount found at the defendant's home, where agents also discovered 64 false immigration documents.  The evidence received by the district court indicated that the defendant's "normal" fee for the use of these documents was $500 per person, that she had been involved in this "business" since 1988, when she was arrested in possession of 284 false documents that she was then "renting" for between $45-$140, and that the documents were returned to the defendant upon their users' successful entrance to the United States, thereby becoming available for repeated use. *Id.* at *3.  The court approved the fine calculation, which was based on a conservative estimate that each document discovered in the defendant's home was used just once, at the going rate of $500. *Id.*  The defendant argued that the court had wrongly based the fine on the gains derived from her "illegal activity" – all 64 documents – as opposed to the gains derived from the "offense of conviction."  The court found that the district court had properly calculated the fine even assuming that the "term pecuniary gain as used in § 3571(d) refers

only to the gain from the 'offense of conviction.'"  *Id.*   The court emphasized that the indictment to which the defendant had pleaded guilty charged unlawful use of "*five or more*" false immigration documents.  *Id.*  "Given the inevitable uncertainty involved in assessing how much money has been derived from particular criminal conduct, the district court's determination that the 'pecuniary gain' to Aguilar from the 'offense of conviction' was $33,580.00 was not clearly erroneous."  *Id.* at *4.

The Seventh Circuit's opinion in *United States v. Alldredge*, 551 F.3d 645 (7th Cir. 2008), is a recent effort to define the word "offense."   The defendant was convicted of distributing counterfeit currency.   The defendant had received the currency as payment for checks that she forged and shipped for sale overseas.   The district court had enhanced the defendant's sentence on the basis that part of the offense had occurred outside the United States.   The Seventh Circuit reversed, noting that the defendant had not been charged with forging checks or participating in international counterfeiting.  *Id.* at 647.  Because the offense of conviction – distributing counterfeit currency – occurred exclusively in the United States, the related international aspects of the defendant's transaction could not be used as a basis for an enhanced sentence.   The court noted that the Guidelines, which in relevant part are derived from § 3571(d), "implement a charge-offense system rather than a real-offense system."  *Id.*; *see also United States v. Schaefer*, 291 F.3d 932, 938 (7th Cir. 2002) (rejecting a loss calculation derived from all receipts used in the defendant's artwork business, despite agreeing with the government that the defendant's business was "permeated with fraud,"

77

because the government had not established by a preponderance of the evidence that the defendant's entire business was tainted by unlawfulness).

The fine levied against BP Products must be based on the offense of conviction and "relevant conduct." Those are criminal acts and omissions in the ISOM unit.

### b. The Victims' Proposed Bases for Determining Gain

### i. Fine Based on Profits

The victims argue that the fine should be twice the Texas City plant's profits for the six years before the explosion because the information charges a six-year period of noncompliance with Clean Air Act, (Docket Entry No. 28 at 32; Docket Entry No. 51 at 21–24); or twice $1 billion, BP Products's profits from the entire Texas City refinery in the fourteen months before the explosion; or twice $450 million, which the victims allege was BP Products's cost savings from not bringing the entire Texas City plant into compliance with the Clean Air Act, (Docket Entry No. 66 at 103–05); or twice $725 million, which is the result of multiplying the $25 million gain from not updating the ISOM unit (the basis for the fine in the plea agreement) by the 29 refinery units at the Texas plant, (*id.* at 123).

Putting aside the issue of whether BP Products has pleaded guilty to plant-wide criminal conduct, the victims have not identified a factual or legal basis for finding that all of BP Products's profits from the Texas City refinery for the fourteen months – or six years – preceding the accident were derived from the offense. The victims recognize, for example, that then-record oil prices were a major part of the refinery's profits. The victims argue that BP Products "kept unsafe units in operation to reap the *windfall profits of increased gas*

*prices*." (Docket Entry No. 28 at 32) (emphasis added).  The premise of the victims'
argument is that the profits were made possible by keeping unsafe equipment and procedures
in use.  This argument is contradicted by the facts in the record.  Those facts show that the
ISOM unit was taken offline and kept offline after the explosion, and that the Texas City
refinery experienced little change to its profits as a result.  (Docket Entry No. 66 at 102).
Those facts also show that after the explosion, there were many safety improvements made
throughout the plant, during which the plant continued to operate and generate profits.  These
facts defeat the causal link the victims argue exists between deferring or avoiding safety steps
needed to comply with the Clean Air Act and the ability of the plant to continue operating and
to generate profit.  (*Id.* at 108).

Basing the fine on the Texas City refinery's entire profits would not satisfy the §
3571(d) requirement that the gross gain have been *derived from* the offense.  Using gross
profits from the entire Texas City plant as the starting point for the fine – whether for fourteen
months or six years – would require the court to determine what part of these profits were
either costs saved or additional revenues generated by the failure to implement the process
safety measures that are the basis of the offense.  Making this determination – even estimating
it – would require a lengthy and prolonged sentencing process to try to separate the costs
avoided or additional revenues received from failing to establish or implement these safety
measures from the total profits of all or part of the refinery.  If, as BP Products urges,
*Apprendi* applied, these problems would be compounded by the requirement of proof beyond
a reasonable doubt.  Attempting to use the total plant profits as the basis for the fine would

"unduly complicate and prolong" the sentencing process and would result in the application of the complexity provision of § 3571(d), leaving a default fine of $500,000.  The government states that it did not use the total profit derived from the ISOM unit as a basis for the fine because the ISOM unit "was one of the least profitable units out there" and the resulting fine would have been lower.  (*Id.* at 120).

*ii.*     *Fine Based on Cost Savings*

The victims alternatively argue that the fine should be based on BP Products's cost savings from a plant-wide failure to establish and implement written process safety procedures.  In the present case, the voluminous record shows that BP Products did not adequately address process safety throughout the Texas City refinery.  But that record does not provide a basis to establish or estimate the extent to which such conduct amounted to *criminal* acts and omissions throughout the refinery.  Instead, the record shows that there were a number of problems throughout the plant, including failures to train employees adequately. The victims do not contend, and could not contend, that every deficiency identified in the Baker Report, the CSB Report, or other documents is criminal.  And many of the deficiencies are not part of the offense of conviction –  the violations of 40 C.F.R. § 68.73(b) or § 68.87(b)(2) charged in the information – or offense conduct.  Even putting aside that the information charges violations only in the ISOM unit, and putting aside BP Products's *Apprendi* argument, to calculate the fine using gross cost savings (or additional revenues) derived from not establishing or implementing process safety steps throughout the plant would require extensive proceedings to identify what deficiencies were criminal and within the

80

offense of conviction and relevant conduct, and the amount of the savings or additional revenues attributable to those deficiencies.  Such proceedings would be unduly complicated and prolonged, triggering the complexity provision.

The court in *United States v. Gibson* reached a similar conclusion, refusing to base a fine on the defendant's alleged pecuniary gains from violating the Mine Safety and Health Act and making false statements to a federal agency.  409 F.3d at 342.  Although the court conceded that the defendant corporation had "probably realized some gain," the court declined to calculate the fine based on that gain because it could think of "no defensible methodology to use in calculating the gain with any reasonable certainty," so any resulting fine would be premised on "speculation and guesswork."  *Id.*  The court in *United States v. Schwartz* similarly declined to determine restitution based on the putative victims' losses, noting that it would be virtually impossible to distinguish the portion of the victims' losses attributable to the defendants' charged tax fraud from other "intervening factors."  2006 WL 1662899, at *6.  The court concluded that the connection between the "conduct of conviction – which was lying to the IRS," not the victims, and the losses claimed, which included the penalties, interest, and attorneys' fees incurred by the victims after their tax returns were prepared by the defendant, was too complex.  *Id.* at *4.  The court noted that the victims alleged that the defendant had made other, uncharged misrepresentations, both criminal and noncriminal, that contributed to the losses.  *Id.*  The court's conclusion was bolstered by the fact that the loss amounts attributable were disputed.  A protracted battle of forensic experts would be

necessary even to approximate the appropriate loss amount, and the process "would clearly overwhelm an otherwise straightforward sentencing proceeding." *Id.* at *5.

In the present case, making the determinations necessary to satisfy § 3571(d) could easily extend the sentencing phase longer than any trial and would require complex – and to some inevitable extent, speculative – calculation.  Absent the plea, attempting to base the gross-gain fine on twice a plant-wide measure of costs saved or additional revenues obtained by avoiding or deferring process safety procedures would trigger the complexity provision of § 3571(d), resulting in a maximum fine of $500,000.

> ### iii.  Fine Based on the Cost-Saving Estimate that Forms the Basis for the Proposed Plea

The victims suggest in the alternative that a fine based on gross gain could easily be calculated by taking the $25 million cost savings from not replacing the blowdown stack in the ISOM unit and not moving the contractors' facility in that unit offsite (the basis for the $50 million fine in the plea) and multiplying that figure by all 29 refining units at the Texas City refinery.  But this seemingly simple approach could not be done absent stipulation.  Even putting aside that BP Products pleaded guilty to criminal violations only in the ISOM unit, each of the refinery units had different equipment and processes and performed different tasks.  There is no factual basis for assuming that each of the 29 units had the same type of safety deficiencies as the ISOM unit or that similar cost savings were derived in each unit.

BP Products takes the position that even the $25 million cost savings figure from the ISOM unit that forms the basis for the plea agreement could not be established absent stipulation.  (Docket Entry No. 66 at 126–27).  The government adds that the figures from

which the $25 million was derived – the cost of replacing the blowdown stack and of building an offsite facility for contractors – results from steps that were not legally required but were instead a "voluntary remedial measure" by BP Products.  (*Id.* at 128).  The parties assert that the basis used to compute the stipulated fine could not be used in litigation if the plea agreement were rejected.

The victims urge that this court

> should not tolerate such Janus-faced arguments . . . .  Either the fines provision applies or it does not. . . .  If the Defendant wants to obtain the benefits of this Rule 11(c)(1)(C) plea, the Court, the public, and the Victims are entitled to have the Defendant state clearly that the Court possesses legal authority to impose the sentence the Plea calls for.

(Docket Entry No. 51 at 13–14).  The victims' argument raises two issues.  First, may this court accept as part of the plea agreement a fine that was computed on a basis that the parties contend could not be used in litigation?  And second, what is the legal effect of the parties' agreement to such a fine if this court rejects the plea agreement and BP Products withdraws the plea?

On the first issue, the parties do not contend that there is *no* factual basis for a $50 million fine.  Instead, they argue that proving gross pecuniary gain or loss at trial, using any of the various metrics the victims have proposed, would so unduly complicate a sentencing determination that the complexity provision of § 3571(d) would apply.  The parties have proposed a basis for the stipulated fine that, although not based exclusively on the criminal conduct that is the offense of conviction, has a strong factual nexus to that criminal conduct and estimates the pecuniary gain derived from that conduct.  At the February 4, 2008 hearing,

the government explained that although the basis it chose in calculating the fine incorporates certain noncriminal elements, this was the best method it could determine for arriving at an appropriate fine: "[W]e have searched hard and long to try to find a felony resolution on this case and we have stretched the facts as far as we think we can stretch them to achieve the maximum fine in this case . . . ."  (Docket Entry No. 66 at 129).  Because "[t]he quantum of evidence needed to supply a factual basis . . . takes less evidence than would be needed to sustain a conviction at trial," 1A CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE AND PROCEDURE – CRIMINAL § 179 (4th ed. 2008), this court may find a sufficient factual basis for the $50 million fine without determining that a fine approaching that amount could feasibly be proven and calculated at trial under either a reasonable doubt or preponderance of the evidence standard.[30]

On the second issue, if this court were to reject the plea agreement, the parties would return to their "pre-plea posture."  *Cervantes-Valencia*, 322 F.3d at 1062; FED. R. EVID. 410;

---

[30]     In *United States v. Union Foundry Co.*, No. 2:05-00299 (N.D. Ala. filed July 28, 2005), Union Foundry was charged with violations of the Occupational Safety and Health Act, 29 U.S.C. § 666(e), and the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d)(2)(A), 18 U.S.C. § 2.  As a result of the § 666(e) violation, a maintenance employee was crushed to death after becoming caught in a pulley of a conveyor belt.  Under a Rule 11(c)(1)(C) plea agreement, which the court accepted, the parties stipulated to a $3.5 million fine, thee years of probation, and $750,000 worth of community service.  *See* Plea Agreement and Conditions, *United States v. Union Foundry Co.*, No. 2:05-0299 (N.D. Ala. July 28, 2005).  The $3.5 million fine was calculated under § 3571(d) based on what a wrongful death award might have been in a civil case.  David M. Uhlmann, who served as Chief of the Environmental Crimes Section at the Department of Justice between 2000 and 2007, expressed doubt that a fine of this type could have been obtained absent stipulation.  *See* David M. Uhlmann, *Prosecuting Worker Endangerment: The Need for Stronger Criminal Penalties for Violations of the Occupational Safety and Health Act*, Am. Const. Soc'y for L. & Politics (Sept. 2008), *available at* http://www.acslaw.org/files/Uhlmann%20issue%20brief_0.pdf. ("In a contested proceeding . . . that approach might not be successful.").  Uhlmann is now the Jeffrey F. Liss Professor from Practice and the Director of the Environmental Law and Policy Program at the University of Michigan Law School.

FED. R. CRIM. P. 11(f).  The parties' agreement that the cost savings from not replacing the ISOM unit's blowdown stack is an appropriate metric for calculating the fine could not be introduced in a subsequent proceeding.

The victims have vigorously criticized the proposed gross-gain basis for the fine as unreasonably low.  But the alternatives the victims identify for calculating a higher fine based on gross gain are all problematic under § 3571(d).  Each alternative would, at a minimum, unduly complicate and prolong the sentencing proceedings to such a degree that the default $500,000 maximum fine under § 3571(c) would apply.

### 2.    Calculation Based on Loss

The victims argue that this court should reject the plea because the $50 million fine is far lower than could have been obtained using the gross losses resulting from the offense.  The government contends that it did not use gross losses as the fine basis because the calculation would be unduly complex, prolonged, and highly speculative.  The victims counter that gross losses would not be unduly complicated to calculate and would yield a fine amount significantly higher than the $50 million in the plea agreement.

The victims initially proposed several methods for the court to use in calculating the fine.  Most of these methods have since been abandoned or revealed as flawed.  The victims asserted that the $1.6 billion in civil settlements BP Products had paid up to that point would reasonably estimate the victims' losses resulting from the offense.  (Docket Entry No. 51 at 20).  But the amount of civil settlements does not equate to gross loss in a criminal fine.  Such

settlements are just that – settlements – and they include nonpecuniary damages such as pain and suffering, emotional distress, loss of consortium, and punitive damages.

In a later brief, the victims submitted an affidavit from one of their lawyers serving as liaison counsel in the civil cases.  In the affidavit, the lawyer stated that he had "a good faith basis for believing that the victims of the explosion have suffered a total pecuniary loss in excess of $200 million."  The lawyer appears to have arrived at this figure by calculating a "mean average for pecuniary losses" for a subset of victims and multiplying that number by the "over 2,000 victims" that he alleges suffered personal injury in the explosion.  (Docket Entry No. 69, Ex. 1 at 2–3).  Although reasonable estimation is permitted, this affidavit is an inadequate basis for calculating the fine based on gross losses.  There is no recognition of the differences among, or disputes over, the victims' injuries, medical expenses, and lost wages, both past and future.  The government argues that the affidavit would raise serious  issues under *Daubert* and does not provide the level of proof required in a criminal proceeding. (Docket Entry No. 75 at 3 n.4).

The victims argued that the lack of more precise loss information was one of the consequences of the government's failure to confer with them before the plea.  The victims also argued that a presentence investigation should be conducted to gather detailed loss information.  To ensure that the victims had a full opportunity to provide the government and the court with detailed loss information and to provide information relevant to deciding whether a presentence investigation is necessary and whether losses resulting from the offense are a proper basis for calculating and evaluating the fine, this court issued an order at the

hearing on July 16, 2008.  That order set a deadline, agreed to by the victims' counsel, to submit detailed information on gross pecuniary losses resulting from the offense.  The order invited the victims to submit loss information for up to fifty victims.  The victims were instructed to provide pecuniary loss information about all fifteen individuals killed in the explosion and to choose thirty-five more, thereby ensuring that the information would address the highest losses.  Supporting documentation was to be included.  (Docket Entry No. 84 at 21, 43–44).  The purpose was not to arrive at a total loss number, but rather to assist this court in determining whether the pecuniary losses resulting from the offense could feasibly be determined under § 3571(d); whether they were so far in excess of $25 million as to make the $50 million stipulated fine unreasonable; whether a presentence investigation should be conducted; and whether, if the plea were rejected, the sentencing procedure required to arrive at a loss calculation would be unduly complicated and prolonged.  (*Id.* at 31–32).

a.    *The Victims' Submissions*

The victims submitted pecuniary loss information for twenty-eight victims, not fifty. The submission contained loss information for just four of the fifteen who died in the explosion.  The loss information was divided into three categories:  lost wages; past medical; and future medical.  The victims asserted that the total pecuniary losses for this sample group were $102,122,228.88.  (Docket Entry No. 101, Ex. 1).

The government and BP Products pointed out numerous flaws in the victims' methodology and errors in the victims' calculations.  Some are described below.

- Victim 1's future lost earnings include future lost earnings for the victim's spouse, who was not injured in the

explosion.  The victims later clarified that this figure was included because the spouse decided to stay home to care for the injured victim.  (Docket Entry No. 120 at 128).  But the victims did not deduct this figure from the $29 million life care plan offered as evidence of future losses.  Victim 1's claimed past medical expenses of $1,256,405.87 are double the victim's actual past medical expenses.  Worker's compensation records showed that these expenses were $635,644.82.  BP Products asserts that Victims 1's life care plan was implemented at an amount far lower than $29 million, and that the victims have not submitted any information about the true cost of implementation.

- Victim 3 is projected to have future lost wages of $1,521,231.25.  BP Products and the government dispute this figure and there is no information as to preinjury earnings.

- Victim 4 is projected to have future lost wages of $2,904,000.00.  The victims premise this figure on an income of $88,000.00 per year.  But Victim 4's tax returns for 2004 disclose wages of only $44,000.00.

- Victim 7's medical expenses are listed as $3,879,239 for one month of care after the explosion.  Workers' compensation records reveal that the cost of care was only $521,367.00.  The victims claim $5 million in future medical expenses for Victim 7, based on a letter from Victim 7's attorney.  Victim 7's future lost earnings include lost earnings for his spouse, who was not injured in the explosion.

- Victim 8 is projected to have future lost wages of $3,219,312.00.  But the victims' expert report (developed for the civil litigation) projected future lost wages of only $1,408,811.00.  Even that figure was premised on an earning capacity of $75,000.00, which is higher than the salary documentation submitted by the victims.  These documents showed Victim 8's 2003 and 2004 income at $50,546.99 and $62,904.76, respectively.

- Victim 13 is projected to have future lost wages of $983,554.00. But the victims' expert report puts this figure at $312,949.00.

- Victim 14 is projected to have future lost wages of $1,775,142.00. But the victims' expert report puts this figure at $769,757.00. The expert's future lost wages figure is based on the assumption that Victim 14 would not work again, but the victim in fact returned to work shortly after the accident. Victim 14 is listed as having only $9,071.81 in past medical expenses and no future medical expenses.

- Victim 15 is listed as having future lost wages of $3,444,908.00. But the victims' expert report puts this figure at $1,324,376.00.

- Victim 16 is listed as having future lost wages of $4,621,003.00. But the victims' expert report puts this figure at $1,788,891.00. The expert's figure is based on an earning capacity of $110,000.00 per year. Victim 16 earned $37,791.23 in 2003 and $44,735.96 in 2004 . The expert's future lost wages figure is based on the assumption that Victim 16 would not work again, but the victim in fact returned to work one month after the accident at a higher salary.

- Victim 20 is projected to have future lost wages of $1,087,737.00, based on the assumption that Victim 20 will never work again. But Victim 20 returned to work immediately after the explosion, earning more in 2006 ($57,524) than in 2005 ($44,569).

- Victim 25 is projected to have future lost wages of $777,665.00. The victims' expert report estimates the future lost wages to be $267,921.00. But Victim 25 went back to work shortly after the accident at a higher salary. Victim 25 sustained $2,634.00 in past medical expenses and is not projected to have any future medical expenses.

- Victims 22–24 and 26–28 are projected to have future lost wages varying from $735,485.00 to $1,654,656.00. All of

> these individuals have returned to work at higher salaries
> than before the explosion.

(Docket Entry No. 104; Docket Entry No. 107 at 16–25 & App'x; Docket Entry No. 120 at 88–99).

The government and BP Products also point out general problems with the information submitted.  The losses are based on projections or estimates provided by victims' counsel or by experts retained in the civil cases, primarily for the purpose of settling those cases.  In most cases, the victims did not submit documentation such as tax returns or hospital or medical bills to support the projections or assertions.  Many of the victims' lost future earnings were calculated without reference to their ages at the time of the explosion, so future lost wages for individuals at or near retirement age were calculated as if these individuals would miss decades of future work.  For some of the victims, the loss estimates assume an inability to return to work, despite the fact that those victims went back to work immediately, some at higher wages.  For other victims, the future medical expenses are based on life-care plans prepared for civil litigation that, according to information BP Products submitted, overstate the victims' actual expenses under those plans.

The government and BP Products argue that the errors and uncertainties in the victims' submissions demonstrate that the pecuniary loss estimates that the victims provided are unreliable and cannot not be used to determine a fine.  The government argues that this court's difficulty in obtaining reliable information from victims represented by counsel about their pecuniary losses demonstrates the practical difficulties that the parties, probation officers, and the court would face in a sentencing proceeding trying to calculate a fine based on twice the

gross losses resulting from the offense.[31]  The government argues that these practical issues would trigger the complexity exception under § 3571(d) and result in a $500,000 fine.[32]

BP Products adds to these arguments the legal and factual difficulties in untangling the causal relationship between all the losses that the victims identify and the offense.  "In order to establish the causal nexus under Counsel's proposed loss theory, the government would also have to prove that the explosion itself was proximately caused by BP Products's violation of [§§ 68.73(b), 68.87(b)(2)], not by something else."  (Docket Entry No. 107 at 9).  BP Products also argues that under *Apprendi*, any amount of pecuniary loss above the $500,000 limit set by § 3571(c) would require proof beyond a reasonable doubt.  BP Products and the

---

[31]    The government argued:

> [W]hat the[ victims] gave us as proof is inconsistent with what they claim are the pecuniary loss amounts.  The numbers don't add up. . . .  I cannot come into this Court with a good conscience and seek lost wages based on permanent disability for people that continue to work. . . .  I can't make claims for lost wages and past medical that aren't supported by the medical records.  I can't overstate a victim's income just to arrive at a pecuniary loss number that's higher because I want to.  I have to base that on what the facts are.  And so, we look at all this evidence, Your Honor.  It's replete with errors.  And it's not anything that I would feel comfortable with or the court, I think would feel comfortable with basing a criminal fine.
> . . . .
> Would the government then have to go out and hire its own experts to prepare these sort of economic loss or lost wage calculations and then submit them to the probation department?  Would we have to go get independent doctors to examine medical records . . . ?

(Docket Entry No. 120 at 96–99).

[32]    The victims argue that this court has improperly placed the burden of proving loss on the victims, rather than on the parties.  (Docket Entry No. 117 at 7–8).  This contention is incorrect.  This court did not require the victims to prove losses.  This court gave the victims the opportunity to provide information in support of their argument that calculating such losses would not be unduly complicated.  Far from supporting the victims' position, the information the victims have submitted supports the government's argument that proving gross losses in an amount that would yield a fine larger than $50 million would be unduly complicated and prolonged.

government argue that were this standard to apply at trial, calculating pecuniary loss would require having a jury determine, beyond a reasonable doubt, the pecuniary losses of each individual victim.  (Docket Entry No. 120 at 86).

BP Products's causation arguments focus on the liability link between the offense and the explosion.  It is not necessary to resolve that argument.  Nor is it necessary to decide that *Apprendi* applies, as BP Products asserts.  The problems with the information the victims submitted lead to the conclusion that relying on gross losses resulting from the offense to set the fine absent the plea would trigger the complexity exception to § 3571(d) at the sentencing phase.

The cases show that if there are multiple victims present, the causation issues are disputed, and the losses include significant amounts of disputed future losses, the complexity exception to calculating losses in setting a fine (or restitution) is likely to apply.  *See Huff*, 409 F.3d at 563–64 (multiple victims); *Reifler*, 446 F.3d at 113–139 (multiple victims and disputed causation)*; Foote*, 2003 WL 22466158, at *7 (multiple victims and disputed causation)*; Kones*, 77 F.3d at 69 (disputed causation); *Gibson*, 409 F.3d at 342 (disputed causation); *Schwartz*, 2006 WL 1662899, at *5 (disputed causation); *Oslund*, 453 F.3d at 1062–63 (disputed future losses); *Cienfuegos*, 462 F.3d at 1167–68 (disputed future losses).  This case has all of those features.  This court tested the extent to which those features would complicate determining the fine amount based on losses by inviting the victims to submit the type of information that they would ask the court to use to determine the criminal fine.  The

victims' own submissions showed that there is no practical or legal way to arrive at a fine using the loss prong of § 3571(d) without triggering the complexity provision.

The victims' information was unreliable, incomplete, and contradicted by documents and other data.  Much of the information was vigorously disputed.  Many of those disputes centered around projected future losses.  Resolving those disputes and ensuring that the loss information was sufficiently reliable for use – under even a preponderance of the evidence standard – for hundreds or thousands of victims, is beyond the capability of an already burdened probation office; a presentence investigation is not the solution to this problem. Determining the pecuniary losses in this case would require a sentencing court to "become embroiled in intricate issues of proof."  *Reifler*, 446 F.3d at 136.  This would be inconsistent with the legislative intent that courts should avoid "protracted hearing[s] that would last longer than the trial" in determining fines.  H.R. Rep. No. 98–906, at 17 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5433, 5450.  Faced with cases presenting less complicated sentencing information, appellate courts have indicated that district courts should not to attempt to set restitution or fines based on losses resulting from the offense.  *See Huff,* 409 F.3d at 563–64; *Reifler*, 446 F.3d at 113–139; *Kones*, 77 F.3d at 69–70; *Gibson*, 409 F.3d at 342.  The same result appears likely here.

### b.    *Worker's Compensation Records*

The victims propose using the worker's compensation payments BP Products made to determine the past pecuniary losses resulting from the offense.  The government required BP Products to submit worker's compensation records as part of the DOJ investigation.  Those

records show that BP Products paid $21 million to 463 workers injured in the explosion. (Docket Entry No. 104 at 5 n.3; Docket Entry No. 120 at 120).  The parties and the victims dispute that $21 million reliably describes past pecuniary loss.

The government and BP Products argue that the figure inflates the amount of pecuniary loss because the Texas Worker's Compensation statute is "liberally construe[d] . . . in favor of the injured worker," *Castellow v. Swiftex Mfg. Corp.*, 33 S.W.3d 890, 896 (Tex. App.–Austin 2000), *abrogated on other grounds, Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544 (Tex. 2001), and is "akin to strict liability," (Docket Entry No. 120 at 120).  The victims argue that the $21 million figure underrepresents the amount of past pecuniary loss, because BP Products made an agreement with medical providers that allowed it to pay about fifty cents on the dollar for most claims.  (*Id.* at 135).

Even if the worker's compensation records could be used to estimate past pecuniary losses, that would not take into account, or provide a way to address, future pecuniary losses. If those future losses are excluded and the worker's compensation payments are the only basis for past pecuniary losses, the losses resulting from the offense are lower than the $25 million the government and BP have agreed to as the base fine.  If the disputed future losses are included, if the worker's compensation figures are disputed, and if additional past pecuniary losses have to be determined, the difficulties in determining the fine remain. *See Kones*, 77 F.3d at 69 (the complexity provision in VWPA should apply when there are "fault and causation issues before the sentencing court that cannot be resolved with the information otherwise generated in the course of the criminal proceedings on the indictment"); *Reifler*, 446

94

F.3d at 136 (the complexity provision in MVRA should apply to avoid "becom[ing] embroiled in intricate issues of proof" involving "the determination of complex factual issues"); *Gibson*, 409 F.3d at 342 (complexity provision in § 3571(d) should apply when there is "no defensible methodology to use in calculating the gain with any reasonable certainty").

### D.    Conclusion as to the Victims' Objections to the Fine

The victims' objections to the fine because it is based on too low a gain amount, and is not based on the victims' losses, are not a basis for finding the proposed plea unacceptable. The methods and measurements the victims propose are either unsupported by the law and facts or would raise such difficult issues as to likely trigger the complexity provision of § 3571(d).

## VI.   The Victims' Objections to the Terms of Probation

Under the proposed plea agreement, BP Products will serve a three-year term of probation.  Title 18 U.S.C. § 3563 sets out mandatory conditions for a probation term.  A sentencing court must require as part of any term of probation that the defendant not commit another crime during the probation term and that the defendant pay any fine or restitution imposed. § 3563(a)(1), (2).

BP Products will also be required to comply fully with the Settlement Agreement executed by BP Products and OSHA on September 22, 2005 and the Agreed Order executed by BP Products and the TCEQ on May 31, 2006.   The government explained that based on the overlap of the PSM regulations and the Clean Air Act RMP regulations, for purposes of the criminal resolution of this case, compliance with the OSHA Settlement Agreement as a

condition of probation was appropriate.  (Docket Entry No. 96 at 4).  BP Products and the government have represented to this court that these requirements are rigorous steps to address and remedy the underlying causes of the explosion, beyond the causes that BP Products admitted in the plea to the criminal information and in the Statement of Facts.

The victims' primary objection to the proposed probation conditions is that BP Products is not in compliance with the OSHA Settlement Agreement.  The victims have not challenged BP Products's compliance with the TCEQ Agreed Order.  (Docket Entry No. 120 at 59).  The victims argue that appointment of an independent monitor is necessary to ensure that BP Products fulfills its obligations under the OSHA Settlement Agreement.  The victims ask that this court appoint a monitor with "no fiduciary or administrative loyalties to BP" to oversee BP Products's compliance with the regulatory settlements.  (Docket Entry No. 28 at 39).  The victims also ask this court to reject the plea because the probation terms do not include certain other terms, such as requiring the parent company, BP Global, to provide BP Products with sufficient money to "make this plant safe," including compliance with "all applicable laws and regulations," and implementation of an "effective Ethics and Compliance Program."  (Docket Entry No. 120 at 71–72, 135).

The OSHA Settlement Agreement required BP Products to retain an independent PSM expert to conduct a "comprehensive audit and analysis of the PSM Systems at BP Products' Refinery and assess the robustness of the PSM systems," and supply OSHA with statements of action addressing the expert's findings.  (Docket Entry No. 96, Ex. 2).  BP Products also agreed to conduct an additional pressure relief-valve audit in satisfaction of this Agreement.

(*Id.*, Ex. 12).  The results of that audit were due to OSHA by December 31, 2008.[33]  BP

Products argues that appointing an independent monitor would amount to "duplicative

oversight," because OSHA's "comprehensive access to [BP Products's] facilities, records, and

personnel" will provide adequate oversight throughout BP Products's term of probation.

(Docket Entry No. 32 at 31).

The government has emphasized that BP Products's completion of its obligations under

the OSHA Settlement Agreement is a condition of probation.  At the October 7, 2008 hearing,

the government explained to this court that a three-year term of probation, as opposed to the

possible five-year term available by statute, 18 U.S.C. § 3561(c)(1), was selected because the

aim of the plea agreement was to bring BP Products into compliance with its regulatory

obligations on an "accelerated schedule."  (Docket Entry No. 120 at 13).  At the February 4,

2008 hearing, the government explained that "there's a deadline for this. . . .  [I]f the plea is

accepted today, then everything [under the OSHA Agreement] has to be done by February 4,

2011."  (Docket Entry No. 66 at 172).  The government states that if OSHA determines that

BP Products is out of compliance with the Settlement Agreement during the term of probation,

---

[33]       Although the Settlement Agreement stipulates that it will expire four years after its
September 22, 2005 execution date and the Agreed Order stipulates that it will expire five years after its May
31, 2006 execution date, the parties have assured this court that the plea agreement extends the term of the
Settlement Agreement through BP Products's three-year term of probation.  The government states that
"[d]uring the period of probation, BP Products must comply with the specific requirements of a Settlement
Agreement previously executed by BP Products and [OSHA]."  (Docket Entry No. 18 at 6).  The government
plans "regular contact" with OSHA and the TCEQ "throughout the probation period."  (Docket Entry No.
66 at 175).  BP Products affirms that "BP Products's continued compliance with the OSHA Agreement is .
. . a condition of the three-year probation to be imposed as part of the sentence in this case."  (Docket Entry
No. 12 at 11).  The government also informed this court that if the probation term were extended as the plea
agreement provides, the terms of the TCEQ Agreed Order would remain in place throughout that extension.
(Docket Entry No. 120 at 13).

it will "come into the court and seek a revocation of probation or extension of probation." (Docket Entry No. 120 at 15).   OSHA has certified that BP Products is currently in compliance with the Settlement Agreement.   (Docket Entry No. 96, Ex. 4) ("OSHA is monitoring BP's activities and based upon the information known to OSHA at this time, it has not found any evidence that BP is currently violating the Settlement Agreement.").

At the October 7, 2008 hearing before this court, counsel for the victims asserted that OSHA is wrong in its conclusion that BP Products is in compliance with the Settlement Agreement: "I think the facts absolutely demonstrate an inadequacy [in compliance with the agreement].   I don't want to characterize OSHA in any pejorative way.   I know that government agencies are oftentimes understaffed and underbudgeted and stretched." (Docket Entry No. 120 at 38).   The victims assert that the probation terms are inadequate because OSHA is an inadequate monitor.   The victims ask this court to reject the plea because OSHA's conclusion that BP Products is in compliance with its Settlement Agreement is wrong.

The victims do not address whether and to what extent OSHA is entitled to deference in its enforcement of the Settlement Agreement.   An agency's interpretation of, or finding of facts under, a regulation it is charged with enforcing is entitled to deference because "[a]dministrative agencies are simply better suited than courts to engage in such a process." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 569 (1980); *see also* 3 CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE § 12.24[3] (2d ed. 1997) ("It is readily recognized that many conclusions reached by the agency are the result of a technical competence that

even the most arrogant nonexpert could not hope to replicate.").  The Supreme Court has "recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  Although this court is not directly reviewing OSHA's findings, it must determine whether the record supports the victims' allegation that OSHA is wrong in finding that BP Products is in compliance with the Settlement Agreement.

### A.    The OSHA Settlement Agreement and the Sawyer Report

At the July 18, 2008 hearing, this court invited submissions from the parties and victims on BP Products's compliance with the OSHA Settlement Agreement and with the PSM regulations the Agreement is intended to enforce.  The victims submitted an expert report by Michael E. Sawyer, an industry safety consultant who was retained by the plaintiffs in many of the civil cases related to the explosion.[34]  The Sawyer report raises the following arguments

---

[34]     BP Products objected to the introduction of the Sawyer report on the grounds that "[t]he CVRA does not authorize, and has never before been used by, a victim to submit expert reports or testimony. . . . [T]he right to be heard is a right to allocute.  Allocution entails only the presentation of a personal statement from the speaker; it does not include a right to submit extrinsic evidence, much less expert testimony."  (Docket Entry No. 94 at 21).  Without attempting to define general limits for appropriate extrinsic evidence (or expert testimony) in the context of victims' objections under the CVRA, this court notes the unusual circumstances of this case.  The appellate court found a CVRA violation because the victims were not informed in advance of the proposed plea terms and given the opportunity to confer with the prosecutor before the plea was executed.  The appellate court recognized that after that occurred, the victims had been given expansive and numerous opportunities to be heard.  The appellate court found no basis for rejecting the plea on the basis of the CVRA violation but instructed this court to continue to take fully into account the objections that the victims asserted.  In order to ensure that this instruction was carried out, this court considered all the victims' submissions.

In addition, the victims and their counsel in the civil cases arising out of the explosion had met with the government frequently before the plea agreement was executed and had provided the government with the Sawyer report.  BP Products had also been given copies of the report and had deposed Sawyer in the civil

(continued...)

about BP Products's compliance with the OSHA Settlement Agreement and the PSM regulations it is intended to enforce:

- BP Products did not retain a PSM expert to "conduct" an audit of its PSM systems as the OSHA Settlement Agreement requires, but instead only allowed the PSM expert, AcuTech, to "assist" BP Products in conducting the audit. (Docket Entry No. 89, Ex. 1 at 13–14).

- The audit of the PSM systems was not "comprehensive," but merely a "spot check" of certain systems and inadequate. (*Id.*, Ex. 1 at 14–16).

- BP Products has identified certain remediation items as "closed" despite the fact that it has not yet remedied those items, but simply put in place a schedule for remediation in the future. BP Products is acting too slowly on future remediation. (*Id.*, Ex. 1 at 16–17).

- BP Products has failed to provide sufficient plans for remediating important items. (*Id.*, Ex. 1 at 17).

- AcuTech conducted first-hand inspections of the Texas City refinery only for the initial report. AcuTech's follow-up progress reports were based exclusively on data submitted by BP Products. (*Id.*, Ex. 1 at 16).

These criticisms must be considered in light of OSHA's Compliance Guidelines and Recommendations for Process Safety Management, 29 C.F.R. § 1910.119 App'x C, which include guidelines for compliance audits. Under 29 C.F.R. § 1910.119(o), such audits must be completed at least once every three years. The guidelines state in part that:

---

[34](...continued)
cases. There was no improper surprise to BP Products or the government, or unwarranted expansion of the record, by considering the Sawyer report, given all of these circumstances.

> Employers need to select a trained individual or assemble a
> trained team to audit the process safety management system and
> program. . . .  The audit is to include an evaluation of the design
> and effectiveness of the process safety management system and a
> field inspection of the safety and health conditions and practices
> to verify that the employer's systems are effectively implemented.
> The audit should be conducted or led by a person knowledgeable
> in audit techniques who is impartial towards the facility or area
> being audited.  The essential elements of an audit program include
> planning, staffing, conducting the audit, evaluation and corrective
> action, follow-up and documentation.

29 C.F.R. § 1910.119 App'x C ¶ 14.  "An effective audit includes a review of the relevant

documentation and process safety information, inspection of the physical facilities, and

interviews with all levels of plant personnel."  *Id.*

OSHA's guidelines endorse the use of sampling techniques in compliance audits,

provided that the "sample size [selected is] sufficient to give a degree of confidence that the

audit reflects the level of compliance with the standard."  *Id.*  The Center for Chemical Process

Safety,[35] which publishes guidelines for conducting PSM audits, confirms that "[b]ecause

auditing basically constitutes a check on, or verification of, the implementation of PSM

systems at a specific location . . . sampling is a well-established aspect of auditing."  (Docket

Entry No. 96, Ex. 9 at 28–29).  "In most audit situations, it may be desirable as well as

adequate to review only 10–20% of the population."  (*Id.*, Ex. 9 at 29).

---

[35]     The Center for Chemical Process Safety (CCPS) is a not-for-profit corporate membership
organization that identifies and addresses process safety needs within the chemical, pharmaceutical, and
petroleum industries.  The CCPS was a signatory to the Chemical Reactivity Hazards Management Alliance
with OSHA, the EPA, and five other chemical organizations.  The Alliance worked together between 2004
and 2007 to provide information, guidance, and access to training resources to chemical manufacturers.  The
victims have not challenged the legitimacy of the CCPS PSM audit guidelines.

OSHA guidelines also provide that after an audit, the company's management should craft a comprehensive corrective action plan, "establish[ing] priorities, timetables, resource allocations and requirements and responsibilities."   29 C.F.R. § 1910.119 App'x C ¶ 14. OSHA recognizes that although "[m]any of the deficiencies can be acted on promptly, . . . some may require engineering studies or more detailed review of actual procedures and practices."  *Id.*

Each of Sawyer's criticisms of BP Products's compliance with the Settlement Agreement is examined below.

### 1.    Whether BP Products Improperly Controlled the Audit

Sawyer criticizes BP Products on the ground that AcuTech merely "assisted" BP Products in conducting the audit.  This criticism is based on statements in AcuTech's initial report that "AcuTech assisted BP to conduct a comprehensive PSM Systems compliance audit, and analysis and assessment of the robustness of the PSM Systems at BP Products' Texas City Refinery."  (Docket Entry No. 94, Ex. 6 at 6).  But these statements are clarified by other portions of the initial report confirming that AcuTech personnel conducted the audit.  "The audit was conducted by a team of seven auditors from AcuTech and Lloyd's Register Capstone, Inc. who are degreed engineers with training and experience in auditing, PSM, engineering, operations, and construction."  (*Id.*).  "[T]he audit team did not include any persons from BP or other external organizations."  (*Id.*, Ex. 6 at 29).  The report explains that "BP permitted certain representatives from the BP U.S. Refineries Independent Safety Review Panel [the Baker panel] to participate as observers.  At various times throughout the audit, the

Panel representatives accompanied the audit team but were not part of it; nor did they influence or interfere with the conduct of the audit." (*Id.*). The report makes clear that AcuTech conducted the audit, as required by the OSHA Settlement Agreement.

### 2. Whether the Audit's Sampling Practices Were Improper

Sawyer criticizes the audit as a "spot check" of the required items, rather than a comprehensive review. Sawyer complains that of 26 refinery units in the Texas City plant,[36] only 24 were actually audited. Of those 24 units, Sawyer offers the following criticisms:

- Only 11 (46% of the units) were audited to determine whether safety information, as required by 29 C.F.R. § 1910.119(d), was available for each unit.[37]

- Only 31% of the refinery units were audited to determine whether a process hazard analysis, as required by § 1910.119(e), had been completed for each unit.[38]

- Only 54% of the refinery units were audited to determine whether employee training, as required by § 1910.119(g), had been conducted for each unit.[39]

---

[36]    The Texas City refinery in fact has 29 refining units and four chemical units. (Docket Entry No. 96, Ex. 6 at 1).

[37]    Section 1910.119(d) provides, in relevant part, that "process safety information shall include information pertaining to the hazards of the highly hazardous chemicals used or produced by the process, information pertaining to the technology of the process, and information pertaining to the equipment in the process."

[38]    Section 1910.119(e) provides, in relevant part, that for all processes covered by the PSM regulations, each "employer shall perform an initial process hazard analysis (hazard evaluation) on processes covered by this standard. This process hazard analysis shall be appropriate to the complexity of the process and shall identify, evaluate, and control the hazards involved in the process."

[39]    Section 1910.119(g) provides, in relevant part, that "[e]ach employee presently involved in operating a process, and each employee before being involved in operating a newly assigned process, shall be trained in an overview of the process . . . . The training shall include emphasis on the specific safety and health hazards, emergency operations including shutdown, and safe work practices applicable to the

(continued...)

- Only 38% of the refinery units were audited for mechanical integrity, as required by § 1910.119(j).[40]

- Only 54% of the refinery units were audited to determine whether written procedures to manage changes, as required by § 1910.119(l), had been established for each unit.[41]

(Docket Entry No. 89, Ex. 1 at 14–16). Sawyer asserts that this "sampling" violates the Settlement Agreement requirement that the auditor "conduct a comprehensive audit and analysis of the PSM Systems at BP Products' Refinery and assess the robustness of the PSM systems." (*Id.*, Ex. 1-A ¶ 1(a)).

Sawyer's characterization of the audit as addressing only 24 of 26 refinery units is not accurate. AcuTech's audit evaluated not refining units but "PSM-Covered Processes" – in other words, processes at the Texas City refinery that were subject to the PSM regulations. The AcuTech report defines a "process" as:

> Any activity involving a highly hazardous chemical including any use, storage, manufacturing, handling, or the on-site movement of such chemicals, or combination of these activities. Any group of

---

[39](...continued)
employee's job tasks." The section also provides that "[r]efresher training shall be provided at least every three years, and more often if necessary . . . ."

[40]   Section 1910.119(j) provides, in relevant part, that an employer shall "establish and implement written procedures to maintain the on-going integrity of process equipment"; "train each employee involved in maintaining the on-going integrity of process equipment in an overview of that process and its hazards and in the procedures applicable to the employee's job tasks"; "inspect[ ] and test[ ]" the process equipment "follow[ing] recognized and generally accepted good engineering practices" and "document[ing] each inspection"; "correct deficiencies in equipment that are outside acceptable limits . . . before further use or in a safe and timely manner"; and "assur[e] that [new] equipment as it is fabricated is suitable for the process application for which [it] will be used."

[41]   Section 1910.119(l) provides, in relevant part, that "[t]he employer shall establish and implement written procedures to manage changes (except for 'replacements in kind') to process chemicals, technology, equipment, and procedures . . . ."

> vessels which are interconnected and separate vessels which are
> located such that a highly hazardous chemical could be involved
> in a potential release is considered a process.

(Docket Entry No. 94, Ex. 6 at 16). AcuTech's definition is drawn directly from the definition

in 29 C.F.R. § 1910.119. AcuTech identified 26 PSM-covered processes at the plant. Two of

those processes – in the ISOM Unit and the Fluidized Catalytic Cracking unit No. 2 – were

being taken permanently off-line. AcuTech reviewed each of the 24 remaining PSM-Covered

Processes. (*Id.*, Ex. 6 at 25, 40–41).

The initial report reveals that in designing the sampling plan, AcuTech followed the

PSM audit management guidelines set out by the Center for Chemical Process Safety.[42]

---

[42]    The guidelines on sampling state:

**2.3.3   Sampling Strategies and Techniques**

Because auditing basically constitutes a check on, or verification of, the implementation of PSM systems at a specific location, audit team members generally take a "sampling" approach to examine large "populations" of records or documents or groups of employees to make a determination regarding compliance. Despite the fact that sampling is a well-established aspect of auditing, selecting appropriate sampling methods and sample size can be difficult. Thus, the auditor must exercise considerable caution when selecting a sampling method to gather information. If, for example, the sampling method does not adequately represent the population under review, the information gathered can be misleading and cause the auditor to draw a biased, inaccurate, or unsubstantiated conclusion. To help ensure that each sample selected is appropriate and defensible, auditors typically follow six basic steps:

1. *Determine the Objective of the Protocol Step Being Conducted*. What particular aspect of a regulatory requirement or internal policy will be reviewed? The answer to this question, although at times obvious, helps the auditor to identify clearly the boundaries of the population under review.

2. *Identify the Population Under Review*. What is the population of records, employees, etc. to be reviewed? What segments of that population are relevant to the audit? For example, when verifying the

(continued...)

---

[42](...continued)

existence of a preventive maintenance program, the first step is to identify all equipment that potentially should have been covered. Frequently, the size of the population can be estimated based on your review of selected documents, the observations made during reviews of PSM systems in place, and interviews conducted with facility personnel.

Independent records should be used whenever possible to develop the sample. For example, in reviewing training records it is not wise to start with a sample developed from a stack of training records provided by the facility coordinator. The training records available to the facility coordinator will only reflect those who have been trained (or, more precisely, those with training records). To gather data about the extent of training and training records, it would be more desirable to start with personnel department or payroll records and develop a sample of employees who should have been trained. Then, the training records could be reviewed to help determine whether each employee in the sample had been trained.

The final task in this step is to identify potential bias in the sampling frame. For example, consider the following questions: Was the auditor in control of selecting the frame of interest? From what records was the population under review identified? Are other data missing that would influence the sampling frame selection?

3. *Determine the Sampling Method to Be Employed*. Samples selected by an auditor are judgmental, but may be aided by a systematic selection strategy (see Table 2-2). A sample developed largely on the basis of the auditor's judgment may be appropriate where the size or nature of the population makes a systematic sample difficult or unreasonable to obtain. A systematic sample is one selected through the use of a systematic process chosen to represent the population that is being reviewed. Numerous methods are available to select a sample for review, but no one method is correct for all situations.

4. *Determine the Sample Size*. The appropriate sample size can be determined either on the basis of the auditor's judgment or statistically, depending on the goals and objectives of the audit program. In most audit situations, it may be desirable as well as adequate to review only 10–20% of the population. For very large populations, however, developing a sample size that represents 10% of the population may be too cumbersome or too time-consuming. In such cases, the auditor may want to select a smaller sample, but she should be sure that the sample is large enough to allow reasonable conclusions to be drawn, or otherwise be aware of the limitations inherent in drawing conclusions from the sample selected.

(continued...)

AcuTech also considered the nature of each of the processes to be audited, the relative degree of process safety risk in each process, the degree of changes in the design and operation of the processes, the PSM elements in each process, the personnel involved in each process, and recent incidents.  (*Id.*, Ex. 6 at 39–45).  The audit was structured such that compliance with each of the fourteen PSM elements in § 1910.119 was tested in at least five units and in most cases more.  Each unit was audited for compliance with the PSM requirements for developing and implementing safe operating procedures,[43] conducting compliance audits,[44] and making PSM compliance information available to employees responsible for compiling such information.[45]  (*Id.*, Ex. 6 at 41).

----

[42](...continued)

5. *Conduct Sampling*.  Again, careful attention must be paid to any potential for bias entering the sampling.  Independent records should be used wherever possible to develop the sample, and records for sampling should be selected by the auditor, not by facility personnel.

6. *Document the sample, strategy, and methodology employed*.  To assure management that a reasonable audit was conducted and to ensure quality control of the sampling process, the auditor should be prepared to indicate why the particular sample was selected.

(Docket Entry No. 96, Ex. 9).

[43]     Section 1910.119(f) provides, in relevant part, that "[t]he employer shall develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information . . . ."

[44]

Section 1910.119(o) provides, in relevant part, that "[e]mployers shall certify that they have evaluated compliance with the provisions of this section at least every three years to verify that the procedures and practices developed under the standard are adequate and are being followed."

[45]

Section 1910.119(p) provides, in relevant part, that "[e]mployers shall make all information necessary to comply with the section available to those persons responsible for compiling" PSM compliance information "without regard to possible trade secret status of such information."

In conducting the comprehensive audit required by the OSHA Settlement Agreement, AcuTech was to take a representative sampling of all of the PSM elements at the Texas City refinery. This could be done within the Settlement Agreement's deadline: AcuTech had to issue its PSM systems audit report within six months of being retained. An exhaustive review of every piece of equipment and every aspect of the refinery could not be accomplished in six months, but would take years. (*Id.* at 26–27). OSHA's conclusion that BP Products complied with the audit requirement of the Settlement Agreement is supported by the record. Sawyer's contention that BP Products violated the Settlement Agreement by permitting sampling practices in the audit is unsupported and unpersuasive.

The Sawyer report does not discuss in detail the instructions in the OSHA Settlement Agreement on what items BP Products was to emphasize in its "comprehensive audit and analysis of the PSM Systems." These items included:

> (1) the safe location of personnel in relation to hazardous processes; (2) the safe movement of vehicles into process areas; (3) the construction of fired and unfired pressure vessels, particularly the relief of overpressures to a safe location, in accordance with 29 C.F.R. 1910.106(i)(3) and the referenced ASME codes; (4) the classification of hazardous locations as defined in 29 C.F.R. 1910.399; (5) the notification of contractors and employees regarding potential hazards; (6) the inspection and maintenance of alarms providing personnel with notification of hazardous conditions that may be developing; (7) the standard operating procedures (particularly start-up and emergency shut-down procedures); (8) the adequacy of pressure relief for individual pieces of equipment; (9) the adequacy of safety instrumented systems; (10) human factor analysis; and (11) lock out/tag out programs, procedures, and applications.

(Docket Entry No. 96, Ex. 2 ¶ 1.b.(1)–(11)).

AcuTech's first report stated that "[t]he initial audit did not include a detailed analysis of items 1.b.(1)–1.b.(11) listed in OSHA's Settlement Agreement with BP."  (Docket Entry No. 94, Ex. 6 at 26).  The audit was structured so that if the examination of the fourteen PSM elements revealed problems with the eleven items OSHA had enumerated, "more detailed analyses of these issues [would] be recommended" for future investigation.  (*Id.*).  One issue is whether, even if AcuTech's decision to sample and method of sampling was proper, it sampled the wrong things.  In other words, did the failure to make these points of emphasis a special focus of the audit violate the OSHA Settlement Agreement?  The record shows that OSHA detected this initial failure, and demanded and obtained additional action consistent with the Agreement.

OSHA concluded that the audit as initially structured did not comply with paragraph 1.b.(1)–(11) of the Settlement Agreement and took action.  In an undated letter written as a follow-up to an August 3, 2007 meeting with BP Products's PSM Manager and other BP Products representatives, OSHA's Acting Area Director wrote:

> Under the agreement, the PSM expert was to conduct a comprehensive audit and analysis of the PSM systems and assess the robustness of the PSM systems.  More specifically, paragraph 1.b of the settlement agreement outlines what the audit and analysis by the PSM expert must include. Notably, sub-paragraph 8 requires that the PSM expert address "[t]he adequacy of pressure relief for individual pieces of equipment."
> . . . .
> In an effort to obtain further information regarding the work that AcuTech was hired to perform, OSHA issued subpoenas and conducted additional interviews. These interviews confirmed that AcuTech was not hired to perform the type of detailed analyses that OSHA anticipated would be performed with respect to evaluating the adequacy of pressure relief for individual pieces of

equipment. Thus, based upon the follow-up investigation, OSHA does not believe that BP has fully complied with subparagraph 8 of the September 22, 2005 settlement agreement. It is OSHA's position that for BP to fully comply with the settlement, BP must undertake the following: (1) provide to OSHA a comprehensive report detailing the projects (and their status) undertaken to determine whether the pressure relief devices for individual pieces of equipment are adequate; (2) as the original settlement agreement specifically contemplated that this work would be conducted by an independent PSM expert, retain a PSM expert to independently evaluate the work done by BP in this area, and (3) submit a detailed time-line regarding the projected date that these projects will be concluded.

(Docket Entry No. 96, Ex. 10).

AcuTech took steps to address these special-emphasis items in an addendum to the initial report and in follow-up reports. Instead of organizing its compliance discussion by the fourteen PSM elements, AcuTech addressed compliance under the eleven special-emphasis items. For each item, AcuTech described the extent that the item was addressed in the audit (including which of the tested PSM elements had revealed information pertinent to the special emphasis item), along with the actions and follow-up associated with any applicable audit findings and recommendations. To the extent that an aspect of the special-emphasis items was not addressed in the initial audit, AcuTech described current or planned activities by BP Products and AcuTech to address the item. (Docket Entry No. 94, Exs. 7, 8, 9, 10). AcuTech's final report was published on February 16, 2008.

BP Products also informed OSHA in a January 16, 2008 letter, after being warned by the government that noncompliance would threaten the plea bargain, (Docket Entry No. 96, Ex. 11), that it would hire a third-party consultant to conduct an additional audit. This audit

110

was to test the engineering soundness of the refinery's pressure-relief systems, focusing on two of the refinery's units that "formerly relied on blowdown stacks that have now been eliminated." BP Products stated that "if any major systemic deficiencies as determined by the expert consultant are uncovered in the audit, BP will address these deficiencies in all the process units." The results of this audit were due to OSHA no later than December 31, 2008. (*Id.*, Ex. 12).

OSHA's conclusion that these additional steps satisfy the Settlement Agreement, and that "based upon the information known to OSHA at this time, it has not found any evidence that BP is currently violating the Settlement Agreement," (*id.*, Ex. 4), is supported by the record. OSHA's diligence in pursuing this issue paints a far different picture of the agency than the picture painted by the victims or by Sawyer. OSHA conducted a follow-up investigation, issuing subpoenas and conducting additional interviews. (*Id.*, Ex. 10). As a result of OSHA's investigation, BP Products is conducting the additional audit that Sawyer faults BP Products for not doing initially. (*Id.*, Ex. 12).

As discussed below, concerns about the focus of the audit are also satisfied to a large extent by the fact that the audit of the fourteen PSM elements and the follow-up reports do address many of the special emphasis items. To the extent that the audit did not comprehensively address these items, the follow-up reports include important information about steps that BP Products has taken or will take to address these items.

### 3.        Whether the Time Frame Is Acceptable

In his report, Sawyer asserts that BP Products has acted too slowly in remediating the deficiencies identified in the AcuTech audit.  Sawyer complains in particular that when BP Products responds in a statement of action to OSHA that it has "closed" an item, this does not necessarily mean that the issue has been remedied.  Instead, in many cases this means only that BP Products has put in place a plan of action to remedy the issue.  Sawyer argues that "[t]o BP, 'closure' of an action item means merely that BP has written a document that it is going to check the issue at some time in the future."  (Docket Entry No. 89, Ex. 1 at 17).  BP Products counters that although "[t]he OSHA Agreement requires BP Products to implement the feasible recommendations made by AcuTech, [it] does not mandate their resolution within a specified time period . . . . OSHA recognizes that such initiatives are time-consuming."  (Docket Entry No. 94 at 29).

The OSHA Settlement Agreement instructs BP Products to "implement all feasible recommendations" from the audit report but does not specify a time frame in which this must be completed.  OSHA's Appendix to § 1910.119 recognizes that implementing audit recommendations requires an employer to "establish priorities, timetables, resource allocations and requirements and responsibilities," and that some deficiencies "may require engineering studies or in depth review of actual procedures and practices."  29 C.F.R. § 1910.119, App'x C at 14.  There is no evidence from the language of the plea agreement or from OSHA's interpretation of the PSM regulation that BP Products breached the Settlement Agreement by failing to implement the recommendations quickly.

Whether the time frame BP Products has proposed for implementation is reasonable under the PSM regulations is a separate issue.  Sawyer argues that BP Products has demonstrated undue delay in inspecting and updating its Safety Instrumented Systems (SIS), one of the special-emphasis items in the OSHA Settlement Agreement.  SIS have sensors for detecting abnormal operating conditions and are capable of automatically returning conditions to a safe state or shutting down the process when abnormal conditions are sensed.  The ISOM unit did not have SIS in place at the time of the explosion.  Sawyer complains that "it does not appear that AcuTech actually inspected any SIS system on any unit, or determined which units are or are not equipped with SIS."  (Docket Entry No. 89, Ex. 1 at 9).  Sawyer also complains that BP Products's promise to implement advanced SIS in all relevant units by 2012 is unreasonably slow.  (*Id.*, Ex. 1 at 10–11).

Sawyer's statement that the audit did not test for the presence and soundness of SIS does not appear accurate.  AcuTech's reports show that the Texas City refinery was audited for compliance with 29 C.F.R. § 1910.119(d)(3), which requires the compilation of process safety information relating to equipment, including interlocks and detection or suppression systems, and § 1910.119(j), which requires inspection, testing, and implementation of written procedures for the maintenance of emergency shutdown systems and controls, including "monitoring devices and sensors, alarms, and interlocks."  (Docket Entry No. 94, Ex. 10 at 36).  OSHA has characterized § 1910.119(d)(3) and § 1910.119(j) as regulations governing SIS.[46]

---

[46]

*See* U.S. Dep't of Labor, OSHA, *Compliance with PSM and ANSI/ISA-S84.01 for Safety Instrumented Systems* (Mar. 23, 2000), *available at*
(continued...)

AcuTech's report also states that as a long-term project,

> BP is addressing [SIS] as part of the Texas City Advanced Control Program (TCACP), which is a major program to upgrade the technology and safety integrity of the Texas City refinery automation and control systems over a three-year period. Specifically, the purpose of TCACP is to re-design Texas City operations for an increased level of automation, meet the requirements for safety instrumented systems (i.e., those control functions/systems that place the unit/equipment rapidly in a safe and stable condition, or emergency shutdowns).

(Docket Entry No. 94, Ex. 10 at 36). The TCACP implementation was to proceed on a timetable. At the time of the final report, the Phase 1 engineering was complete and installation was scheduled for completion by May 2009. Phase 2 was to be completed by late 2009, Phase 3 by December 2010, and Phase 4 by early 2011. All process units were to be completed by the end of 2012. (*Id.*, Ex. 10 at 37–38). Sawyer argues that there was no timetable in place when the first progress report was published, that the second progress report slated completion for the end of 2011, and that the final report's upward revision to 2012 represents an unacceptable delay. But Sawyer presents no basis for rejecting OSHA's determination that the timetable for significant plant-wide renovation is reasonable and properly implements the Settlement Agreement. Sawyer's criticism is not a persuasive basis for rejecting the plea because of deficient conditions of probation.

---

[46](...continued)
http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIONS&p_id=23722 (last visited March 6, 2009).

### 4. Whether BP Products's Remediation Response Has Been Adequate

The Sawyer report states that the AcuTech audit did not comply with the OSHA Settlement Agreement because "an evaluation of [the relief valves ("RVs")] to determine if the relief capacities and settings are correct for the equipment [they] protect[ ] still has not been conducted to date." (Docket Entry No. 89, Ex. 1 at 4). Sawyer quotes AcuTech's final report, which acknowledges the limited study of the relief valves:

> AcuTech audited the PSM System for Mechanical Integrity (MI). The adequacy of the MI program for RVs was examined during audit, particularly the inspection, testing and preventive maintenance (ITPM) and quality assurance (QA) requirements as they apply to relief valves. However, the actual design of a specific RV with respect to the equipment it protects to determine if the RV capacity and setpoint were correctly calculated and the right RV chosen were not examined.

(Docket Entry No. 94, Ex. 10 at 33). Sawyer appears correct that the AcuTech audit did not comply with the OSHA Settlement Agreement requirement that "[t]he adequacy of pressure relief for individual pieces of equipment" be studied as a special-emphasis item. (Docket Entry No. 96, Ex. 2 ¶ 1.b(8)). As BP Products recognizes, high pressure and high temperatures are sources of risk at refineries such as the Texas City plant, particularly plants that have been in operation for years. Another employee at BP Products's Texas City refinery, William Gracia, was killed after the metal lid of a water filtration unit in the Ultracracker process unit blew off due to overpressure. (Docket Entry No. 110, Ex. 1). BP Products entered a settlement with OSHA after Gracia's death, agreeing to correct six regulatory violations and to pay a $28,000 fine. (*Id.*; Docket Entry No. 111).

Sawyer's criticism, however, does not provide a basis for rejecting the proposed plea. The record does not show that the solution to the problem is an additional monitor of the OSHA Settlement Agreement, on top of the monitoring OSHA already provides, both under the Agreement and under its general regulatory mandate.  As discussed above, OSHA detected this problem – even before the Gracia tragedy – and acted, requiring BP Products to retain a relief-systems expert and to conduct an additional audit of relief valves.   (Docket Entry No. 96, Ex. 12).

Sawyer also complains, citing the final AcuTech report, that numerous relief-system issues detected by the AcuTech audit have not yet been remedied.  His complaints include the following:

- Sawyer states that of 112 high risk atmospheric relief valves identified, only 6 had been mitigated, "leaving 95% still at high risk."  He omits the rest of the entry, which states that an additional "31 will be mitigated prior to unit recommissioning and 80 have active projects to further evaluate and potentially mitigate" the risk.

- Sawyer states that "[d]rum overfill high level screening has been completed on only 3 out of 25 refinery units; 88% remains unfinished." He omits AcuTech's explanation that "[d]rum overfill risk evaluation was added rather late to the program. . . .  No significant risks were found as a result of the first three unit evaluations.  Due to the large number of drums (over 1000), it is expected that this effort will be complete by the end of 2008, with the . . . risk evaluation and plan to address problems at the end of 2009."

- Sawyer states that "three [process] units containing 5 reactor vessels have not been corrected" for "relief system and depressurization risk," omitting that these units "have achieved about 80% of the risk mitigation," with the remaining mitigation scheduled for completion.

116

- Sawyer states that "36% of ISBL relief system analyses have not been completed," omitting that "the final [analyses] are in progress and due for completion in early 2008."

(Docket Entry No. 89 at 5–6; Docket Entry No. 94, Ex. 10 at 19–21).  These criticisms appear to be taken out of context.  AcuTech explained that it was providing these figures as an update on the progress of BP Products's Atmospheric Blowdown & Flare Project ("ABF Project"), which "was established in late March 2005 with [the] scope of upgrading relief systems across the Texas City Refinery."  The "primary goal" of the ABF Project was the "elimination of blowdown stacks and ensuring the capability and adequacy of the refinery's relief systems including individual relief devices, flares, drums and spheres."  (Docket Entry No. 94, Ex. 10 at 17).  When AcuTech's final report issued, BP Products had reduced the number of blowdown stacks in service from twelve to one.  The report explained:  "The remaining blowdown stack in service is in emergency heavy oil, steam and condensate service and is assessed as low risk with no plans for removal.  Of the remaining 11, none are tied to a process and 9 have actually been demolished or are associated with mothballed units."  (*Id.*, Ex. 10 at 19).  The ABF Project is scheduled for completion in 2012.  (*Id.*, Ex. 10 at 21).  Sawyer's criticisms of the remediation of the relief systems that were the subject of the audit do not show noncompliance with the OSHA Settlement Agreement.

### 5.    Whether BP Products's Provision of Data for Follow-Up Reports Is Proper

The Sawyer report correctly points out that BP Products's compliance with the OSHA Agreement and the PSM regulations has been directly verified by a third party (AcuTech) only

once, during the initial audit.  "[S]ince the initial audit of May 2006, the PSM Expert has not performed any additional audit activities or verification of audit resolutions."  (Docket Entry No. 89, Ex. 1 at 14).  AcuTech acknowledges in its follow-up and final reports that "[t]he progress reported regarding the status of and progress on the initial audit recommendations are based solely on information provided directly to AcuTech by BP."  (Docket Entry No. 94, Ex. 10 at 7).  But Sawyer is not correct that this shows BP Products's failure to comply with the OSHA Settlement Agreement.  That Agreement requires BP Products to retain a PSM systems expert "to conduct a comprehensive audit and analysis of the PSM Systems."  It also requires the PSM expert to "provide two semi-annual progress reports and one final report."  There is no requirement that AcuTech conduct the investigation that gathers the information for these follow-up reports.  (Docket Entry No. 96, Ex. 2 at 3).  OSHA concluded that this audit structure did not violate the terms of the Settlement Agreement.  The record supports OSHA's conclusion.

The victims did not argue that making compliance with the Settlement Agreement a condition of probation was too lenient because the Settlement Agreement's terms were insufficient.  Rather, the victims argued that BP Products had failed to comply, making additional enforcement steps necessary.  The record does not show failure to comply, as the victims assert.  The victims' objections to the terms of probation relating to the enforcement of the OSHA Settlement Agreement are not grounds for rejecting the proposed plea.

### B.     The TCEQ Agreed Order

The victims have not asserted that BP Products has failed to comply with the TCEQ Agreed Order or that the terms of that order are inadequate.  (Docket Entry No. 120 at 59).  A brief discussion of BP Products's progress under that Order is useful to analyze the adequacy of the probation terms.

Sawyer's report asserts that as of February 16, 2008, 40% of flare-design deficiencies identified at the refinery had not been resolved.  (Docket Entry No. 89, Ex. 1 at 5).  On August 13, 2008, the Director of the TCEQ's Enforcement Division wrote a letter to this court, stating as follows:

> TCEQ is in the process of reviewing the submissions and actions taken by BP which were required to be performed under the terms of the Agreed Order.  TCEQ Enforcement staff have consulted with the TCEQ Regional Office in Houston, TCEQ legal staff and other TCEQ personnel . . . . The corrective measures contained in the Ordering Provisions include the requirement of a phased schedule for the facility's flares and other combustion devices to come into compliance with state rules and regulations.  The final phase is required to be completed no later than June 15, 2011.  As of this date, and based solely on information known to the TCEQ, I have determined that BP is in compliance with the specific compliance schedule . . . .

(Docket Entry No. 96, Ex. 5).  The TCEQ letter provides confirmation from an additional agency that BP Products is on track to update its flare system and that the time frame is reasonable.

C.       Whether an Independent Monitor Is Necessary

The victims argue that this court should appoint an independent monitor to ensure that BP Products is meeting its PSM obligations and the terms of the OSHA Settlement Agreement and the TCEQ Agreed Order.  The victims argue that the plea agreement's reliance on OSHA and the TCEQ to police their own agreements limits the government's enforcement power to whatever enforcement powers already exist under the OSHA and TCEQ orders.  The victims further assert that OSHA has failed to exercise the enforcement powers that it already has. At the October 7, 2008 hearing, counsel for some of the victims asserted that OSHA is mistaken – or worse –  in its conclusion that BP Products is in compliance with the Settlement Agreement: "I think the facts absolutely demonstrate an inadequacy [in compliance with the agreement].   I don't want to characterize OSHA in any pejorative way.   I know that government agencies are oftentimes understaffed and underbudgeted and stretched." (Docket Entry No. 120 at 38).  The victims assert that these two arguments – that the plea agreement limits enforcement powers against BP Products to the enforcement powers in the OSHA Settlement Agreement and the TCEQ Agreed Order, and that these enforcement powers are inadequate to monitor and correct BP Products's conduct – make an independent monitor necessary.

The victims' argument that the plea agreement limits the agencies' enforcement powers to those specified in the Settlement Agreement and Agreed Order is unpersuasive.  Under these agreements, OSHA and the TCEQ retain all of their original regulatory powers.  (Docket Entry No. 96, Ex. 2 at 14) ("Nothing in this Agreement shall be construed as limiting OSHA's

authority to conduct any type of inspection authorized by the Act."); (*id.*, Ex. 3 at 12) ("Nothing in this Agreed Order shall prevent the Executive Director from initiating an enforcement action against BP Products alleging that emissions from any Affected Combustion Device constitute an emissions event.").  OSHA already has an order from the Fifth Circuit under 29 U.S.C. § 666(b),[47] which permits a civil contempt action against BP Products if it violates the Settlement Agreement.  (*Id.*, Ex. 4).  The government points out that the proposed condition of probation will give OSHA additional enforcement powers:

> Under the Settlement Agreement as originally executed, if OSHA was unable to resolve a dispute, it could only seek a contempt order from the Circuit Court of Appeals.  29 U.S.C. § 660(b). Under the proposed Plea Agreement which now incorporates the Settlement Agreement, if OSHA believes it cannot resolve a dispute with BP Products regarding compliance with a condition of the Settlement Agreement, the Department of Justice may now seek the more serious sanction of a violation of probation.

(Docket Entry No. 33 at 8).

Furthermore, under the proposed plea, if BP Products breaches the OSHA Settlement Agreement or the TCEQ Agreed Order, it will be subject not only to a civil contempt order but to a criminal probation violation.  Under 18 U.S.C. § 3565(a), the punishment for violating a probation condition may include "extending the term [of probation] or enlarging the conditions," or "revok[ing] the sentence of probation and resentenc[ing] the defendant."  *See*

---

[47]     Title 29 U.S.C. § 666(b) provides:

Any employer who has received a citation for a serious violation of the requirements of section 654 of this title, of any standard, rule, or order promulgated pursuant to section 655 of this title, or of any regulations prescribed pursuant to this chapter, shall be assessed a civil penalty of up to $7,000 for each such violation.

*also* U.S.S.G. § 8F1.1 ("Upon a finding of a violation of a condition of probation, the court may extend the term of probation, impose more restrictive conditions of probation, or revoke probation and resentence the organization.").  A court may modify or revoke a defendant's probation if it is "reasonably satisfied," by a preponderance of the evidence, that the defendant's conduct "has not been as good as required by the conditions of probation." *United States v. Levine*, 983 F.2d 785, 787 (7th Cir. 1993) (internal quotations omitted) (quoting *United States v. Thomas*, 934 F.2d 840, 846 (7th Cir. 1991)); *see also United States v. Teran,* 98 F.3d 831, 836 (5th Cir. 1996).  Proof beyond a reasonable doubt is not required.  *Levine*, 983 F.2d at 787.

"[A] single probation violation [i]s sufficient to support the district court's exercise of discretion to revoke [a defendant's] probation." *United States v. Lindo*, 52 F.3d 106, 107–08 (6th Cir. 1995).  The Sentencing Guidelines suggest as a matter of policy that if imprisonment cannot be part of the sentence, revocation of probation "is the appropriate disposition" when the defendant commits two or more violations.  U.S.S.G. § 7B1.3, cmt. n.1.  The Sentencing Guidelines also provide that "[i]n the event of repeated violations of conditions of probation [by an organizational defendant], the appointment of a master or trustee may be appropriate to ensure compliance with court orders."  U.S.S.G. § 8F1.1, cmt. n.1.  When a defendant violates a condition of probation, the district court must hold a hearing and consider the sentencing factors set forth in 18 U.S.C. § 3553(a) – the same factors that the court is required to consider in imposing the initial sentence.  18 U.S.C. § 3565(a); FED. R. CRIM. P. 32.1(b)(2).

122

If this court concluded, by a preponderance of the evidence, that BP Products was not complying with the terms of these settlements, it would have the option of revoking BP Products's probation and resentencing, or modifying the terms by extending the length or imposing additional terms, including the type of independent monitor the victims seek. The proposed plea agreement adds enforcement powers to the existing regulatory requirements. The record supports OSHA's conclusion that BP Products is in compliance with the OSHA Settlement Agreement. The victims agree that BP Products is in compliance with the TCEQ Agreed Order. The record does not show that the Settlement Agreement requires an additional monitor to be effective. OSHA appears to be a diligent monitor and has kept the government apprised of BP Products's progress. BP Products and OSHA have an "on-going dialogue," in which "[r]epresentatives from the Refinery and OSHA meet on a monthly basis to discuss safety and health matters related to the Refinery." (Docket Entry No. 94 at 27). The government will confer with OSHA and the TCEQ on the second Monday of every month if the proposed plea is approved. (Docket Entry No. 120 at 10–11). The fact that the proposed plea agreement does not require an additional monitor does not provide a sound basis for rejecting the plea.

It is also not clear that an additional court-appointed monitor at this time would provide the advantages that the victims seek. Neither the court nor the probation office have the expertise or the resources to monitor BP Products's compliance with the complex and detailed provisions of the PSM regulations. Delegating this task to a court-appointed expert would not solve this problem. Although BP Products would pay the expert's expenses and fee, the court

123

would still have to analyze the expert's findings and recommendations and settle disputes between BP Products and the expert, which the court is ill-equipped to do.  OSHA and the TCEQ have the expertise and have demonstrated that they and the Department of Justice are committed to the increased scrutiny the Settlement Agreement and Agreed Order require.

### D.   Conclusion as to the Objections to the Proposed Probation Terms

The victims' primary objection to the terms of probation was that the terms did not provide for an additional court-appointed monitor to ensure that the OSHA Settlement Agreement was properly enforced.  The victims also criticized the fact that the proposed plea agreement did not contain a provision that allowed the court to impose other conditions of probation if it accepted the plea.  Such a provision would be contrary to the law that limits this court's role in a Rule 11(c)(1)(C) plea to deferring, accepting, or rejecting the plea; this court cannot accept the plea and then modify its terms, even if the parties agreed.  *See McClure*, 335 F.3d at 413 ("[O]nce the court has accepted the agreement, it may not subsequently reject or modify it."); *see also Morgan*, 506 F.3d at 709.  The victims urged this court to make compliance with applicable laws and regulations a condition of probation.  The standard conditions of probation accomplish that result.  The victims also argue that the probation terms are deficient because they do not require a "contractual assurance" by BP Global to provide adequate funding to comply with the conditions of probation.  But compliance is required.  The lack of such a "contractual assurance" or the lack of funds would not provide a defense or excuse if BP Products failed to comply with the conditions of probation.

124

The victims do not appear to argue that the terms of the OSHA Settlement Agreement or the TCEQ Agreed Order are inadequate.  Instead, the victims' primary argument is that OSHA is not adequately enforcing the Settlement Agreement and that BP Products is not in compliance, making an additional independent monitor necessary.  The record shows that BP Products is in compliance, that OSHA's enforcement has been effective, and that OSHA and the Department of Justice are committed to continued effective monitoring and enforcement. There is accordingly no factual or legal basis to reject the proposed plea on the grounds the victims assert.

## VII.  Whether This Court Should Order a Presentence Investigation and Report

BP Products and the government have moved to waive the presentence investigation and report.  (Docket Entry No. 8).  The victims object.  "Presentence reports, while often an important resource, are not a mandatory part of the sentencing process."  *United States v. Brown*, --- F.3d ---, 2009 WL 537492, at *1 (6th Cir. 2009).  "[A] district court may dispense with a presentence report if it finds that such a report is unnecessary."  *United States v. Cantu*, 786 F.2d 712, 712 n.1 (5th Cir. 1986), *cert. denied*, 479 U.S. 847 (1986) (holding that a presentence report was not required because the district court found that "it had all the necessary information at hand," and noting that "the district court granted the petitioners the opportunity to address the court regarding sentencing"); *see also United States v. Colmenares-Hernandez*, 659 F.2d 39, 42–43 (5th Cir. 1981), *cert. denied*, 454 U.S. 1127 (1981) (upholding the district court's decision not to order a presentence report because "there was sufficient

125

information in the record for the court to meaningfully exercise the sentencing discretion" and there was no indication that the probation officer would likely provide additional information).

Federal Rule of Criminal Procedure 32(c)(1)(A) permits a court to forgo a presentence investigation and report if "the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record." FED. R. CRIM. P. 32(c)(1)(A)(ii).

Local Rule 32.1 requires that a motion to waive a presentence report contain:

1.  a factual summary of the defendant's relevant conduct in committing the offense;

2.  a listing of the defendant's criminal history, including dates of conviction, dispositions, and representation by counsel;

3.  guideline calculations leading to the establishment of the total offense level and criminal history category;

4.  a statement reflecting the resulting imprisonment, fine and supervised release ranges, as well as any factors that may warrant a departure from these ranges;

5.  a statement as to the identity and address of any victim(s) and the amount of restitution due to any victim. In the case of any identified victim where no restitution or only partial restitution is being recommended, the motion shall include a statement justifying the recommendation.

S.D. Tex. Crim. L.R. 32.1.  The motion filed by BP Products and the government complies with these requirements.  (Docket Entry No. 8).  BP Products has submitted a sworn statement of facts admitting its conduct in committing the offense.  (*Id.*, Ex. A; Docket Entry No. 96, Ex. 6).  BP Products has stated that it has no criminal history, while acknowledging violations at

the Texas City refinery and criminal offenses by affiliate entities.[48]  Because the Sentencing

Guidelines do not apply to environmental offenses, there is no applicable Guideline calculation

in this case.  Instead, the sentence is to be determined under 18 U.S.C. §§ 3553 and 3572.  *See*

U.S.S.G. §§ 8C2.1 cmt. background; 8C2.10.  The record includes extensive information as

to the victims.  This is not a case in which restitution is required.[49]  (Docket Entry No. 8 at 12).

This case is unusual because the criminal investigation was only one part of extensive

efforts to learn and understand the acts and omissions of the defendant.  In most cases, the

presentence investigation is necessary because such information either has not been gathered

or has not been analyzed in ways relevant to sentencing considerations.  That is not the case

here.  The record includes lengthy and detailed reports about BP Products's acts and omissions,

criminal and otherwise, far beyond what a probation office could accomplish or supplement.

There are lengthy and detailed reports about the requirements imposed since the explosion to

address BP Products's acts and omissions, including reports provided by experts retained by

the victims in their civil cases.  The victims have been given ample opportunity to submit

---

[48]     The victims initially criticized the motion for failing to include the criminal history of all the BP Global related entities, including BP Exploration Alaska, Inc.  (Docket Entry No. 16 at 3–6).  But the victims later conceded that the government properly charged only BP Products and that the parties did not omit any of its criminal history.  The victims no longer argue that this court should consider the conduct of related entities in determining the adequacy of the plea terms.  (Docket Entry No. 66 at 88–89).

[49]     BP Products and the government argue that restitution is not available for violations of 42 U.S.C. § 7413(c)(1) because the restitution statutes, 18 U.S.C. §§ 3663, 3663A, do not apply to Title 42.  But restitution is available for § 7413(c)(1) violations when imposed as a discretionary condition of probation under 18 U.S.C. § 3563(b)(2):  "The court may provide, as further conditions of a sentence of probation . . . that the defendant . . . make restitution to a victim of the offense under section 3556 (but not subject to the limitation of section 3663(a) or 3663A(c)(1)(A))."  The terms of the plea agreement, which this court cannot alter, but only accept or reject, do not provide for such restitution.  The victims have not argued for such restitution.

information relevant to sentencing, and they have done so.  Those submissions have shown that

the probation office could not effectively or efficiently obtain reliable, useful information as

to the victims' losses in a presentence investigation.  All these reports and submissions have

provided this court with an exhaustive and detailed account of BP Products's conduct and its

consequences.[50]  The Guidelines do not apply to this case, so there is no need for the  probation

---

[50]        The court in *United States v. Tyler Pipe Co.*, No. 6:05-0029 (E.D. Tex. filed Mar. 22, 2005),
waived the presentence investigation and report under similar circumstances.  Tyler Pipe was accused of
knowingly violating the Clean Air Act by constructing and operating a plant component without obtaining
a preconstruction permit and concealing the construction from the EPA and TCEQ.  The resulting component
was substantially out of compliance with air pollution technology requirements and generated illegal
emissions.  *See* Information, *United States v. Tyler Pipe Co.*, No. 6:05-0029 (E.D. Tex. Mar. 22, 2005).  Tyler
Pipe entered a plea agreement under which it pled guilty to an information charging it with violations of 18
U.S.C. § 1001(a)(1) (for concealment of a material fact from the EPA) and 42 U.S.C. § 7413(c)(1) (the same
provision of the Clean Air Act to which BP Products has entered a plea of guilty in the present case).  Under
the plea agreement, Tyler Pipe agreed to pay a $4.5 million fine, fulfill an extensive Compliance Agreement,
and submit to a five year period of probation.  *See* Plea Agreement, *United States v. Tyler Pipe Co.*, No. 6:05-
0029 (E.D. Tex. Mar. 22, 2005).

The government and Tyler Pipe moved to waive the presentence investigation and report, arguing
that these would not provide the court "with additional, material information":

> The PSR inevitably would have to rely upon summaries of the
> investigation, as the investigation of the criminal case was extensive,
> involving several thousand boxes of documents, many of which were
> produced by the Defendant, and more than 100 witness interviews.
> Secondly, without extensive, expert assistance, the PSR would not be able
> to evaluate critically the cost savings captured by the Defendant from this
> misconduct.  The estimated cost savings calculated by the United States and
> the Defendant were based on multiple assumptions, and varied widely based
> on these assumptions.  Because these estimations do not lend themselves to
> routine or standardized evaluation, the PSR is not particularly suited to
> access these issues.  Finally, this Information in this case represents the first
> time in any jurisdiction in the United States that the New Source
> Review/Prevention of Serious Deterioration provisions of the Clean Air Act
> has served as the basis for a criminal prosecution.  Therefore, there are no
> comparable cases with which the PSR could compare the facts in this case.

Motion to Waive Presentence Report, *United States v. Tyler Pipe Co.*, No. 6:05-0029 (E.D. Tex. Mar. 22,
2005).

The court in *Tyler* granted the waiver, concluding:

(continued...)

office to fill the role of assisting in applying the Guidelines.  The probation office is made up of extremely talented, dedicated, and hardworking individuals, but this is not the kind of case in which they have relevant expertise or experience or adequate resources to add to the information already in the record.  A presentence investigation and report would not be likely to provide this court with information important to exercising the discretion required in this case, but would further delay already delayed proceedings.  The objection to the lack of a presentence investigation and report is not a basis for rejecting or deferring the proposed plea.

## VIII.  Whether the CVRA Violation Provides a Basis for Rejecting the Plea

The Fifth Circuit found a CVRA violation because the government did not confer with the victims about the terms of the proposed plea before it was executed, but instead conducted the plea negotiations under a court-approved procedure that kept those terms confidential until agreement was reached.  The Fifth Circuit concluded, however, that these violations were not grounds for mandamus, and that "the better course" was to allow this court to evaluate the proposed plea agreement.

---

[50](...continued)
> This case has a two-year history with a well-developed factual record summarized for this Court in a factual resume and legal memoranda.  The parties have, after long negotiation, reached an agreement about an appropriate fine.  Further, this is the first time that the New Source Review/Prevention of Serious Deterioration provisions of the Clean Air Act have served as the basis for a criminal prosecution, so that there are no cases to which the PSR could compare the facts of this case.  Given the unique circumstances of this case and the Rule 11(c)(1)(C) agreement stipulating a specific sentence, the Court is of the view that it can meaningfully exercise its sentencing authority without a PSR.

Order, *United States v. Tyler Pipe Co.*, No. 6:05-0029 (E.D. Tex. Mar. 22, 2005).

This court has "take[n] heed that the victims have not been accorded their full rights under the CVRA and [has] carefully consider[ed] their objections and briefs . . . in deciding whether the plea agreement should be accepted."  (Docket Entry No. 79 at 8).  This court has ensured that the victims have had ample opportunity to participate in the sentencing process and to have their views and information fully considered.

This court has also considered whether, had the victims conferred with the government on the proposed plea terms before the agreement was executed, no plea or a different plea would have resulted.  The record does not support such a conclusion.  Instead, the record shows that the victims had extensive communications with the prosecutors before the plea's execution.  During that period, the victims provided the government with much of the information that they later submitted to this court in support of their argument that the proposed plea should be rejected.  At the October 7, 2008 hearing before this court, counsel for some of the victims described how the victims had "worked very close[ly] with the Department of Justice to try to get them the information that [they] were deriving from the civil litigation," (Docket Entry No. 120 at 149–150), as follows:

> THE COURT: Are you saying that before the plea was announced, that you were in close communication and giving information to the Department of Justice?
>
> MR. COON: Yes, ma'am. . . . On a regular basis, their attorneys would come in, first from Houston, later from Washington.  We were closer to the documents that were being produced in the discovery.  We started – we finally cabbaged on to the TCEQ issues and understood better the regulatory compliance issues that were not what we were originally looking for in the case.  But as we evolved more into the litigation, we understood better these

noncompliance issues with TCEQ and the emissions problems they were having there, including –

THE COURT: And you took those to the Department?

MR. COON: And we took those and we shared that information –

THE COURT: Did Mr. Sawyer's report get to the Department?

MR. COON: Mr. Sawyer's report got to –

THE COURT: Before the plea was announced?

MR. COON: Yes, ma'am.  His – all of his opinions and all the expert information we had was regularly provided to the DOJ . . . .

(*Id.* at 150–151).  The government has confirmed that it "remained in contact with counsel for the victims through the investigation [and] benefitted from their cooperation with the investigation." (Docket Entry No. 63 at 5).  Despite knowing the victims' criticisms about BP Products's compliance with the OSHA Settlement Agreement, the government agreed with BP Products that compliance with this Agreement, along with the TCEQ Agreed Order, should be included in the probation terms of the proposed plea.  The record shows no basis to conclude that had the conferral right been honored before the plea agreement was executed, the plea terms or probation conditions would have been different.

The victims argue that had the conferral right been met, they would have been able to provide the government with more extensive information as to their losses.  But the victims argued that the conferral right would have been met by procedures tailored to the number of victims and the stage of the government's negotiations with BP Products.  (Docket Entry No.

131

79 at 6).  The victims suggested that such procedures could have included a town-hall meeting or a meeting with a few of the victims' counsel.  Such procedures would not allow the kind of detailed information-gathering that obtaining individual victims' losses would require. Moreover, this court put into place a procedure that *did* give the victims and their counsel an opportunity to provide detailed loss information.  The results showed that obtaining and analyzing the loss information would be difficult and time-consuming.  Again, the record shows no basis to conclude that had the conferral right been honored, the result would have been different.

The purpose of the conferral right is not to give the victims a right to approve or disapprove a proposed plea in advance or to participate in the plea negotiations.  The purpose of the reasonable right to confer is for victims to provide information to the government, obtain information from the government, and to form and express their views to the government and court.  *See In re W.R. Huff Asset Management Co., L.L.C.*, 409 F.3d at 564*; United States v. Sacane*, No. 3:05-cr-325, 2007 WL 951666, at *2 (D. Conn. Mar. 28, 2007); *United States v. Ingrassia*, No. Cr. 04-0455, 2005 WL 2875220, at *17 n.11 (E.D.N.Y. Sept. 7, 2005); 150 Cong. Rec. S4260, S4262 (daily ed. Apr. 22, 2004) (statement of Sen. Feinstein).  The government was in extensive and regular contact with the victims  before the plea agreement. The records that the government obtained from the victims during that time had much of the information that the victims assert would have affected the terms of the plea had they been able to confer with the government before the plea agreement was executed.  The government's

extensive investigation allowed it to learn much from the victims before the plea agreement was negotiated and executed.

The Fifth Circuit held that "the victims should have been notified of the ongoing plea discussions and should have been allowed to communicate meaningfully with the government, personally or through counsel, before a deal was struck." (Docket Entry No. 79 at 7). Although "these victims should have been heard at an earlier stage," this court has "fully consider[ed] the victims' objections and concerns in deciding whether the plea agreement should be accepted." (*Id.* at 8). This court has taken extensive steps, including over the parties' objections, to ensure that the CVRA violation did not in any way diminish the force or effect of the victims' objections. This court concludes that the CVRA violation does not provide a basis to reject the proposed plea.

## IX.   Whether To Accept or Reject the Proposed Plea

In reviewing the victims' objections, this court has analyzed many aspects of the proposed plea terms. Those terms must be analyzed under 18 U.S.C. §§ 3553, 3563, and 3572.

Section 3553 requires, in relevant part, that in assessing the appropriateness of a sentence, a court must consider the history and characteristics of the defendant, the seriousness of the offense, whether the proposed sentence is an adequate deterrent to future criminal conduct, and whether the sentence protects the public. Section 3572(a) provides, in relevant part, that in determining a fine, the court should consider the defendant's "income, earning capacity, and financial resources," "the burden that the fine will impose upon the defendant," "any pecuniary loss inflicted upon others as a result of the offense," and "whether the

133

defendant can pass on to consumers or other persons the expense of the fine." Section 3572(a) also provides that the court should consider "the organization's role in the offense," "civil obligations arising from the organization's conduct," "any nonpecuniary loss caused or threatened by the offense," and "any prior civil or criminal misconduct by the organization."

The seriousness of the offense cannot be overstated. Fifteen people died and over 170 were injured. The explosion would not have occurred had BP Products complied with the requirements of 40 C.F.R. §§ 68.73(b) and 68.87(b)(2) in testing and operating the raffinate splitter in the ISOM unit and in warning the contractors in the trailers before the March 23, 2005 startup of the splitter. The record also shows that BP Products has a history of inadequate and deficient process safety management, at the Texas City refinery and elsewhere. The CSB concluded that several of the causes that contributed to the explosion had been identified in previous audits at the refinery but not remedied. (Docket Entry No. 8, Ex. 2 at 138–140). In 2006, OSHA fined BP Products an additional $2.4 million for violations at its Oregon, Ohio refinery that were similar to those involved in the March 2005 explosion, including "locating people in vulnerable buildings among the processing units; failing to correct de-pressurization deficiencies; failing to correct deficiencies with gas monitors; and failing to prevent the use of non-approved electrical equipment in locations in which hazardous concentrations of flammable gases or vapors may exist."[51]

---

[51]     U.S. Dep't of Labor, OSHA, Office of Commc'ns, *OSHA National News Release: OSHA Fines BP $2.4 Million for Safety and Health Violations* (Apr. 25, 2006), *available at* http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=NEWS_RELEASES&p_id=12170 (last visited March 6, 2009).

Having considered the entire record, this court concludes that the sentence addresses the factors set out in §§ 3553 and 3572(a). BP Products is pleading guilty to a felony violation, one of the first under the RMP regulations of the Clean Air Act. There is no basis to conclude that a higher offense could have been charged. The $50 million fine is the largest criminal fine assessed for a violation of the Clean Air Act regulations, and appears to be the largest criminal fine imposed for a fatal industrial accident. (Docket Entry No. 12 at 2). The $50 million fine is derived from a reasonable estimate of the gross pecuniary gain that BP Products derived from the criminal offense. There is no basis to find the fine unreasonable or inadequate because it is not based on a higher gross pecuniary gain. The complex causation issues that would attend any effort to determine, absent the plea, what cost savings or additional revenue BP Products derived from the offense, including relevant criminal conduct, would present a significant likelihood of triggering the § 3571(d) complexity exception and result in a maximum fine of $500,000.

Nor is there any basis to find the fine unreasonable or inadequate because it is not based on the gross pecuniary losses resulting from the offense. Because of the number of victims, the complexity of the causation and related issues, and the disputed nature of the future losses, attempting to base the fine on the victims' losses would trigger the complexity exception to § 3571(d) and result in a fine of $500,000. The terms of probation, which subject the Texas City refinery to specific steps to meet regulatory requirements and a broad program of safety measures and enhancements, will also have a deterrent effect and protect the public interest.

It is appropriate in considering the adequacy of the fine to examine the other financial consequences of the criminal conduct and other conduct that caused the explosion.  In *United States v. The Purdue Frederick Co.*, 495 F. Supp. 2d 569, 572 (W.D. Va. 2007), for example, the court concluded that a $500,000 criminal fine was adequate after examining other civil and state penalties to which the defendants were subject, which totaled over $600 million.  The crime was misbranding of prescription opioid medication, in violation of the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331(a), 333(a)(2).  The penalties included over $100 million to federal government healthcare agencies under a civil settlement agreement; almost $60 million in escrow for states that elected to settle claims; over $3.4 million to Medicaid programs for improperly calculated rebates; $20 million to the state of Virginia for a prescription monitoring program; $5.3 million to the Virginia Medicaid Fraud Control Unit's Program Income Fund; $276.1 million in forfeiture to the United States; $130 million in private settlements; and over $4.6 million in monitoring costs under an agreement with the United States Department of Health and Human Services.  *Id.*  In *United States v. Huber*, 462 F.3d at 952–53, the Eighth Circuit affirmed the district court's refusal to fine the defendants after concluding that a $3.9 million forfeiture award "adequately covered the ground that a fine would cover."  In *In re the Exxon Valdez*, 296 F. Supp. 2d at 1079 n.111, the court explained that it had accepted a plea agreement that allocated a significantly larger portion of the penalty to restitution than to a fine because it was "far preferable for Exxon to be sanctioned by means of a restitution obligation which would be employed for restoration of the environment than by a larger fine which would not be so employed."  *See also United States v. Anderson*, 267 F. App'x 847, 849–850 (11th

Cir. 2008) (unpublished) (affirming a sentence of three years of probation and six months of home detention, despite the fact that the Guidelines called for a sentence of 18 to 24 months of imprisonment, because the defendant had made full restitution of $134,999.40 plus $16,844.75 in interest and had paid a civil penalty of $134,999.40 and $2,874.99 in interest to the SEC before he learned that criminal charges would be brought against him; the court concluded that the prompt payment "indicated his genuine intent to make amends for his wrongdoing."); *cf. United States v. Corrado*, 227 F.3d 543, 558 (6th Cir. 2000) (rejecting as inadequate fines imposed in lieu of restitution because "[n]either of these fines was adequate [in amount] to take the place of the forfeitures sought").

BP Products has paid over $1.6 billion to the victims to settle approximately 4,000 civil lawsuits arising from the explosion.  BP Products has also paid almost $21.7 million to OSHA and the TCEQ in fines.  BP Products will pay an additional $265 million to comply with the OSHA Settlement Agreement and the TCEQ Agreed Order.  These additional penalties may be considered in assessing the adequacy of a fine.  The plea agreement allocates a substantially larger proportion of the financial consequences from the explosion to civil judgments and regulatory compliance measures rather than the criminal fine.

The court must also take into account "the exigencies of plea bargaining from the government's point of view," including "limited resources and uncertainty of result."  *United States v. Bundy*, 359 F. Supp. 2d at 538.  The issues in this case present significant risks that absent the plea, the government would not be able to prevail or would only obtain a $500,000

fine.  These risks have been considered in weighing the adequacy and reasonableness of the proposed plea terms.

Considering the specific facts and circumstances presented in this voluminous record, including the victims' objections, this court finds that the proposed plea is a reasonable disposition given the available alternatives, the risks they present, and the limits inherent in the statutes that the government can use to obtain and punish a felony conviction for conduct leading to an industrial accident.

**X.    Conclusion**

This court accepts the plea agreement.

SIGNED on March 12, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge